Nos. 17-7035 (Lead Case), 17-7039

In the

# United States Court of Appeals
# for the District of Columbia Circuit

———————————

AMERICAN SOCIETY FOR TESTING AND MATERIALS;
NATIONAL FIRE PROTECTION ASSOCIATION, INC.; and
AMERICAN SOCIETY OF HEATING, REFRIGERATING,
AND AIR-CONDITIONING ENGINEERS, INC.,

*Plaintiffs-Appellees,*

v.

PUBLIC.RESOURCE.ORG, INC.,

*Defendant-Appellant.*

*(Full caption on inside cover)*

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————

**BRIEF OF SIXTY-TWO LIBRARY ASSOCIATIONS,
NONPROFIT ORGANIZATIONS, LEGAL TECHNOLOGY COMPANIES,
FORMER SENIOR GOVERNMENT OFFICIALS, LIBRARIANS,
INNOVATORS, AND PROFESSORS OF LAW
AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT-APPELLANT**

———————————

CHARLES DUAN
  *Counsel of Record*
MEREDITH F. ROSE
PUBLIC KNOWLEDGE
1818 N Street NW, Suite 410
Washington, DC 20036
(202) 861-0020
cduan@publicknowledge.org

*Counsel for amici curiae*

Rev. b06140c4

AMERICAN SOCIETY FOR TESTING AND MATERIALS;
NATIONAL FIRE PROTECTION ASSOCIATION, INC.; AND
AMERICAN SOCIETY OF HEATING, REFRIGERATING,
AND AIR-CONDITIONING ENGINEERS, INC.,

*Plaintiffs–Appellees,*

v.

PUBLIC.RESOURCE.ORG, INC.,

*Defendant-Appellant.*

_____

AMERICAN EDUCATIONAL RESEARCH ASSOCIATION, INC.;
AMERICAN PSYCHOLOGICAL ASSOCIATION, INC.; AND
NATIONAL COUNCIL ON MEASUREMENT IN EDUCATION, INC.,

*Plaintiffs–Appellees,*

v.

PUBLIC.RESOURCE.ORG, INC.,

*Defendant-Appellant,*

AMERICAN SOCIETY FOR TESTING AND MATERIALS;
NATIONAL FIRE PROTECTION ASSOCIATION, INC.; AND
AMERICAN SOCIETY OF HEATING, REFRIGERATING,
AND AIR-CONDITIONING ENGINEERS, INC.,

*Intervenors-Appellees.*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), *amici curiae* certify as follows.

**(A)    Parties and Amici.**  Except for the following, all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the Defendant-Appellant's brief filed August 28, 2017.

American Association of Law Libraries

American Library Association

Askin, Jonathan

Association of College and Research Libraries

Association of Research Libraries

Bailey, Lila

Bridy, Annemarie

Browner, Carol M.

Butler, Brandon

Carrier, Michael A.

Carroll, Michael W.

Chon, Margaret

Claybrook, Joan

Courtney, Kyle K.

Cross, Will

DelRosso, Jim

Dygert, Amy Vanderlyke

Fastcase, Inc.

Felten, Edward

Free Law Project

Ghosh, Shubha

Gibson, James

Hansen, David

James, Bruce R.

Judicata, Inc.

Justia Inc.

Katz, Ariel

Keele, Benjamin J.

Kraft, Seamus

Lee, Sarah Hooke

Levine, Kendra K.

Liebesman, Yvette Joy

Lincoln Network

Love, Brian

Macgillivray, Alexander

McJohn, Stephen

McLaughlin, Andrew

Michaels, David

Mosley, Raymond A.

Ochoa, Tyler T.

Olson, David

OpenGov Foundation

Patil, DJ

Perzanowski, Aaron

Podesta, John D.

Post, David G.

Public Knowledge

Re:Create Coalition

Reid, Blake E.

R Street Institute

Russell, Judith C.

Silbey, Jessica

Skalbeck, Roger V.

Smith, Megan J.

Sorkin, David E.

Sunlight Foundation

VanRoekel, Steven

Walker, Robert

Wheeler, Ronald E.

Williams, Beth

Wong, Nicole

Wu, Michelle M.

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1(a), the *amici* represent that they have no parent corporations and that no publicly-held company has a 10% or greater ownership interest in them.

The *amici* are library associations, nonprofit organizations, legal technology companies, former government officials, librarians, technologists, and professors of law.

**(B)   Rulings Under Review.**  References to the rulings at issue appear in the Defendant-Appellant's brief filed August 28, 2017.

**(C)   Related Cases.**  To the knowledge of counsel, other than any cases listed in the Defendant-Appellant's brief filed August 28, 2017, the case on review was not previously before this Court or any other court, and there are no other related cases currently pending in this Court or in any other court.

## STATEMENT ON CONSENT TO FILE AND SEPARATE BRIEFING, AND DISCLOSURE OF RELATIONSHIPS WITH PARTIES AND COUNSEL

Pursuant to Federal Rule of Appellate Procedure 29(a), all parties received appropriate notice of and consented to the filing of this brief. Pursuant to Rule 29(c)(5), no counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of the brief. No person or entity, other than *amici*, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief.

Although not required to do so, *amici* further disclose the following relationships with Defendant-Appellant Public.Resource.Org and its counsel, in the interest of candor. Officers of Fastcase.com, Inc. and Justia Inc. are members of the Board of Directors of Public Resource. Edward Felten was previously on the Board of Directors and advisory board of Public Resource's counsel the Electronic Frontier Foundation (EFF). Lila Bailey was formerly an intern at EFF. Additionally, the Re:Create Coalition includes EFF as a member. None of the aforementioned *amici* have contributed to the content of this brief.

This brief is the lead *amicus* brief in support of the Defendant-Appellant, and so pursuant to Circuit Rule 29(d) no statement explaining the need for separate briefing is required. Counsel endeavored to contact every potential *amicus* party and counsel well in advance of the deadline for briefing, and offered an opportu-

nity to join this brief. To the extent that a statement supporting separate briefing is desired, it is that this brief uniquely represents the interests of the public and consumers, and no other *amici* are known to intend to file a brief on behalf of that particular position.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES . . . . . .  i

STATEMENT ON CONSENT TO FILE AND SEPARATE BRIEFING, AND
DISCLOSURE OF RELATIONSHIPS WITH PARTIES AND COUNSEL  . . . .  v

TABLE OF AUTHORITIES  . . . . . . . . . . . . . . . . . . . . . . .  viii

INTEREST OF *AMICI CURIAE*  . . . . . . . . . . . . . . . . . . . . .  1

INTRODUCTION AND SUMMARY OF ARGUMENT . . . . . . . . . . . . .  2

ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

I.   Access to the Text of the Law Advances Practical Interests of Vital
     National Importance  . . . . . . . . . . . . . . . . . . . . . . .  6

     A.   Innovation in the Legal Disciplines Depends, and Has Histori-
          cally Depended, on a Right of Access to the Text of the Law  . . . .  6

     B.   Exclusive Rights in the Law Can Foster Discrimination and Bias,
          a Serious Concern for Future Algorithmic Law . . . . . . . . . . . 10

II.  Access to the Text of the Law Is a Fundamental Right and Important
     National Interest, Superior to Private Copyrights  . . . . . . . . . . . 15

     A.   The Fundamental Importance of Access to the Text of the Law
          Dates Back to the Founding of the Nation  . . . . . . . . . . . . . 15

     B.   The First Amendment Right to Receive Information Guarantees
          Access to the Text of the Law  . . . . . . . . . . . . . . . . . . 18

III. The Standards Organizations Need Not Depend on Copyright Royal-
     ties, and Can Be Fully Compensated by Other Means . . . . . . . . . . 22

IV.  Multiple Doctrines Involved in This Case Can Account for a Funda-
     mental Right of Access to the Text of the Law . . . . . . . . . . . . . 25

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

APPENDIX A: List of Organizational *Amici Curiae* to This Brief . . . . . . . 28

APPENDIX B: List of Individual *Amici Curiae* to This Brief  . . . . . . . . . 32

CERTIFICATE OF COMPLIANCE  . . . . . . . . . . . . . . . . . . . . 39

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . 40

## TABLE OF AUTHORITIES

Authorities upon which this brief primarily relies are indicated with asterisks in the margin.

### CASES

*Alliance for the Mentally Ill v. City of Naperville,*
  923 F. Supp. 1057 (N.D. Ill. 1996) . . . . . . . . . . . . . . . . . . . . . .  10

\* *Banks v. Manchester,*
  128 U.S. 244 (1888) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17, 26

*Building Officials & Code Administrators v. Code Technology, Inc.,*
  628 F.2d 730 (1st Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . .  18, 22

*Campbell v. Acuff-Rose Music, Inc.,*
  510 U.S. 569 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

*Center for National Security Studies v. United States Department of Justice,*
  331 F.3d 918 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . .  20

*Co. Doe v. Public Citizen,*
  749 F.3d 246 (4th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . .  20

*Detroit Free Press v. Ashcroft,*
  303 F.3d 681 (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . .  20

*eBay Inc. v. MercExchange, LLC,*
  547 U.S. 388 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

\* *Eldred v. Ashcroft,*
  537 U.S. 186 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

*Feist Publications, Inc. v. Rural Telephone Service Co.,*
  499 U.S. 340 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

*Folsom v. Marsh,*
  9 F. Cas. 342 (C.C.D. Mass. 1841) (No. 4901) . . . . . . . . . . . . . . .  26

\* *Globe Newspaper Co. v. Superior Court,*
  457 U.S. 596 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . .  19–21

*Hemisphere Building Co. v. Village of Richton Park,*
  171 F.3d 437 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . .  10

*Kendall v. United States ex rel. Stokes,*
  37 U.S. (12 Pet.) 524 (1838) . . . . . . . . . . . . . . . . . . . . .  21

*Loomis v. Wisconsin,*
  137 S. Ct. 2290 (cert. denied June 26, 2017) (mem.) . . . . . . . . .  14

*Martin v. City of Struthers,*
  319 U.S. 141 (1943) . . . . . . . . . . . . . . . . . . . . . . . . .  18

*Matthew Bender & Co. v. West Publishing Co.,*
  158 F.3d 693 (1998) . . . . . . . . . . . . . . . . . . . . . . . . .  8

*Mills v. Alabama,*
  384 U.S. 214 (1966) . . . . . . . . . . . . . . . . . . . . . . . . .  21

*Nash v. Lathrop,*
  142 Mass. 29 (1886) . . . . . . . . . . . . . . . . . . . . . . . . .  17

*Nevada Fair Housing Center, Inc. v. Clark County,*
  565 F. Supp. 2d 1178 (D. Nev. 2008) . . . . . . . . . . . . . . . . .  11

*New York Civil Liberties Union v. New York City Transit Authority,*
  684 F.3d 286 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . .  20

*North Jersey Media Group v. Ashcroft,*
  308 F.3d 198 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . .  20

*Press-Enterprise Co. v. Superior Court,*
  464 U.S. 501 (1984) . . . . . . . . . . . . . . . . . . . . . . . . .  19

*Press-Enterprise Co. v. Superior Court,*
  478 U.S. 1 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . .  19

* *Richmond Newspapers, Inc. v. Virginia,*
  448 U.S. 555 (1980) . . . . . . . . . . . . . . . . . . . . . . . . .  19

*Salinger v. Random House, Inc.,*
  811 F.2d 90 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . .  14

*Sharif ex rel. Salahuddin v. New York State Education Department,*
709 F. Supp. 345 (S.D.N.Y. 1989) . . . . . . . . . . . . . . . . . . . 11

*Stanley v. Georgia,*
394 U.S. 557 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . 18

*State v. Loomis,*
2016 WI 68 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Thornhill v. Alabama,*
310 U.S. 88 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Twentieth Century Music Corp. v. Aiken,*
422 U.S. 151 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . 24

\* *Veeck v. Southern Building Code Congress International, Inc.,*
293 F.3d 791 (5th Cir. 2002) . . . . . . . . . . . . . . . . . 22, 26–27

*Washington Post v. Robinson,*
935 F.2d 282 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . 20

\* *West Publishing Co. v. Mead Data Central, Inc.,*
799 F.2d 1219 (8th Cir. 1986) . . . . . . . . . . . . . . . . . 7–8, 10

\* *Wheaton v. Peters,*
33 U.S. (8 Pet.) 591 (1834) . . . . . . . . . . . . . . . . . 17, 26–27

*Yale University v. Connecticut State Codes & Standards Committee,*
No. HHB-CV17-6038904-S (Conn. Super. Ct. filed June 23, 2017) . . . . . 11

*Yoder v. Town of Morristown,*
No. 7:09-cv-7 (N.D.N.Y. filed Jan. 6, 2009) . . . . . . . . . . . . . 11

### Constitutional Provisions and Foundational Documents

The Declaration of Independence (1776) . . . . . . . . . . . . . . . . . . 21

—— para. 6 (1776) . . . . . . . . . . . . . . . . . . . . . . . . 16

\* U.S. Const. amend. 1 . . . . . . . . . . . . . . . . . 4, 11, 15, 18–21, 26

—— amend. 5 . . . . . . . . . . . . . . . . . . . . . . . . . . 18

U.S. Const. amend. 14 . . . . . . . . . . . . . . . . . . . . . 18

**STATUTES**

16 Car. 1, c. 10 (1640) (Eng.), *available at* https://babel.hathitrust.org/cgi/
pt?id=pst.000017915564;view=1up;seq=142 . . . . . . . . . . . . . . . 16

\* 17 U.S.C. § 102(b) . . . . . . . . . . . . . . . . . . . . . . . 25–26

\*  —— § 107 . . . . . . . . . . . . . . . . . . . . . . . . . 25–26

Postal Service Act of 1792, ch. 7, 1 Stat. 232 . . . . . . . . . . . . . . . . 17

Records Act of 1789, ch. 14, 1 Stat. 68 . . . . . . . . . . . . . . . . . . 17

**OTHER SOURCES**

Am. Educ. Research Inst. et al., *Standards for Educational and Psychological
Testing* (1999) . . . . . . . . . . . . . . . . . . . . . . . . . 11

Am. Educ. Research Inst. et al., *Standards for Educational and Psychological
Testing* (2014) . . . . . . . . . . . . . . . . . . . . . . . . . 12

Am. Law Inst., *Annual Report* (2016) . . . . . . . . . . . . . . . . 23–24

Am. Soc'y for Testing & Materials, *Annual Report* (2016), https://www.
astm.org/ABOUT/images/ASTM-AnnualReport-2016.pdf . . . . . . . . 24

Julia Angwin et al., *Machine Bias*, ProPublica (May 23, 2016), https://www.
propublica.org / article / machine - bias - risk - assessments - in - criminal -
sentencing . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Olufunmilayo B. Arewa, *Open Access in a Closed Universe*, 10 Lewis & Clark
L. Rev. 797 (2006) . . . . . . . . . . . . . . . . . . . . . . . . 8

William Blackstone, *Commentaries on the Laws of England* (1765) . . . . . . . 16

Brief for the United States, *Loomis v. Wisconsin*, 137 S. Ct. 2290 (May 23,
2017) (No. 16-6387) (mem.) . . . . . . . . . . . . . . . . . . . . 14

Morris L. Cohen, *An Historical Overview of American Law Publishing*, 31
Int'l J. Legal Info. 168 (2003) . . . . . . . . . . . . . . . . . . . . 7

Complaint, *Yoder v. Town of Morristown*, No. 7:09-cv-7 (N.D.N.Y. Jan. 6, 2009), http://www.becketlaw.org/case/yoder-v-morristown/ . . . . . . . 11

Cassius Dio, *Roman History* (Earnest Cary trans., Harvard Univ. Press 1968) (c. A.D. 222), *available at* https://catalog.hathitrust.org/Record/102073560 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Executive Office of the President, *Big Data: Seizing Opportunities, Preserving Values* (2014), *available at* https://obamawhitehouse.archives.gov/sites/default/files/docs/big_data_privacy_report_5.1.14_final_print.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13–14

George L. Haskins, *Codification of the Law in Colonial Massachusetts*, 30 Ind. L.J. 1 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

H.R. Rep. No. 94-1476 (1976) . . . . . . . . . . . . . . . . . . . . . 25–26

IETF Trust, *Legal Provisions Relating to IETF Documents* (Mar. 25, 2015), http://trustee.ietf.org/docs/IETF-Trust-License-Policy.pdf . . . . . . . 23

Int'l Code Council, *Annual Report* (2015), http://media.iccsafe.org/AnnualReports/2015/2015AnnualReport.pdf . . . . . . . . . . . 22, 24

Richard J. Lazarus, *The (Non)Finality of Supreme Court Opinions*, 128 Harv. L. Rev. 540 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Mark A. Lemley, *Intellectual Property Rights and Standard-Setting Organizations*, 90 Cal. L. Rev. 1898 (2002) . . . . . . . . . . . . . . . . . 23

Letter from James Madison to W.T. Barry (Aug. 4, 1822), *reprinted in* 3 *Letters and Other Writings of James Madison* 276 (1884), *available at* https://catalog.hathitrust.org/Record/006785162 . . . . . . . . . . . . . . . 17

*Letters and Other Writings of James Madison* (1884), *available at* https://catalog.hathitrust.org/Record/006785162 . . . . . . . . . . . . . . . 17

Amanda Levendowski, *How Copyright Law Can Fix Artificial Intelligence's Implicit Bias Problem*, 92 Wash. L. Rev. (forthcoming 2018), https://ssrn.com/abstract=3024938 . . . . . . . . . . . . . . . . . . . . . . . . . 13

Adam Liptak, *Final Word on U.S. Law Isn't: Supreme Court Keeps Editing*, N.Y. Times, May 27, 2014, at A1, https://www.nytimes.com/2014/05/25/us/final-word-on-us-law-isnt-supreme-court-keeps-editing.html . . 12

David Listokin & David B. Hattis, *Building Codes and Housing*, 8 Cityscape No. 1, at 21 (2005), *available at* https://www.huduser.gov/periodicals/cityscpe/vol8num1/ch2.pdf . . . . . . . . . . . . . . . . . . . . . 22

Livy, *Ab Urbe Condita* (B.O. Foster trans., Harvard Univ. Press 1919) (c. 27 B.C.), *available at* https://catalog.hathitrust.org/Record/007114827 . . . . 5

John Locke, *Two Treatises of Government* (5th ed. 1728), *available at* https://catalog.hathitrust.org/Record/009027013 . . . . . . . . . . . . . . . . . 16

Aarian Marshall, *Red Light Cameras May Be Issuing Some Tickets Based on Bogus Math*, Wired (May 1, 2017), https://www.wired.com/2017/05/red-light-cameras-may-issuing-tickets-based-bogus-math/ . . . . . . . . 13

Jay Mathews, *The Bias Question*, The Atlantic (Nov. 2013), https://www.theatlantic.com/magazine/archive/2003/11/the-bias-question/302825/ . 13

Taylor Moore, Ctr. for Democracy & Tech., *Trade Secrets and Algorithms as Barriers to Social Justice* (2017), https://cdt.org/insight/trade-secrets-and-algorithms-as-barriers-to-social-justice/ . . . . . . . . . . . . . 13–14

Jon O. Newman, *Copyright Law and the Protection of Privacy*, 12 Colum.-VLA J.L. & Arts 459 (1988) . . . . . . . . . . . . . . . . . . . . . . . . 14

Patti Ogden, *"Mastering the Lawless Science of Our Law": A History of Legal Citation Indexes*, 85 L. Libr. J. 1 (1993) . . . . . . . . . . . . . . . . . . . 7

L. Ray Patterson & Craig Joyce, *Monopolizing the Law*, 36 UCLA L. Rev. 719 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Petition for Administrative Appeal, *Yale Univ. v. Conn. State Codes & Standards Comm.*, No. HHB-CV17-6038904-S (Conn. Super. Ct. June 23, 2017), *available at* http://civilinquiry.jud.ct.gov/DocumentInquiry/DocumentInquiry.aspx?DocumentNo=12513742 . . . . . . . . . . . . . 11

Arie Poldervaart, *Legislation by Reference—A Statutory Jungle*, 38 Iowa L. Rev. 705 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Mohana Ravindranath, *OpenGov Start-up Company Makes Government Transparency Its Business*, Wash. Post (Feb. 1, 2015), http://wapo.st/1AfIaxo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Phyllis Rosser, Ctr. for Women Policy Studies, *The SAT Gender Gap: Identifying the Causes* (1989), http://files.eric.ed.gov/fulltext/ED311087.pdf . . 11

Basha Rubin, *Legal Tech Startups Have a Short History and a Bright Future*, TechCrunch (Dec. 6, 2014), https://techcrunch.com/2014/12/06/legal-tech-startups-have-a-short-history-and-a-bright-future/ . . . . . . . . . 9

Louis J. Sirico, Jr., *The Federalist and the Lessons of Rome*, 75 Miss. L.J. 431 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

S. Rep. No. 94-473 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Suetonius, *De Vita Caesarum* (J.C. Rolfe trans., William Heinemann 1914) (c. A.D. 120), *available at* https://catalog.hathitrust.org/Record/001182041 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*The Federalist No. 57* (James Madison) . . . . . . . . . . . . . . . . . . . . 17

*The Laws and Liberties of Massachusetts* (Max Farrand ed., Harvard Univ. Press 1929) (1648) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Unif. Law Comm'n, *Annual Report 2015/2016* (2016) . . . . . . . . . . . 23

*W3C Document License*, World Wide Web Consortium (Feb. 1, 2015), https://www.w3.org/Consortium/Legal/2015/doc-license . . . . . . . . . 23

Frederick Parker Walton, *Historical Introduction to the Roman Law* (1903), *available at* https://catalog.hathitrust.org/Record/100326077 . . . . . . . . 5

Rebecca Wexler, *Life, Liberty, and Trade Secrets: Intellectual Property in the Criminal Justice System*, 70 Stan. L. Rev. (forthcoming 2018), https://ssrn.com/abstract=2920883 . . . . . . . . . . . . . . . . . . . . . . . . 14

*Works of Jeremy Bentham* (John Bowring ed., 1843), *available at* https://catalog.hathitrust.org/Record/001383956 . . . . . . . . . . . . . . . . . . . 16

## INTEREST OF *AMICI CURIAE*

*Amici curiae* include library associations, nonprofit organizations, legal technology companies, former government officials, technologists, librarians, and professors of law. Though diverse in background, these many *amici* share a common view expressed in this brief: that access to the text of the law is a public value of exceptional importance, a value that copyright can and should accommodate.

*Amici* rely on access to the text of the law for purposes including education, dissemination of knowledge, development of new and innovative technologies, public advocacy, and investigative journalism among others. These purposes ultimately all work toward the larger project of a vibrant national discourse in advancement of the critical project of constitutional self-government.

Counsel thanks Katrina Worsham and Marine Margaryan, both at Public Knowledge, for their contributions to this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

To understand the importance of access to the law, consider that it once saved the Roman Republic. About 451 B.C., in an effort to mollify the commoner *plebs* threatening to secede from the ruling *patricii*, a council prepared a codification of the law. The resulting Twelve Tables of Law would be remembered across history not so much for their content but for being published—"engraved in bronze, and set [] up in a public space."[1] Public exhibition worked to "make it clear that all citizens were equal before the law" and to eliminate "the complaint on the part of the *plebs*, that the law was an affair of mystery."[2]

A single precept should guide the present case: The right to access the text of the law—the words that define duties carrying the force of government power—is of categorical importance. That right prevented class war in Rome, it laid the foundations for modern representative government, and it ensures basic liberties of free speech and due process today.

Yet it is a right ignored by the appellees, standards organizations who lobby to have their model codes adopted into law, and then assert copyright exclusivities to place artificial limits on access to those now-enforceable (though often outdated) codes. If successful, those organizations would possess sweeping powers to charge tolls for access to the law, rendering the law an affair of mystery to those unable to pay.

This Court should reject the standard organizations' claims to private control over the text of the law. It should uphold the right of the public to access that law freely, a right of ancient origin and fundamental importance. The decision of the district court to the contrary should be reversed.

1.  Full access to the text of the law has practical effects that confer societal benefits of signal importance. Two of these effects are treated in detail.

First, access to the text of the law begets innovation. Historical freedom to reprint and use the words of the law engendered a uniquely American tradition of creative tools, such as statutory compilations and case citators. These and more advanced modern tools depend on access to the law.

Second, the right of access has been vital to uncovering biases and implicit discrimination in legal rules. Laws often have unexpected racial or gender biases. Oversight by reporters and the public is essential to rooting out these discriminatory effects, and access to the law is essential to that oversight.

2.  Given these important practical benefits, it is unsurprising that the legal doctrine treats access to the law as a fundamental right and important national interest. Access to the law was essential to the system of self-governance that the Framers constructed. Their historical inspirations (including the Roman Republic), writings, and legislative acts suggest that access to the law was—and is still—a basic element of republicanism.

Additionally, unrestricted access to the law is a constitutional right. The First Amendment guarantees a right to receive information, including certain government information, and laws in force fall squarely within that category of information to which access is guaranteed.

3.    Certainly the standards organizations' work is valuable and merits compensation, but there are other, more appropriate ways for them to receive it. A review of other model code and technical standards developers shows that, even without copyright royalties, those developers are successful and well-compensated in a number of ways, including state appropriations, member contributions, volunteer efforts, and sale of complementary goods and services. These opportunities are substantial compensation and, more importantly, do not curtail the public's fundamental rights.

4.    The fundamental right of access to the law plays into multiple issues in this appeal. The doctrines of copyrightability and fair use can accommodate, and have accommodated, that right of access. So too can the preliminary injunction standard, and in particular the public interest factor of that standard, effectuate the right of access.

The key, though, is that this Court not allow private entities to diminish any citizen's right to access the law. Another Roman anecdote illustrates why.

The emperor Gaius (popularly Caligula) sought to finance his lavish lifestyle with oppressive taxes. When the people demanded to have the law behind the taxes posted, the emperor complied, but only "in exceedingly small letters on a tablet which he then hung up in a high place."[3] The historian Suetonius noted the effect of this charade: Like the standards organizations in this case, Gaius sought "to prevent the making of a copy."[4]

Whether they be high walls or paywalls, artificial limits on the people's right to access and copy the text of the law are contrary to the essence of government by the people. Copyright law does accommodate, and should accommodate, this right underpinning an accountable democracy.

---

[1]3 Livy, *Ab Urbe Condita* ¶¶ 33–34, 57, at 109–13, 195 (B.O. Foster trans., Harvard Univ. Press 1919) (c. 27 B.C.), *available online.* Locations of authorities available online are shown in the Table of Authorities.

[2]Frederick Parker Walton, *Historical Introduction to the Roman Law* 109 (1903), *available online.*

[3]59 Cassius Dio, *Roman History* ¶ 28, at 357 (Earnest Cary trans., Harvard Univ. Press 1968) (c. A.D. 222), *available online.*

[4]4 Suetonius, *De Vita Caesarum* ¶ 41, at 469 (J.C. Rolfe trans., William Heinemann 1914) (c. A.D. 120), *available online.*

5

## ARGUMENT

### I. Access to the Text of the Law Advances Practical Interests of Vital National Importance

The practical effects of access to the law are of singular importance to democratic values and societal interests. Access to the law has at least two key effects discussed below: first, on innovation in legal research technologies; and second, on elimination of discrimination and bias in the law.

### A. Innovation in the Legal Disciplines Depends, and Has Historically Depended, on a Right of Access to the Text of the Law

Access to the text of the law underlies important advances in the technology of legal research. Indeed, the history of development of legal research tools, starting from the colonies and leading up to the present day, reveals both how significant American innovation in the tools of the law has been, and how erroneously overbroad interpretations of copyright can undercut—and have undercut—the path of that innovation.

1.    The people of the United States have been innovators in the practice of law, even before the states were united. In 1648, the Massachusetts Bay Colony published a comprehensive legal code, including constitutional provisions for governance, relevant English law, colonial statutes, and even a few new ideas

not found in the extant law.[5] This 1648 code, hailed as "the first 'modern' code of the modern period," was novel in its completeness and organization.[6] (Notably, the 1648 code included Nathaniel Ward's 1641 proposal, *The Body of Liberties*—the incorporation of a model code into law.)

The 19th century saw extensive American efforts to tame the rapidly growing body of case law.  During that period, lawyers created indexes, digests, citators, and other tools, the most famous of which is *Shepard's Citations*, the origin of the word "Shepardizing."[7] Indexes and citators were game-changers in the legal profession, allowing courts and lawyers to analyze precedent with greater precision than ever before.

2.   But all of this codifying, digesting, and indexing depended on copying: organizing texts into volumes, borrowing quotes of text, and especially duplicating page numbers of case reporters.  Overbroad assertions of copyright can put this innovation at risk, as the following example shows.

West Publishing prepares the books of the National Reporter System, the page citations of which are the *sine qua non* of legal citation.  In *West Publish-*

---

[5] *See The Laws and Liberties of Massachusetts* (Max Farrand ed., Harvard Univ. Press 1929) (1648); George L. Haskins, *Codification of the Law in Colonial Massachusetts*, 30 Ind. L.J. 1, 3–5 (1954).

[6] Haskins, *supra* note 5, at 3.

[7] *See* Patti Ogden, *"Mastering the Lawless Science of Our Law": A History of Legal Citation Indexes*, 85 L. Libr. J. 1, 5, 18–36 (1993).  *See generally* Morris L. Cohen, *An Historical Overview of American Law Publishing*, 31 Int'l J. Legal Info. 168 (2003) (summarizing history of American innovation in legal publishing).

*ing Co. v. Mead Data Central, Inc.*, the computer service LEXIS sought to operate a database of legal cases, including "star pagination" corresponding to the page numbers of West's reporters. 799 F.2d 1219, 1222 (8th Cir. 1986). West charged that LEXIS's inclusion of star pagination was copyright infringement; the Eighth Circuit agreed and affirmed a preliminary injunction. *See id.* at 1229.

*West Publishing* stifled the development of computer legal research technologies for over a decade. The parties settled, resulting in the Westlaw–LexisNexis duopoly that prevails today.[8] As one scholar noted, copyright in page numbering became a tool that the "incumbents at times use to block new market entry and competitive products."[9]

Twelve years later, the Second Circuit rejected copyright in page numbers, holding the Eighth Circuit's decision overruled by intervening Supreme Court case law. *See Matthew Bender & Co. v. W. Publ'g Co.*, 158 F.3d 693, 708 (1998). By deeming page numbering uncopyrightable, this decision opened the door to a range of legal innovation, some of which is described below.

3.   A brief review of new legal information services developed since *Matthew Bender* reveals how access to the text of the law facilitates innovation—and how copyright can forestall it.

---

[8]*See* L. Ray Patterson & Craig Joyce, *Monopolizing the Law*, 36 UCLA L. Rev. 719, 720 & n.1 (1989).

[9]*See* Olufunmilayo B. Arewa, *Open Access in a Closed Universe*, 10 Lewis & Clark L. Rev. 797, 823 (2006).

Several new services provide databases of case law and statutes, offering better interfaces and competing with the dominant Westlaw and LexisNexis. Fastcase, Justia, and Bloomberg Law are examples among many. One service, Judicata, uses natural language processing technologies to understand and color-code the relationships among different cases and statements of law.[10]

Artificial intelligence is also reshaping legal research. The platform Ravel analyzes statutes and case law to find textual similarities and present lawyers with visualizations of trends and connections for answering complex legal research questions. Another company, Casetext, uses machine learning to mine cases, statutes, and litigation documents for useful precedent, reducing days of legal research to seconds.[11]

Online platforms also use the text of the law to connect citizens with government. The OpenGov Foundation offers collaboration tools where individuals can annotate current laws, providing constituents with a voice for communicating with lawmakers.[12] Tools like these bring self-governance into the digital age.

Legal technologies serve a civic purpose of ensuring that the law and lawmaking institutions are accessible, understandable, and accountable. But these

---

[10] *See generally* Basha Rubin, *Legal Tech Startups Have a Short History and a Bright Future*, TechCrunch (Dec. 6, 2014), *available online*.

[11] *See* Rubin, *supra* note 10.

[12] *See* Mohana Ravindranath, *OpenGov Start-up Company Makes Government Transparency Its Business*, Wash. Post (Feb. 1, 2015), *available online*.

technologies depend on the fundamental right to access the words of that law—
to analyze, repackage, summarize, simplify, and republish those words in useful
forms that serve the project of democracy. As *West Publishing* shows, copyright
is a powerful tool that, when misapplied, can hinder that fundamental right of
access, that legal innovation, and ultimately that democratic project.

## B. Exclusive Rights in the Law Can Foster Discrimination and Bias, a Serious Concern for Future Algorithmic Law

Copyright in the text of the law can entrench undesirable discrimination and
bias in the law. Bias in the law is a prominent issue today, and is likely to be
even more prominent in a future of software-based legal determinations—a future
already here. Avoiding such improprieties requires public oversight of the text
of the law, which heightens the importance of access to that text.

1. Laws, especially technically detailed regulations like the model codes at
issue, can have discriminatory effects even when facially neutral. A fire safety
code (promulgated by one appellee standards organization) was held facially
discriminatory against handicapped persons, in violation of federal law. *See
Alliance for the Mentally Ill v. City of Naperville*, 923 F. Supp. 1057, 1073 (N.D.
Ill. 1996).[13] Yale Law School has charged in a lawsuit that the state building

---

[13]An alternate ground of decision in *Alliance for the Mentally Ill* was later dis-
approved in dicta, *see Hemisphere Bldg. Co. v. Vill. of Richton Park*, 171 F.3d 437,
441 (7th Cir. 1999), but the facial discrimination holding continues to be good

code of Connecticut violates gender identity discrimination laws by mandating separate-sex restrooms.[14]  An Amish community argued successfully that local building codes violated religious liberty interests protected by the First Amendment.[15]

 Educational testing standards pose greater concerns, as poorly drawn tests can disfavor classes of test takers by race or gender.[16]  Indeed, the *Standards for Educational and Psychological Testing*, at issue in this case, reveal how difficult and fluid the norms for avoiding bias can be. The 1999 edition recognizes fairness as an important issue but presumes that tests are fair unless "credible research reports that differential item functioning exists across age, gender, racial/ethnic, cultural, disability, and/or linguistic groups."[17]  By contrast, the 2014 edition makes test developers responsible "for minimizing the potential for tests' being affected by . . . linguistic, communicative, cognitive, cultural, physical, or other

---

law, *see Nev. Fair Hous. Ctr., Inc. v. Clark County*, 565 F. Supp. 2d 1178, 1185 (D. Nev. 2008).

   [14]Petition for Administrative Appeal at para. 16, *Yale Univ. v. Conn. State Codes & Standards Comm.*, No. HHB-CV17-6038904-S (Conn. Super. Ct. June 23, 2017), *available online.*

   [15]Complaint at ¶ 11, *Yoder v. Town of Morristown*, No. 7:09-cv-7 (N.D.N.Y. Jan. 6, 2009), *available online.*

   [16]*See, e.g., Sharif ex rel. Salahuddin v. N.Y. State Educ. Dep't*, 709 F. Supp. 345, 355 (S.D.N.Y. 1989) (gender bias of SAT); Phyllis Rosser, Ctr. for Women Policy Studies, *The SAT Gender Gap: Identifying the Causes* (1989), *available online.*

   [17]Am. Educ. Research Inst. et al., *Standards for Educational and Psychological Testing* 81 (1999).

characteristics."[18] The changed burden of proof indicates the difficulty and importance of this fairness issue.

2.  Exclusive rights in the text of the law can interfere with elimination of bias and discrimination under the law.

Copyright raises barriers to access for scholars, journalists, and other members of the interested public who wish to inspect the law for problematic bias. That alone perpetuates latent bias in the law. But more perniciously, copyright can prevent the use of technology to analyze the law and discover improprieties.

Scholars in 2014, for example, used "technological advances" such as "electronic scanning and comparison software programs" to analyze Supreme Court opinions.[19] Their research led to stunning findings about the Court's silent practices of changing its opinions, findings that made the front page of the *New York Times*.[20] If the judicial opinions they analyzed were under copyright, then those scholars might not have been able to do this groundbreaking research.

It is no answer that the standards organizations themselves can root out bias and discrimination in their codes; their first inclination would likely be to reject

---

[18]Am. Educ. Research Inst. et al., *Standards for Educational and Psychological Testing* 64 (2014).

[19]Richard J. Lazarus, *The (Non)Finality of Supreme Court Opinions*, 128 Harv. L. Rev. 540, 588–89, 607 (2014).

[20]*See* Adam Liptak, *Final Word on U.S. Law Isn't: Supreme Court Keeps Editing*, N.Y. Times, May 27, 2014, at A1, *available online.*

and obscure such defects rather than correct them.[21] And the standards organizations simply may lack the breadth of experience to detect hidden discriminatory effects. Public accountability is essential to discovering problems in model codes enacted into law. If the public cannot review those codes without the permission of a copyright owner, then public policy and equality under the law will suffer.

3.    Public oversight to identify bias becomes especially important as new technologies become integrated into the law. Of particular interest is the use of computer algorithms to determine the legal status of individuals, a practice increasingly used in various areas within the justice system, such as criminal sentencing and traffic cameras.[22] Well-known instances of discriminatory bias in these legally determinative systems further highlight the fundamental importance of access to the law.

Multiple times now, computer programs have been shown to exhibit problematic, even potentially unconstitutional, biases in their design or output.[23] When

---

[21]*See, e.g.,* Jay Mathews, *The Bias Question*, The Atlantic (Nov. 2013), *available online* (noting the College Board's repeated efforts to dismiss evidence that the SAT is racially biased).

[22]*See* Taylor Moore, Ctr. for Democracy & Tech., *Trade Secrets and Algorithms as Barriers to Social Justice* 3 (2017), *available online*; Aarian Marshall, *Red Light Cameras May Be Issuing Some Tickets Based on Bogus Math*, Wired (May 1, 2017), *available online.*

[23]*See, e.g.,* Executive Office of the President, *Big Data: Seizing Opportunities, Preserving Values* 51–53 (2014), *available online*; Amanda Levendowski, *How Copyright Law Can Fix Artificial Intelligence's Implicit Bias Problem*, 92 Wash. L. Rev. (forthcoming 2018) (manuscript at 2–13), *available online.*

those programs become part of a legal system, such as a criminal sentencing procedure, both courts and the United States government have recognized that serious due process and equal protection problems arise.[24]

Access to the law has been essential to exposing flaws of bias in these legal systems. Bias in sentencing algorithms, for example, came to light largely through investigative reporting that tested the algorithms.[25] But intellectual property rights, including copyright, can be and have been exploited to limit that access.[26]

Certainly, this present case is not about copyright in legal algorithms, though there are important similarities.[27] But the problems presented by technology-assisted law reiterate the crucial importance of public oversight over those systems that determine the rights and obligations of citizens. Access to the text of the law is the precondition for that public oversight.

---

[24]*See State v. Loomis*, 2016 WI 68, ¶ 63 (2016); Brief for the United States at 12, *Loomis v. Wisconsin*, 137 S. Ct. 2290 (May 23, 2017) (No. 16-6387) (mem.).

[25]*See* Julia Angwin et al., *Machine Bias*, ProPublica (May 23, 2016), *available online*.

[26]*See* Rebecca Wexler, *Life, Liberty, and Trade Secrets: Intellectual Property in the Criminal Justice System*, 70 Stan. L. Rev. (forthcoming 2018), *available online*; Moore, *supra* note 22; *Salinger v. Random House, Inc.*, 811 F.2d 90, 100 (2d Cir. 1987); Jon O. Newman, *Copyright Law and the Protection of Privacy*, 12 Colum.-VLA J.L. & Arts 459 (1988).

[27]Computer algorithms are step-by-step rules for determining a result, not unlike model codes or laws. *See* Executive Office of the President, *supra* note 23, at 46.

## II.  ACCESS TO THE TEXT OF THE LAW IS A FUNDAMENTAL RIGHT AND IMPORTANT NATIONAL INTEREST, SUPERIOR TO PRIVATE COPYRIGHTS

Access to the text of the law is no ordinary interest—it is a fundamental right of basic importance to constitutional government.  The importance of that right may be appraised through two approaches: first, the role of access to the law in the original understanding of the Framers; and second, the place of that right of access within the First Amendment.

### A.  THE FUNDAMENTAL IMPORTANCE OF ACCESS TO THE TEXT OF THE LAW DATES BACK TO THE FOUNDING OF THE NATION

Access to the text of the law undergirds the American system of representative self-government.  The importance of that right is reflected both in the history that informed the Framers and in contemporaneous events.

The importance of access to the text of the law pervades the philosophical and historical foundations upon which American constitutional republicanism was built.  The Framers used the Roman Republic as a model,[28] and thus were aware of how dissemination of the Law of the Twelve Tables ensured class equality and due process. *See supra* p. 2.

Enlightenment philosophy also associated liberty with accessibility of the law.  Locke wrote that the power of government "ought to be exercised by *es-*

---

[28] *See generally* Louis J. Sirico, Jr., *The Federalist and the Lessons of Rome*, 75 Miss. L.J. 431 (2006).

*tablished and promulgated laws*; that both the people may know their duty, and be safe and secure within the limits of the law; and the rulers too kept within their bounds." 2 John Locke, *Two Treatises of Government* § 137, at 236 (5th ed. 1728), *available online*; *see also* 3 *Works of Jeremy Bentham* 205 (John Bowring ed., 1843), *available online* (withholding of the text of the law "would be one of the greatest crimes of governments").

It is likely the Framers were influenced by these traditions favoring access to the law, but it is virtually certain they were fearful of denial of access to the law. They knew how Caligula posted the tax law up high and in small print, to prevent the people from copying it down. *See supra* p. 5. They knew of the Star Chamber, which had "undertaken to punish where no Law doth warrant." 16 Car. 1, c. 10 (1640) (Eng.), *available online*; *see also* 1 William Blackstone, *Commentaries on the Laws of England* *269 (1765). And they knew how King George III, in an effort to interfere with colonial government, "called together Legislative bodies at Places . . . distant from the Depository of their public Records"—an act so outrageous that it formed the fourth grievance of the Declaration of Independence.

Where the text of the law was made public, the Framers would have seen republican liberty; where the words of power were made hard to access, the Framers would have seen tyranny. Indeed, the constitutional plan for Congress depends on accountability to voters—which requires that Congress's laws be ac-

cessible for scrutiny.[29]  As Madison wrote, "a people who mean to be their own Governors, must arm themselves with the power which knowledge gives."[30]

Acts of early Congress also confirm the importance of access to the law. The Records Act of 1789 provided that Congress would publish the text of every bill, whether enacted or not, in at least three newspapers. *See* ch. 14, § 2, 1 Stat. 68. The Postal Service Act of 1792 provided for free mailing of newspapers, to ensure that these important legal texts were distributed throughout the nation. *See* ch. 7, § 21, 1 Stat. 232, 240.

This historical context explains why early courts so easily held that the text of the law could not be subject to copyright. *Wheaton v. Peters* barely dedicated a sentence to the proposition that "the court are unanimously of opinion, that no reporter has or can have any copyright in the written opinions delivered by this court." 33 U.S. (8 Pet.) 591, 668 (1834).  *Nash v. Lathrop* summarily rejected the notion that a legislature could hold copyright in its statutes; "It is its duty to provide for promulgating them." 142 Mass. 29, 35 (1886).  *Banks v. Manchester* more tersely noted the "judicial *consensus*" against copyright in judicial opinions. 128 U.S. 244, 253 (1888).  No extensive discussion was necessary, because the right to access the law was so fundamental to the structure of government.

---

[29]*See, e.g., The Federalist No. 57* (James Madison).

[30]Letter from James Madison to W.T. Barry (Aug. 4, 1822), *reprinted in* 3 *Letters and Other Writings of James Madison* 276 (1884), *available online.*

The historical evidence shows that access to the text of the law has been a fundamental right and important national value, since at least the founding of the United States. The case law confirms that copyright is consistent with this impeccably-pedigreed right. This Court should hold no differently.

## B. The First Amendment Right to Receive Information Guarantees Access to the Text of the Law

In view of this original understanding that access to the law is a premise of constitutional republicanism, it should be unsurprising that a right to access the text of the law is implied in the Constitution. And, indeed, that right is implied in at least two places: the Due Process Clause of the Fifth and Fourteenth Amendments, and the First Amendment. As the due process argument is well-described elsewhere, *see, e.g., Bldg. Officials & Code Adm'rs v. Code Tech., Inc.* ("*BOCA*"), 628 F.2d 730, 734–35 (1st Cir. 1980), the discussion below focuses on the latter right.

1. The Constitution requires unrestricted access to the text of laws based on the established right to receive information under the First Amendment. As the Supreme Court has recognized, freedom of speech not only encompasses the right to distribute information, but also "necessarily protects the right to receive it." *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943); *accord Stanley v. Georgia*, 394 U.S. 557, 564 (1969).

18

The right to receive information extends to certain government information, based on a two-part "experience and logic" test of the work's historical accessibility and importance to government function. In *Globe Newspaper Co. v. Superior Court*, the Supreme Court invalidated a statute requiring courts to exclude the public from certain trials involving minors. *See* 457 U.S. 596, 598–99 & n.1 (1982). Access to criminal trials was guaranteed under the First Amendment, said the Court, because such trials exhibited two elements: First, criminal trials "historically ha[ve] been open"; and second, access "plays a particularly significant role in the functioning of the judicial process and the government as a whole." *Id.* at 605–06. With both elements satisfied, the Court held that access to criminal trials may be blocked only by a state interest satisfying strict scrutiny. *See id.* at 607.[31]

*Globe*'s bipartite test of historical access and importance to government function has been applied in multiple contexts beyond criminal trials. *Press-Enterprise Co. v. Superior Court* used the two-part analysis to find a right to access *voir dire* proceedings. *See* 464 U.S. 501, 505–10 (1984). A second (unrelated) case applied the same "two complementary considerations" to preliminary hearing transcripts. *Press-Enter. Co. v. Superior Court*, 478 U.S. 1, 8 (1986). Furthermore,

---

[31]In *Richmond Newspapers, Inc. v. Virginia*, a majority of the Justices also applied these two elements to reach the same result. *See* 448 U.S. 555, 580 (1980) (plurality op.); *id.* at 598 (Brennan, J., concurring in judgment); *id.* at 601, 604 (Blackmun, J., concurring in judgment).

19

the federal appeals courts have applied the same two-part test to assess rights of access to government documents under the First Amendment. *See, e.g., N.Y. Civil Liberties Union v. N.Y. City Transit Auth.*, 684 F.3d 286, 298–99 (2d Cir. 2011) (transit authority proceedings); *Wash. Post v. Robinson*, 935 F.2d 282, 292 (D.C. Cir. 1991) (plea agreements); *Co. Doe v. Pub. Citizen*, 749 F.3d 246, 265–66 (4th Cir. 2014) (administrative enforcement decision); *N. Jersey Media Group v. Ashcroft*, 308 F.3d 198, 208–09 (3d Cir. 2002) (administrative deportation hearings) (test is "broadly applicable to issues of access to government proceedings"); *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 695–96 (6th Cir. 2002) (same).[32]

Accordingly, where access to a government work both has historical roots and is significant to a government function, restrictions on access implicate the First Amendment and are subject to strict scrutiny.

2.   Access to the text of the law implicates the First Amendment because it satisfies the two-part *Globe* test. Since private copyright interests cannot satisfy strict scrutiny—private profit is not a compelling interest, and copyright is not narrowly tailored to that interest—copyright law cannot act to prevent access to the text of the law.

---

[32]The D.C. Circuit once hypothesized that the test might be limited to the criminal proceedings context, but ultimately did not rely on that hypothesis since the information sought would likely not have satisfied the test anyway. *See Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 935 (D.C. Cir. 2003). Justice O'Connor also once suggested that the test should be limited to criminal proceedings, but no other Justice joined her opinion. *See Globe*, 457 U.S. at 611.

The historical tradition of access to the law is indisputable. Codes of law have been accessible to the public since antiquity, and access to the law in America has been a tradition since the Declaration of Independence. *See* Section II.A *supra* p. 15. Even incorporation by reference within statutes is no novel thing. *See Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 625 (1838); Arie Poldervaart, *Legislation by Reference—A Statutory Jungle*, 38 Iowa L. Rev. 705, 706 & n.4 (1953) (citing legislation by reference from 1285).

Access to the text of the law also plays a significant role in the functioning of government. The constitutional scheme depends on open discourse among citizens of how government should operate—"the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966); *see Globe*, 457 U.S. at 605. But that discourse can be informed and effective only if the public can fully apprise itself of the content of the law. Denying access to the text of the law thus "impairs those opportunities for public education that are essential to effective exercise of the power of correcting error through the processes of popular government." *Thornhill v. Alabama*, 310 U.S. 88, 95 (1940).

The First Amendment ensures that all people have access to the text of the law, so they may participate in that discussion antecedent to self-governance. This is an individual right of the highest order which copyright law must accommodate and has to date accommodated.

21

### III.  The Standards Organizations Need Not Depend on Copyright Royalties, and Can Be Fully Compensated by Other Means

The standards organizations' primary justification for copyright in the text of the law is that they deserve compensation and would fail as businesses without copyright royalties from that text.  The organizations' services certainly merit some amount of compensation.  But copyright royalties are neither necessary nor proper to achieve this end, in view of numerous examples of standards developers who are successful even absent copyright royalties on the text of the law.

Perhaps most instructive is the example of the International Code Council. Formed in 1994 as a merger of three model building code developers,[33] the Council cannot plausibly claim copyright in its codes incorporated into law, as two of its three original members received adverse decisions, one holding model codes uncopyrightable following incorporation and the other strongly suggesting the same.  *See Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 293 F.3d 791 (5th Cir. 2002); *BOCA*, 628 F.2d 730.  Nevertheless, the Council is profitable: In 2015, it had revenues of $23 million in sales and $37 million in program services, including consulting, certification, and training.[34]  Contrary to the prophecies of the standards organizations in this case, judicial declarations against copyright in legally binding text do not make a dent in model code developers' ultimate success.

---

[33]*See* David Listokin & David B. Hattis, *Building Codes and Housing*, 8 Cityscape No. 1, at 21, 27 (2005), *available online.*

[34]*See* Int'l Code Council, *Annual Report* 52 (2015), *available online.*

Two more examples are the Uniform Law Commission and the American Law Institute, who author among other things the Model Penal Code and Uniform Commercial Code. Copyright effectively cannot protect those codes because they are bodily incorporated into numerous states' laws. Also notable are Internet technology standards, generally available at absolutely no cost.[35]

All these model code and standards developers succeed without copyright royalties based on the text of the law, because they have at least three alternate avenues for obtaining funds and resources. First, they enjoy immense reputation benefits from having their model codes adopted into law, which translates into top talent donating free time and effort.[36]

Second, they receive charitable support from governments, foundations, and members.[37] Members will seek to join because of the opportunity to draw standards toward their self-interests.[38] A builder, for example, enjoys great advantage when its own practices are adopted into a model code, and even more advantage when that code is made law.

---

[35] *See* IETF Trust, *Legal Provisions Relating to IETF Documents* (Mar. 25, 2015), *available online*; *W3C Document License*, World Wide Web Consortium (Feb. 1, 2015), *available online.*

[36] *See* Unif. Law Comm'n, *Annual Report 2015/2016*, at 9 (2016).

[37] *See* Unif. Law Comm'n, *supra* note 36, at 9; Am. Law Inst., *Annual Report* 34 (2016).

[38] *See* Mark A. Lemley, *Intellectual Property Rights and Standard-Setting Organizations*, 90 Cal. L. Rev. 1898, 1896–97 (2002).

Third, and perhaps most importantly, standards bodies offer value-added complementary goods such as commentaries, education, training, consulting, and certification.[39] Complementary goods are a direct profit route for standards organizations. Also, member companies can often exploit their inside knowledge and connection with the standard to offer complementary goods and services.

These paths to profit can sustain the business of model code development, without imposing the negative externality of cutting off individuals' right to access the law. There is no reason why the appellee standards organizations in this case cannot enjoy these profit opportunities as well—and indeed, they already do.[40]

Copyright law has always entailed a balance between adequately rewarding authors and promoting greater goals; "private motivation must ultimately serve . . . the general public good." *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975). Where the standards organizations can be and already are well-compensated through contributions, memberships, prestige, and complementary goods, the correct balance is in favor of the general public good of access to the text of the law.

---

[39]*See* Am. Law Inst., *supra* note 37, at 23, 28; Int'l Code Council, *supra* note 34, at 12, 15–17, 21–27.

[40]*See, e.g.,* Am. Soc'y for Testing & Materials, *Annual Report* 29 (2016), *available online* (noting multiple revenue streams).

## IV. Multiple Doctrines Involved in This Case Can Account for a Fundamental Right of Access to the Text of the Law

The fundamental right of access to the text of the law can be applied to at least three doctrines involved on appeal: copyrightability of the model codes, fair use in redistributing them, and the public interest factor for injunctive relief.

Regarding injunctive relief, the district court's decision must be evaluated under the four-factor test of *eBay Inc. v. MercExchange, LLC*, the last factor of which is whether "the public interest would not be disserved by a permanent injunction." 547 U.S. 388, 391 (2006). Here, the effect of an injunction is to delete free copies of the text of enforceable law from the Internet, forcing at least some citizens to have to pay to access the law where they previously did not have to do so. That effect is a substantial diminishment of an important individual right. The district court's grant of an injunction thus should at a minimum be vacated to allow the court to consider the weight of that individual right.

More directly, the doctrines of copyrightable subject matter under 17 U.S.C. § 102(b) and fair use under 17 U.S.C. § 107 account for the right of access to the law. Both of these copyright statutes are merely statutory recognition of prior judge-made law.[41] As a result, they incorporate the prior judicial decisions

---

[41] On § 102(b), *see Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 355–56 (1991); H.R. Rep. No. 94-1476, at 57 (1976) (§ 102(b) "in no way enlarges or

against copyright in statements of the law, such as *Banks* and *Wheaton*. This is why, for example, the Fifth Circuit interpreted § 102(b) not literally but in view of older Supreme Court cases, holding that those older cases (such as *Banks* and *Wheaton*) precluded copyright in model codes incorporated into law. *See Veeck*, 293 F.3d at 795–800.

Copyrightable subject matter and fair use furthermore accommodate the right of access because the Supreme Court has said that they do. *Eldred v. Ashcroft* held that the copyrightability and fair use doctrines are "built-in First Amendment accommodations." 537 U.S. 186, 219 (2003). Since the First Amendment guarantees a right to access the law, *see* Section II.B *supra* p. 18, *Eldred*'s instruction would go unmet if neither the copyrightability doctrine nor fair use accommodated that right.

The standards organizations' arguments have largely relied on cases not specifically contemplating statutes or other edicts of law. But these arguments fail to account for the fact that judicial decisions on copyright have always treated

---

contracts the scope of copyright protection under the present law"); S. Rep. No. 94-473, at 54 (1976).

On § 107, *see Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994) (Congress "intended that courts continue the common-law tradition of fair use adjudication"); H.R. Rep. No. 94-1476, *supra*, at 66 (§ 107 was intended "to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way"); S. Rep. No. 94-473, *supra*, at 65; *see also Folsom v. Marsh*, 9 F. Cas. 342, 348–49 (C.C.D. Mass. 1841) (No. 4901) (synthesizing English cases to develop early fair use standard).

the text of the law as distinct from other creative works. Where copyright cases from *Wheaton* to *Veeck* have dealt directly with texts of the law, they have consistently followed the same guide stars, the guide stars by which this Court should navigate this case: that access to the text of the law is a right of fundamental importance, that copyright law is flexible and accommodating enough to coexist with that right, and that the public good in access to the law ultimately must prevail.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

Dated: September 22, 2017

/s/ Charles Duan
_____
CHARLES DUAN
   *Counsel of Record*
MEREDITH F. ROSE
PUBLIC KNOWLEDGE
1818 N Street NW, Suite 410
Washington, DC 20036
(202) 861-0020
cduan@publicknowledge.org

*Counsel for amici curiae*

27

## APPENDIX A
### LIST OF ORGANIZATIONAL *AMICI CURIAE* TO THIS BRIEF

The descriptions provided below are to assist this Court in identifying the organizations acting as *amici*.

### NONPROFIT ORGANIZATIONS

American Association of Law Libraries

> *The only national association dedicated to the legal information profession and its professionals. Founded in 1906 on the belief that people—lawyers, judges, students, and the public—need timely access to relevant legal information to make sound legal arguments and wise legal decisions, its nearly 4,500 members are problem solvers of the highest order.*

American Library Association

> *A nonprofit professional organization, established in 1876, of more than 57,000 librarians, library trustees, and other friends of libraries dedicated to providing and improving library services and promoting the public interest in a free and open information society.*

Association of College and Research Libraries

> *The largest division of the ALA, and a professional association of academic and research librarians and other interested individuals. The Association is dedicated to enhancing the ability of academic library and information profession-*

28

*als to serve the information needs of the higher education community and to improve learning, teaching, and research.*

Association of Research Libraries

*An association of 123 research libraries in North America, whose members include university libraries, public libraries, government and national libraries. The Association's programs and services promote equitable access to and effective use of recorded knowledge in support of teaching and research.*

Free Law Project

*A nonprofit organization with the mission of providing free access to primary legal materials, developing legal research tools, and supporting academic research on legal corpora. Free Law Project works with researchers, journalists, startups, and the public to create and maintain high quality legal resources that make the legal system more fair and innovative.*

Lincoln Network

*A nonprofit organization working to advance liberty through technology. Lincoln Network was born from the optimistic view that when technology and public policy meet, under the right conditions and with the right tools, both worlds win. The organization regularly hosts policy panels, hackathons, and conferences convening influencers and technologists to address challenges facing political institutions and the Nation.*

OpenGov Foundation

*A nonprofit organization whose mission is to create a 21st Century Congress where elected officials and staff can meaningfully engage at scale with those they represent, and where citizens can see, shape and understand the critical decisions that affect their lives, their families and their businesses.*

Public Knowledge

*A non-profit organization that is dedicated to preserving the openness of the Internet and the public's access to knowledge, promoting creativity through balanced intellectual property rights, and upholding and protecting the rights of consumers to use innovative technology lawfully.*

Re:Create Coalition

*An alliance of organizations representing creators, advocates, thinkers, users, and consumers who stand for a copyright system grounded in the Founders' promise to "promote the progress of science and useful arts."*

R Street Institute

*A nonprofit, non-partican public policy research organization whose mission is to engage in policy research and educational outreach that promotes free markets, as well as limited yet effective government, including properly calibrated legal and regulatory frameworks that support Internet economic growth and economic liberty.*

30

Sunlight Foundation

> *A national, nonpartisan, nonprofit organization that uses civic technology, open data, policy analysis and journalism to make government and politics more accountable and transparent to all. Sunlight's vision is for technology to enable more complete, equitable and effective democratic participation.*

## COMPANIES

Fastcase, Inc.

> *A legal publishing company based in Washington, D.C. that uses citation analysis, data visualization, mobile apps, and machine learning to make legal research smarter and to democratize the law.*

Judicata, Inc.

> *A company that provides research and analytic tools to turn unstructured case law into structured and easily digestible data. Judicata's color-mapping research tool fundamentally transforms how people interact with the law: It increases reading comprehension and speed, illuminates the connections among cases, and makes the law more accessible to both lawyers and nonlawyers.*

Justia Inc.

> *A technology company whose mission is to advance the availability of legal resources for the benefit of society, with special focus on making primary legal materials and community resources free and easy to find on the Internet.*

## APPENDIX B
### List of Individual *Amici Curiae* to This Brief

The affiliations listed below are provided to assist this Court in identifying the individuals acting as *amici*. The individuals joining this brief do so in their individual capacities.

**Former Government Officials**

The Honorable Carol M. Browner

*Eighth Administrator of the Environmental Protection Agency (1993–2001)*

The Honorable Joan Claybrook

*Administrator of the National Highway Traffic Safety Administration (1977–1981)*

Edward Felten

*Chief Technologist of the Federal Trade Commission (2011–2012),*

*Deputy Chief Technology Officer of the United States (2015–2016)*

The Honorable Bruce R. James

*Twenty-Fourth Public Printer of the United States (2002–2006)*

Alexander Macgillivray

*Deputy Chief Information Officer of the United States (2014-2016)*

Andrew McLaughlin

*Deputy Chief Technology Officer of the United States (2009–2011)*

The Honorable David Michaels

    *Assistant Secretary of Labor,*

    *Occupational Safety and Health Administration (2009–2017)*

Raymond A. Mosley

    *Director, Office of the Federal Register (1996–2012)*

DJ Patil

    *Deputy Chief Technology Officer for Data Policy & Chief Data Scientist,*

    *United States Office of Science and Technology Policy*

John D. Podesta

    *Chief of Staff to President William J. Clinton (1998–2001),*

    *Counselor to President Barack H. Obama (2014–2015)*

Judith C. Russell

    *Superintendent of Documents, Government Printing Office (2003–2007)*

The Honorable Megan J. Smith

    *Third Chief Technology Officer of the United States (2014–2016)*

Steven VanRoekel

    *Chief Information Officer of the United States (2011–2014)*

Nicole Wong

    *Deputy Chief Technology Officer of the United States (2014-2016)*

## Librarians, Professors, and Other Individuals

Jonathan Askin

*Professor of Clinical Law, Brooklyn Law School*

Lila Bailey

*Policy Counsel, Internet Archive*

Annemarie Bridy

*Professor of Law & Ellis Law Fund Scholar, University of Idaho College of Law*

Brandon Butler

*Director of Information Policy, University of Virginia Library*

Michael A. Carrier

*Distinguished Professor & Co-Director of the Rutgers Institute for Information Policy and Law, Rutgers Law School*

Michael W. Carroll

*Professor of Law & Director of the Program on Information Justice and Intellectual Property, American University Washington College of Law*

Margaret Chon

*Donald and Lynda Horowitz Professor for the Pursuit of Justice, Seattle University School of Law*

Kyle K. Courtney

*Copyright Advisor for Harvard University*

Will Cross

*Director of the Copyright and Digital Scholarship Center,*

*North Carolina State University*

Jim DelRosso

*Digital Projects Coordinator, Hospitality, Labor, and Management Library,*

*Catherwood Library, Cornell University*

Amy Vanderlyke Dygert

*Director of Copyright Services, Cornell University*

Shubha Ghosh

*Crandall Melvin Professor of Law & Director of the Technology Commercialization Law Center, Syracuse University College of Law*

James Gibson

*Professor of Law & Associate Dean for Academic Affairs,*

*University of Richmond School of Law*

David Hansen

*Director of the Office of Copyright and Scholarly Communications,*

*Duke University Libraries*

Ariel Katz

*Associate Professor & Innovation Chair in Electronic Commerce,*

*Faculty of Law, University of Toronto*

Benjamin J. Keele

   *Research and Instructional Services Librarian,*

   *Robert H. McKinney School of Law, Indiana University*

Seamus Kraft

   *Executive Director, Co-Founder & President of the Board,*

   *The OpenGov Foundation*

Sarah Hooke Lee

   *Associate Dean & Director of Information and Research Services,*

   *Northeastern University School of Law*

Kendra K. Levine

   *Director of the Institute of Transportation Studies Library,*

   *University of California, Berkeley*

Yvette Joy Liebesman

   *Professor of Law, Saint Louis University School of Law*

Brian Love

   *Assistant Professor & Co-Director of the High Tech Law Institute,*

   *Santa Clara University School of Law*

Stephen McJohn

   *Professor of Law, Suffolk University Law School*

Tyler T. Ochoa

*Professor of Law, Santa Clara University School of Law*

David Olson

*Associate Professor, Boston College Law School*

Aaron Perzanowski

*Professor of Law, Case Western Reserve University School of Law*

David G. Post

*Professor of Law, Temple University Beasley School of Law (ret.)*

Blake E. Reid

*Associate Clinical Professor, University of Colorado Law School*

Jessica Silbey

*Professor of Law, Northeastern University School of Law*

Roger V. Skalbeck

*Associate Dean for Library and Information Services & Associate Professor of Law, University of Richmond School of Law*

David E. Sorkin

*Associate Professor of Law, The John Marshall Law School*

Robert Walker

*Clinical Supervising Attorney, University of California, Berkeley, School of Law*

Ronald E. Wheeler

*Associate Professor of Law and Legal Research, Boston University School of Law*

Beth Williams

*Director of the Robert Crown Law Library & Senior Lecturer in Law,*

*Stanford Law School*

Michelle M. Wu

*Professor of Law & Law Library Director, Georgetown University Law*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of the Federal Rules of Appellate Procedure and the Circuit Rules. The document contains **6,305** words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f).

This document complies with the typeface and type style requirements of the Federal Rules. The document has been prepared in a proportionally spaced typeface using the *xelatex* typesetting system, in the font Libertinus Serif.

Dated: September 22, 2017         */s/ Charles Duan*
                                                           Charles Duan
                                                           *Counsel for amici curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on September 22, 2017, I caused the foregoing **Brief of Sixty-Two Library Associations, Nonprofit Organizations, Legal Technology Companies, Former Senior Government Officials, Librarians, Innovators, and Professors of Law  as *Amici Curiae*  in Support of Defendant-Appellant** to be electronically filed with the Clerk of the Court using CM/ECF, which will automatically send email notification of such filing to all counsel of record.

Dated: September 22, 2017          */s/ Charles Duan*
                                                Charles Duan
                                                *Counsel for amici curiae*