NOT YET SCHEDULED FOR ORAL ARGUMENT
## No. 17-7035
(Consolidated with 17-7039)

# United States Court of Appeals
# for the District of Columbia Circuit

AMERICAN SOCIETY FOR TESTING AND MATERIALS; NATIONAL FIRE PROTECTION ASSOCIATION, INC.; and AMERICAN SOCIETY OF HEATING, REFRIGERATING, AND AIR CONDITIONING ENGINEERS, INC.,

*Plaintiffs-Appellees,*

*v.*

PUBLIC.RESOURCE.ORG, INC.,

*Defendant-Appellant.*

*On Appeal from the United States District Court for the District of Columbia in Case Nos. 1:13-cv-1215 and 1:14-cv-0857, Honorable Tanya S. Chutkan*

# BRIEF OF THE INTERNATIONAL TRADEMARK ASSOCIATION AS *AMICUS CURIAE* IN SUPPORT OF APPELLEES

David A. Donahue
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
Four Times Square, 17th Floor
New York, New York 10036
(212) 813-5900
ddonahue@frosszelnick.com

Anthony J. Dreyer
Jordan A. Feirman
Hannah M. Marek
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
anthony.dreyer@skadden.com

*Counsel for Amicus Curiae*

December 6, 2017

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.     Parties and Amici.**  Except for the following, all parties and *amici*

appearing in this Court are listed in the Brief of Plaintiffs-Appellees.

The International Trademark Association is an *amicus curiae* in this appeal.

**B.     Rulings Under Review.**  References to the rulings at issue appear in the

Plaintiffs-Appellees' brief filed November 8, 2017.

**C.     Related Cases.**  To the knowledge of counsel, other than any cases listed in

the Plaintiffs-Appellees' brief filed November 8, 2017, the case on review was not

previously before this Court or any other court, and there are no other related cases

currently pending in this Court or any other court.

   /s/ Anthony J. Dreyer

Anthony J. Dreyer

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* the International Trademark Association states that it is not a publicly held corporation or other publicly held entity.  The International Trademark Association does not have any parent corporation, and no publicly held corporation or other publicly held entity holds 10% or more of its stock.

## **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................... ii

GLOSSARY OF ABBREVIATIONS .......................................................1

STATUTES AND REGULATIONS ..........................................................1

IDENTITY AND INTERESTS OF AMICI CURIAE ..............................1

SUMMARY OF ARGUMENT ..................................................................5

ARGUMENT ............................................................................................8

I.      *DASTAR* DOES NOT BAR THE SPONSORING
        ORGANIZATIONS' LANHAM ACT CLAIMS ...........................8

        A.      *Dastar* Is Not Applicable Because It Addressed Facts and
                Policy Concerns Not Remotely Present Here .......................8

                1.      Dastar *Addressed the Problems with Permitting a Section
                        43(a) Lanham Act Claim for Unaccredited Copying* ................9

                2.      *The Sponsoring Organizations' Lanham Act Claims Are
                        Not Based on Unaccredited Copying*.......................................10

                3.      Dastar *Does Not Apply to Section 32 Lanham Act Claims*.......13

                4.      *The Sponsoring Organizations' Claims Do Not Risk
                        Creating "Mutant Copyright"* ....................................................15

        B.      Even If *Dastar* Applied to This Case, the Lanham Act Claims
                Would Still Survive ...........................................................17

II.     THE SECOND CIRCUIT'S DECISION IN *ROGERS* HAS NO
        APPLICATION TO THE CURRENT CASE ..............................21

III.    CONCLUSION...........................................................................25

CERTIFICATE OF COMPLIANCE.......................................................26

ADDENDUM OF STATUTES AND REGULATIONS ..................... A-1

# <u>TABLE OF AUTHORITIES</u>

Page(s)

## CASES

*American Society for Testing & Materials v. Public.Resource.org, Inc.*,
    No. 13-cv-1215 (TSC), 2017 WL 473822 (D.D.C. Feb. 2, 2017) ...............15

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
    539 U.S. 23 (2003)................................................... 3, 5, 6, 8, 9, 13, 14, 15, 17

*Eldred v. Reno*,
    239 F.3d 372 (D.C. Cir. 2001).......................................................21

*ETW Corp. v. Jireh Publishing, Inc.*,
    332 F.3d 915 (6th Cir. 2003) .........................................................23

*Gilliam v. AmericanBroadcasting Cos.*,
    538 F.2d 14 (2d Cir. 1976) ...........................................................12

*ICC Evaluation Services, LLC v. International Association of Plumbing &*
    *Mechanical Officials, Inc.*,
    No.16-54 (EGS), 2016 U.S. Dist. LEXIS 153518
    (D.D.C. Sept. 19, 2016) ...........................................................15

*LaChapelle v. Fenty*,
    812 F. Supp. 2d 434 (S.D.N.Y. 2011) ...........................................15

*M. Arthur Gensler Jr. & Associates v. Strabala*,
    764 F.3d 735 (7th Cir. 2014) .......................................................11

*Mattel, Inc. v. MCA Records, Inc.*,
    296 F.3d 894 (9th Cir. 2002) .......................................................23

*Metlife, Inc. v. Financial Stability Oversight Council*,
    865 F.3d 661 (D.C. Cir. 2017)......................................................22

*Phoenix Entertainment Partners, LLC v. George & Wendy's Tropical Grill,*
    *LLC*, No. 2:16-cv-852-FtM-99MRM, 2017 WL 881826 (M.D. Fla.
    Mar. 6, 2017) ...........................................................................19

*Phoenix Entertainment Partners v. Rumsey*,
    829 F.3d 817 (7th Cir. 2016) ................................................18, 19, 20

ii

*Potter v. District of Columbia*,
    558 F.3d 542 (D.C. Cir. 2009)......................................................................21

*Radiance Foundation, Inc.*,
    786 F.3d 316 (4th Cir. 2015) .........................................................................24

*Rogers v. Grimaldi*,
    875 F.2d 994 (2d Cir. 1989) ..........................................................3, 4, 22, 23

*Slep-Tone Entertainment Corp. v. Duffy's Irish Pub*,
    No. 6:13-CV-560-TC, 2013 WL 5774128 (D. Or. Oct. 23, 2013) ..............19

*Slep-Tone Entertainment Corp. v. Johnson*,
    518 F. App'x 815 (11th Cir. 2013).................................................................19

*Slep-Tone Entertainment Corp. v. Sellis Enterprises, Inc.*,
    87 F. Supp. 3d 897 (N.D. Ill. 2015)...............................................................19

*Slep-Tone Entertainment Corp. v. Wired for Sound Karaoke and DJ
    Services, LLC*,
    845 F.3d 1246 (9th Cir. 2017) .................................................................18, 20

*Twin Peaks Productions,, Inc. v. Publications International, Ltd.*,
    996 F.2d 1366 (2d Cir. 1993) .........................................................................24

*United States v. Stover*,
    329 F.3d 859 (D.C. Cir. 2003).......................................................................21

*University of Alabama Board of Trustees*,
    683 F.3d 1266 (11th Cir. 2012) .....................................................................23

*Warner Brothers Entertainment, Inc. v. X One X Productions*,
    840 F.3d 971 (8th Cir. 2016) .........................................................................16

*Yah Kai World Wide Enterprises, Inc. v. Napper*,
    195 F. Supp. 3d 287 (D.D.C. 2016).................................................................5

*Westchester Media v. PRL USA Holdings, Inc.*,
    214 F.3d 658 (5th Cir. 2000) .........................................................................25

## STATUTES

15 U.S.C. § 1114 ...........................................................................6, 13

15 U.S.C. § 1117 ...............................................................................17

15 U.S.C. § 1125(a) .............................................................................5

15 U.S.C. § 1127 ...............................................................................13

17 U.S.C. § 301(d) .......................................................................4, 17

## OTHER AUTHORITIES

2 McCarthy on Trademarks and Unfair Competition § 10:28
     (5th ed. 2017) ...........................................................................12

5 McCarthy on Trademarks and Unfair Competition § 27:83
     (5th ed. 2017) ...........................................................................12

3 Nimmer on Copyright § 8D.03 (2017) ................................................12

6 Patry on Copyright § 18:50 (2017) ......................................................14

## GLOSSARY OF ABBREVIATIONS

| INTA | International Trademark Association |
|------|-----------------------------------|
| PR   | Public.Resource.Org, Inc.          |

## STATUTES AND REGULATIONS

Pertinent statutes and regulations that are not already included in the briefs previously submitted in this appeal are reproduced in an addendum to this brief.

## IDENTITY AND INTERESTS OF AMICI CURIAE[1]

Founded in 1878, *amicus curiae* the International Trademark Association ("INTA") is a not-for-profit organization dedicated to the support and advancement of trademarks and related intellectual property concepts as essential elements of trade and commerce.  INTA has more than 7,000 members in more than 190 countries.  Its members include trademark and brand owners, as well as law firms and other professionals who regularly assist brand owners in the

---

[1]  No party's counsel authored this brief in whole or in part.  No party or party's counsel made a monetary contribution intended to fund the preparation or submission of this brief, and no person other than *amicus curiae* funded the preparation of this brief.  All parties have consented to the filing of this brief.

creation, registration, protection, and enforcement of their trademarks. All INTA

members share the goal of promoting an understanding of the essential role that

trademarks play in fostering effective commerce, fair competition, and informed

decision-making by consumers.

      INTA was founded in part to encourage the enactment of federal trademark

legislation following invalidation on constitutional grounds of the United States'

first trademark act. Since then, INTA has been instrumental in making

recommendations and providing assistance to legislators in connection with major

trademark and related legislation, and has participated as *amicus curiae* in

numerous cases in the U.S. Supreme Court and Circuit Courts of Appeals across

the country involving significant Lanham Act issues.[2] Moreover, INTA's

---

[2] INTA has filed *amicus* briefs in the U.S. Supreme Court and Circuit Courts of
Appeals in the following matters, among others: *Matal v. Tam*, 137 S. Ct. 1744
(2017); *Sec. Univ., LLC v. Int'l Info. Sys. Sec. Certification Consortium, Inc.*, 137
S. Ct. 624 (2017); *Shammas v. Hirshfeld*, 136 S. Ct. 1376 (2016); *B&B Hardware,
Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293 (2015); *Hana Fin., Inc. v. Hana Bank*,
135 S. Ct. 907 (2015); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134
S. Ct. 1377 (2014); *Pom Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228
(2014); *Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013); *KP Permanent Make-Up,
Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004); *Dastar Corp. v. Twentieth
Century Fox Film Corp.*, 539 U.S. 23 (2003); *Moseley v. V Secret Catalogue, Inc.*,
537 U.S. 418 (2003); *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23
(2001); *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205 (2000); *Fla. Prepaid
Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627 (1999);
*Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159 (1995); *Two Pesos, Inc. v. Taco*
*(cont'd)*

members are frequent participants in litigations in courts and in administrative proceedings before the United States Patent and Trademark Office and Trademark Trial and Appeal Board with respect to actions brought under the Lanham Act, and therefore are interested in the development of clear, consistent, and equitable principles of trademark law.

INTA and its members have a particular interest in this case because Appellant Public.Resource.Org ("PR") and the *Amici Curiae* Law Professors ("*Amici* Professors") have propounded legal positions that risk sharply (and incorrectly) limiting the rights of trademark owners to protect their marks and goods.  In particular, they advocate for overly-broad interpretations of two seminal Lanham Act decisions—*Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003) ("*Dastar*") and *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989) ("*Rogers*")—that would stretch the scope of those decisions well beyond their holdings and underlying rationales.

---

*(cont'd from previous page)*

*Cabana, Inc.*, 505 U.S. 763 (1992); *NantKwest v. Lee, Inc.*, 686 F. App'x 864 (Fed. Cir. 2017); *In re Tam*, 808 F.3d 1321 (Fed. Cir. 2015), *as corrected* (Feb. 11, 2016); *Shammas v. Focarino*, 784 F.3d 219 (4th Cir. 2014); *Ferring Pharm. Inc. v. Watson Pharm., Inc.*, 765 F.3d 205 (3d Cir. 2014); *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holding, Inc.*, 696 F.3d 206 (2d Cir. 2012); *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144 (4th Cir. 2012); and *Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 654 F.3d 958 (9th Cir. 2011).

The proposed interpretation of *Dastar* would create a blunt and inflexible standard that would hamper trademark owners' rights to protect and maintain quality control over their goods in any instance where those goods happen to contain or involve copyrightable materials. Under this construction, even parties that engaged in the most egregious trademark infringement could be insulated from Lanham Act liability any time infringing products contain expressive content. That result is not supportable under any fair reading of *Dastar*, nor would it comport with either: (1) the Lanham Act's express purposes of protecting consumers from "deceptive and misleading use of marks" and commercial competitors "against unfair competition," 15 U.S.C. § 1127; or (2) the Copyright Act's express statement that "[n]othing in this title annuls or limits any rights or remedies under any other Federal statute," 17 U.S.C. § 301(d).

*Amici* Professors would further have the Court take this opportunity to formally adopt the holding in *Rogers* and apply it in a manner that was plainly never contemplated by the Second Circuit: to make it nearly impossible to enforce trademark rights in every instance where trademarks appear in the content of a work. Even if the Court overlooked the fact that *Rogers* was never raised below and thus should not be addressed now, the First Amendment concerns addressed by that decision are only triggered by trademark uses that, unlike here, have "artistic relevance." To remove that critical element from the *Rogers* test would create an

4

entirely new standard and disregard the careful balance that the Second Circuit struck between trademark protection and First Amendment principles.

## SUMMARY OF ARGUMENT

PR's and *Amici* Professors' arguments that the Lanham Act claims brought by Plaintiffs-Appellees (the "Sponsoring Organizations") are barred by *Dastar* and *Rogers* reflect an overly-broad and incorrect expansion of the scope and applicability of those cases, as well as the principal rationales for the holdings articulated by the Supreme Court and Second Circuit, respectively.[3]

*First*, *Dastar* involved a situation not present here: copying creative work without attributing that work to its source (the plaintiff). In *Dastar*, the Supreme Court rejected a proposed claim under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), for "false designation of origin" when the defendant was alleged to have copied the plaintiff's television footage. 539 U.S. at 29. The Court recognized that the sole alleged misconduct—the act of *copying* creative content—sounded in copyright, and that the plaintiff had merely dressed up a copyright claim in Lanham Act language to plead around the fact that the television footage had fallen

_____

[3] INTA takes no position with respect to whether the Sponsoring Organizations have actually demonstrated a likelihood of confusion and/or established Lanham Act liability, which is based on a highly fact-dependent, multi-factor analysis. *See Yah Kai World Wide Enters., Inc. v. Napper*, 195 F. Supp. 3d 287, 317 (D.D.C. 2016) (delineating the seven-factor confusion test applied by courts in this Circuit).

into the public domain (thus negating any copyright infringement claim).  Since copyright law does not provide authors with an independent right of attribution for their works, the Supreme Court was not willing to read such a right into the broad wording of the Lanham Act's general unfair competition provision, Section 43(a). *See* 539 U.S. at 33-34, 38.

By contrast, the current case does not involve unattributed copying.  Rather, it involves *misattribution* and unauthorized use of the Sponsoring Organizations' trademarks in connection with products that the Sponsoring Organizations did not produce.  Specifically, PR created and posted error-ridden, incorrect digital files online, and affixed the Sponsoring Organizations' trademarks to those files, creating the potential that consumers would be misled into believing that the Sponsoring Organizations were the source of those files.  This fact pattern was not discussed in—let alone addressed by—*Dastar*, and the Supreme Court's concerns about creating a new right of attribution in copyright law (under the guise of a Lanham Act cause of action) do not apply to such a straightforward trademark infringement scenario.

Moreover, *Dastar* concerned only the Lanham Act's general unfair competition provision (Section 43(a)), and did not purport to address preemption of claims under Section 32 of the Lanham Act, 15 U.S.C. § 1114.  Thus, *Dastar* has no bearing on the Sponsoring Organizations' claims for infringement of

6

federally registered trademarks under Section 32.  Indeed, *Dastar*'s holding was expressly and specifically based on its interpretation of the term "origin" in Section 43(a) of the Lanham Act—a term that does not appear anywhere in Section 32—further demonstrating that *Dastar* should not be applied to Section 32 claims.

Even if *Dastar* did apply to this case, the Sponsoring Organizations' Lanham Act claims should nevertheless survive because they concern confusion regarding the source of not just creative content, but also (as per *Dastar*'s requirement) "tangible goods:"  the digital files that PR created and distributed online in lieu of genuine files created and sold by the Sponsoring Organizations on their own website.  Notably, the principal authorities on which PR and *Amici* Professors rely recognize that Lanham Act claims are viable under these circumstances.

**Second**, the discussion of *Rogers* by *Amici* Professors is a red herring.  In *Rogers*, the Second Circuit held that heightened requirements must be met to protect trademarks when used for certain kinds of protected expressive purposes. But *Amici* Professors do not (and cannot) show why that doctrine should apply here.

As an initial matter, the proposed test set forth in *Rogers* has not been adopted in this Circuit.  But even if it had been adopted, a trademark use under *Rogers* can be protected by the First Amendment only if its use has "artistic

7

relevance" to the expressive content. *Amici* Professors do not attempt to demonstrate that the use of Sponsoring Organization trademarks by PR was for any artistic purposes, nor would any such contention be plausible; on the contrary, the trademarks were used solely as source identifiers—that is, for the very purpose that trademarks are protected. At all events, *Rogers* was never raised by the actual parties to this litigation in the district court (or in PR's appeal brief), and under D.C. Circuit precedent it would not be appropriate for this Court to consider the issue now.

## ARGUMENT

## I.   *DASTAR* DOES NOT BAR THE SPONSORING ORGANIZATIONS' LANHAM ACT CLAIMS

### A.   *Dastar* Is Not Applicable Because It Addressed Facts and Policy Concerns Not Remotely Present Here

As PR and *Amici* Professors recognize, the Supreme Court's rejection of the Section 43(a) claim in *Dastar* was premised on its conclusion that the plaintiff was "attempt[ing] to use trademark law to circumvent the limitations of the Copyright Act." (PR Br. at 51; *see Amici* Prof. Br. at 4.) In *Dastar*, Twentieth Century Fox Film Corporation ("Fox") sought redress under the Lanham Act for Dastar's use in its own video series of footage from Fox's "Crusade in Europe" television show (the copyrights to which had fallen into public domain) without crediting Fox. *Dastar*, 539 U.S. at 26-27. Fox did not claim that Dastar used any of Fox's

8

trademarks; the sole challenge was that Dastar copied Fox's content.  Recognizing a Lanham Act claim in this context, the Court found, would expand copyright protections beyond what Congress set forth in the Copyright Act.  *Id.* at 35.

The crux of PR's and *Amici* Professors' argument is that permitting the Sponsoring Organizations' claims to go forward "would create exactly the kind of 'mutant copyright' rejected by the Supreme Court."  (*Amici* Prof. Br. at 4.)  But that is not true.  The Sponsoring Organizations' claims and PR's conduct diverge substantially from the allegations and actions at issue in *Dastar*, and *Amici* Professors' concerns about the Lanham Act encroaching on "the province of copyright law" (*id.*) do not apply.  Indeed, the scope of the holding in *Dastar* is far more limited than PR and *Amici* Professors suggest.

> 1. Dastar *Addressed the Problems with Permitting a Section 43(a) Lanham Act Claim for Unaccredited Copying*

In *Dastar*, the proposed Section 43(a) action for false designation of origin was an obvious attempt to dress up a non-viable copyright claim as a Lanham Act claim.  Since the "Crusade in Europe" television show had fallen into the public domain, Fox had no recourse under the Copyright Act when Dastar included Fox's footage in its own video series.  So Fox contended instead that "Dastar's sale of [the video] 'without proper credit' to the Crusade television series constitutes 'reverse passing off' in violation of § 43(a) of the Lanham Act."  *Dastar*, 539 U.S. at 27.  Critically, the alleged misconduct was indistinguishable from, and totally

co-extensive with, misconduct that would have supported a copyright infringement claim:  the copying and distribution of creative content.  In other words, the Lanham Act claim differed from a copyright claim only in form, not substance.

Accordingly, the Supreme Court addressed only the narrow question of "whether § 43(a) of the Lanham Act . . . *prevents the unaccredited copying* of a work," which required interpreting the meaning of the word "origin" as used in that statutory provision.  *Id.* at 25 (emphasis added); *see also id.* at 36 (explaining that Fox's claim posited "a cause of action for, in effect, plagiarism—the use of otherwise unprotected works and inventions without attribution").  The Court's concerns about using trademark law to create a "species of mutant copyright law" by expanding the Copyright Act to incorporate a new right of attribution—as well as the "serious practical problems" associated with enforcing such a right—were necessarily tied to the particular problem with "[r]eading 'origin' in § 43(a) to *require* attribution of uncopyrighted materials."  *Id*. at 34-35 (emphasis added).

> 2. *The Sponsoring Organizations' Lanham Act Claims Are Not Based on Unaccredited Copying*

The Sponsoring Organizations' Lanham Act claims against PR are of a very different nature—and are based on very different alleged misconduct and injury— than those in *Dastar*.

Here, the principal conduct giving rise to the potential Lanham Act claims was PR's undisputed lifting and using of Sponsoring Organization trademarks

when creating new files (such as by disassembling used, hard copies of the Sponsoring Organizations' standards, attaching a cover, and scanning) and then posting them online. Moreover, the new digital products created by PR were apparently of inferior quality, including mistakes such as textual errors and skipped or inverted pages. PR falsely attributed the source of the defective standards to the Sponsoring Organizations, by incorporating their trademarks in the files without permission.

These facts are hardly analogous to those of *Dastar*, which in no way addressed such a "false attribution" scenario. As Judge Easterbrook explained post-*Dastar* when affirming the viability of a Section 43(a)(1)(B) claim for a "false claim of origin:"

> Twentieth Century Fox . . . did not contend that Dastar had falsely identified itself as the videos' creator, wrongly imputed the newly made copies to Twentieth Century Fox, or made any other false claim. Because the origin of goods had been correctly designated, and no false statement made, the Court held that §43(a) did not supply a claim for relief. [Plaintiff], by contrast, does assert that there has been a false claim of origin . . . . ***[Plaintiff] maintains that [Defendant] falsely claims to have been the creator of intellectual property . . . . Nothing in Dastar forecloses such a claim.***

*M. Arthur Gensler Jr. & Assocs. v. Strabala*, 764 F.3d 735, 737 (7th Cir. 2014) (emphasis added). Indeed, leading treatises in both the trademark and copyright spheres recognize that claims of false attribution remain viable post-*Dastar*. *See* 2 McCarthy on Trademarks and Unfair Competition § 10:28 (5th ed. 2017)

11

("[I]t has been held that § 43(a) is not a statute that creates a duty of attribution: it only prevents false attribution."); 3 Nimmer on Copyright § 8D.03 (explaining that "[c]onsonant with Berne Convention jurisprudence, an author's rights are violated if, without his consent, he is attributed to be the author of a work that he did not in fact create" and that Lanham Act false attribution claims "presumably survive" *Dastar* (footnotes omitted)).[4]

That the Sponsoring Organizations' trademarks were being used without authorization on products that did not originate with those organizations could: (a) give rise to confusion among consumers as to the source, affiliation, and/or sponsorship of the products created and disseminated by PR; (b) undercut the Sponsoring Organizations' ability to control the quality of their own trademarked products; and (c) negatively impact the Sponsoring Organizations' goodwill and reputations. Those are precisely the types of injuries that the Lanham Act—and not the Copyright Act—is designed to address. *See* 15 U.S.C. § 1127 (Lanham

---

[4] Similarly, nothing in *Dastar* addresses the situation where, as here, work was attributed to a particular author or source even though substantial changes and alterations were made to that work. *See Gilliam v. Am. Broad. Cos.*, 538 F.2d 14, 24 (2d Cir. 1976) (recognizing a Section 43(a) claim where work had "been edited, without the writer's consent, into a form that departs substantially from the [writer's] original work" and the writer was therefore presented "to the public as the creator of a work not his own"); *see generally* 5 McCarthy on Trademarks and Unfair Competition § 27:83 (discussing *Gilliam* and opining that it and similar cases "probably fit within the Lanham Act § 43(a)(1)(B)").

Act's express purposes include protecting against "deceptive and misleading use of marks" and "unfair competition"); *Dastar*, 539 U.S. at 34 (explaining that the Lanham Act, "by preventing competitors from copying 'a source-identifying mark,' 'reduce[s] the customer's costs' . . . and 'helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product'" (first alteration in original) (citation omitted)).

### 3.     Dastar *Does Not Apply to Section 32 Lanham Act Claims*

*Dastar* is not controlling here for a second reason: *Dastar* turned solely on an interpretation of Section 43(a) of the Lanham Act, but the Sponsoring Organizations brought claims for infringement of their registered marks under Section 32 of the Lanham Act, 15 U.S.C. § 1114. Specifically, the *Dastar* Court addressed the meaning of the word "origin" as used in Section 43(a) and expressly distinguished Section 43(a)'s broad application to unfair trade practices "that goes beyond trademark protection" from those sections of the Lanham Act that "address[] the registration, use, and infringement of trademarks and related marks." 539 U.S. at 28-29.

*Dastar* makes no mention of Section 32, and there is no reason to believe that the Supreme Court intended to extend its ruling to the straightforward infringement of a registered mark, as alleged here. Indeed, the word "origin,"

13

which was so central to the Court's analysis in *Dastar*, does not even appear in Section 32.  This further confirms that the applicability of *Dastar* is limited solely to the "reverse passing off" scenarios expressly discussed by the Court—where works are used "without crediting" or without "attribution"—but does not extend to misapplication of another's trademark.  539 U.S. at 35-37.  *See* 6 Patry on Copyright § 18:50 ("*Dastar* does not, however, reach traditional trademark infringement actions, where the allegation does not concern copying of content, but rather consumer confusion through use of plaintiff's trademark.").

PR is incorrect, then, when it contends that "the core of the injury" alleged in the Lanham Act claims is the fact that PR reproduced the communicative content of the Sponsoring Organizations' standards.  (PR Br. at 52.)  Rather, the trademark injury claimed here is misattribution as to files that the Sponsoring Organizations *did not create*.  In addition, the Sponsoring Organizations claimed that their registered trademarks had affirmatively been misappropriated regardless of whether PR did indeed copy any of their content.  Therefore, as the district court correctly recognized, the Sponsoring Organizations had "an independent basis for claiming that Defendant infringed their trademarks, separate from their copyright

14

infringement claims."[5] *Am. Soc'y for Testing & Materials v. Public.Resource.org, Inc.*, No. 13-cv-1215 (TSC), 2017 WL 473822, at *20 (D.D.C. Feb. 2, 2017).

4.    *The Sponsoring Organizations' Claims Do Not Risk Creating "Mutant Copyright"*

In light of the foregoing factual distinctions, the practical and policy-based concerns that drove the Supreme Court's decision in *Dastar* are not present here. The "species of mutant copyright law" that the *Dastar* Court feared—creating a new right of attribution any time communicative content is copied, 539 U.S. at 34—is not a risk because the Sponsoring Organizations' Lanham Act claims are not based on any alleged failure to provide attribution. Indeed the *opposite* concern is present—one that is at the core of what the Lanham Act is intended to prevent:  use of another's trademark in connection with products or services the trademark holder did not support or approve.  For the same reason, there is also no

---

[5]  By analogy to well-established case law concerning Copyright Act preemption of state law causes of action, the Sponsoring Organizations' claims are "qualitatively different from a copyright claim" because they contain an "extra element"—that is, they seek to protect rights "*not* equivalent to a right protected by the Copyright Act."  *ICC Evaluation Serv., LLC v. Int'l Ass'n of Plumbing & Mech. Officials, Inc.*, No.16-54 (EGS), 2016 U.S. Dist. LEXIS 153518, at *15-16 (D.D.C. Sept. 19, 2016).  Indeed, some courts post-*Dastar* have expressed that "passing off" claims are not preempted by copyright because likelihood of confusion and misrepresentations are such "extra elements."  *See, e.g.*, *LaChapelle v. Fenty*, 812 F. Supp. 2d 434, 449 (S.D.N.Y. 2011) (no preemption of a "passing off" claim because it involves the "extra element" of misrepresentation).

risk (identified in *Dastar*) that parties copying communicative content would need

to locate and provide credit to myriad contributors in order to avoid Lanham Act

liability.  In short, permitting the Lanham Act claims to proceed here would not

run afoul of *Dastar*'s dicta.[6]

---

[6]  *Amici* Professors argue that a narrower reading of *Dastar* would incentivize
copyright owners to pepper their works with trademarks in order to use the
Lanham Act to create perpetual copyright.  To support their position, *Amici*
Professors propose a hypothetical concerning the presence of Mickey Mouse in
*Steamboat Willie*.  (*Amici* Prof. Br. at 7-8.)  But *Amici* Professors' concern is vastly
overblown, and the *Steamboat Willie* hypothetical presents a false parallel to the
Sponsoring Organizations' claims.  *First*, although Mickey Mouse is a Disney
trademark, he is also—unlike the use of the Sponsoring Organizations' trademarks
in PR's files—an integral part of the creative content itself.  So while *Amici*
Professors are correct that basing a Section 43(a) claim on the mere presence of
Mickey Mouse in the cartoon may very well duplicate a copyright claim in that
particular circumstance, that has no application to the situation where a trademark
is being misappropriated for a source-identifying purpose.  *See, e.g., Warner Bros.
Entm't, Inc. v. X One X Prods.*, 840 F.3d 971, 979-80 (8th Cir. 2016) (holding that
*Dastar* did not preclude Lanham Act claims based on the use of trademarked and
copyrighted film and cartoon characters  "on a host of consumer goods" because
such uses were "to associate the products with Warner's films, not to copy the film
itself").  *Second*, in this case—and unlike in the hypothetical—PR used the
Sponsoring Organizations' trademarks in connection with *altered* (and
unquestionably inferior) files.  No one would seriously doubt that confusion could
arise, and Disney could bring a Lanham Act claim, if an individual made major
modifications to *Steamboat Willie* and added the "Disney" trademark to the
modified cartoon.  *Third*, the *Amici* Professors neglect the fact that pleading a
viable Lanham Act claim is not the same thing as succeeding on that claim; as
noted in footnote 3 above, any plaintiff bringing a Section 43(a) claim could not
obtain any relief without adequately demonstrating a likelihood of confusion
regarding authorization or sponsorship pursuant to the multi-factor confusion test
applied in this Circuit (or similar tests applied in other Circuits).

16

On the other hand, interpreting *Dastar* as broadly as PR and *Amici*

Professors suggest could have profound consequences on trademark owners, and

would unnecessarily restrict their rights in a manner that the Supreme Court clearly

did not contemplate.  Most notably, trademark owners would find it nearly

impossible to obtain Lanham Act relief when infringers use trademarks in a way

that is likely to cause consumer confusion if the infringing activity concerns goods

that happen to contain copyrightable expression (whether such content is in the

public domain or not).  That would in turn limit the availability of critical remedies

for violations; for example, statutory and/or treble damages that may be recovered

under the Lanham Act for use of counterfeit marks.  *See* 15 U.S.C. § 1117(b), (c).

To conclude that those remedies are not available by virtue of the existence of

federal copyright law is not only unjustified, but would also run afoul of an express

dictate of the Copyright Act itself:  "Nothing in this title annuls or limits any rights

or remedies under any other Federal statute."  17 U.S.C. § 301(d).

### B.     Even If *Dastar* Applied to This Case, the Lanham Act Claims Would Still Survive

*Dastar* held that the term "origin" in Section 43(a) refers to the producer of

the "tangible goods that are offered for sale, and not to the author of any idea,

concept, or communication embodied in those goods."  539 U.S. at 37.  As

discussed above, that holding has no bearing on the current circumstances.  But

even if *Dastar* applied, the Sponsoring Organizations' Lanham Act claims would

not be barred because this case *does* concern "tangible goods:" the PDF files

created by PR and distributed to consumers for free in lieu of the genuine files

created and sold by the Sponsoring Organizations. Separate and apart from any

confusion arising as to who originated the expressive content in those files, PR's

unauthorized use of the Sponsoring Organizations' trademarks risks substantial

consumer confusion as to who created the error-ridden and unprofessional-looking

PDFs themselves.

    The Seventh Circuit's decision in *Phoenix Entertainment Partners v.*

*Rumsey*, 829 F.3d 817 (7th Cir. 2016)—on which PR and *Amici* Professors heavily

rely—supports this proposition.[7] Although INTA submits that the *Phoenix* court,

like the Ninth Circuit in *Slep-Tone Entertainment Corp. v. Wired for Sound*

*Karaoke and DJ Services, LLC*, 845 F.3d 1246 (9th Cir. 2017), incorrectly applied

*Dastar* to a standard "passing off" scenario,[8] the *Phoenix* court expressly

_____

[7] *Phoenix* also confirms that it is of no consequence that the Sponsoring
Organizations' standards are in digital format rather than hard copy. As the
Seventh Circuit explained: "We shall assume . . . that a digital file counts as a
tangible good for purposes of the trademark analysis. . . . Any number of
communicative products—books, music, movies, computer software—are now
bought and sold in digital form, many of them exclusively so." 829 F.3d at 828
(citation omitted).

[8] In *Phoenix*, the court recognized that the facts of *Dastar* were "sufficiently
different . . . that we do not regard its holding as controlling the result in this case,"
but concluded that *Dastar*'s reasoning was nevertheless persuasive. 829 F.3d at

*(cont'd)*

recognized that circumstances like those present here *could* give rise to a Lanham Act claim.

In *Phoenix*, the Seventh Circuit rejected the plaintiff's claim that consumers were likely to be confused about the origin of unauthorized karaoke tracks in which the plaintiff's mark was embedded when those karaoke tracks were being performed on the screens in the defendant's bar. 829 F.3d at 829. But the court was careful to note that its conclusion—that there could be no confusion about the origin of the "tangible goods"—was based on the fact that

> [i]t is not alleged, nor does the briefing suggest, ***that the patrons see the physical good in question—the digital file*** that presumably resides on a hard drive of the bar's karaoke system. Even if a patron might be aware that there is such a file, ***she does not see that file or the medium on which it resides, as she might if she were purchasing*** a karaoke track on a compact disc from a dealer or ***as a download from an internet website, for example***. The patron sees only the performance of the creative content of the digital file. . . . Whatever the source, the consumer sees and hears the same content and her perception of that content will be essentially the same.

_____

*(cont'd from previous page)*

826. Other courts addressing the same issue in related cases brought by the *Phoenix* plaintiff have concluded that *Dastar* does not bar Lanham Act claims. *See, e.g., Slep-Tone Entm't Corp. v. Johnson*, 518 F. App'x 815, 818 n.1 (11th Cir. 2013); *Phoenix Entm't Partners, LLC v. George & Wendy's Tropical Grill, LLC*, No. 2:16-cv-852-FtM-99MRM, 2017 WL 881826, at *4 (M.D. Fla. Mar. 6, 2017); *Slep-Tone Entm't Corp. v. Sellis Enters., Inc.*, 87 F. Supp. 3d 897, 905 (N.D. Ill. 2015); *Slep-Tone Entm't Corp. v. Duffy's Irish Pub*, No. 6:13-CV-560-TC, 2013 WL 5774128, at *2 (D. Or. Oct. 23, 2013).

19

*Id.* at 828-29 (emphasis added); *see id.* at 829 (explaining that the consumer "never sees a website offering downloads of Sound Choice tracks. . . . [and has] no interaction with the medium from which the tracks are played"). The Ninth Circuit in *Slep-Tone* relied on this distinction as well, quoting from this same excerpt in *Phoenix*. 845 F.3d at 1250.

What *Phoenix* acknowledges as actionable is precisely what was alleged in the current case: consumers went to PR's website and downloaded the faulty PDFs. Consumers unquestionably saw the "physical good in question—the digital file," and could have been confused about whether PR or the Sponsoring Organizations—whose trademarks were visible—were the source of the files in addition to just the expressive content therein. This situation is thus entirely consistent with *Amici* Professors' argument that "any confusion about the source of the digital file would have to be traceable to something other than the content of that file"—here, the accessibility and distribution of the digital files directly from PR. (*Amici* Prof. Br. at 9 (quoting Mark. P. McKenna & Lucas S. Osborn*, Trademarks and Digital Goods*, 92 Notre Dame L. Rev. 142, 1451 (2017)).) And since the PDFs being disseminated by PR were undisputedly of inferior quality (having inverted pages, etc.), the Sponsoring Organizations' potential injury from consumer confusion was compounded.

20

## II.     THE SECOND CIRCUIT'S DECISION IN *ROGERS* HAS NO APPLICATION TO THE CURRENT CASE

In their brief, *Amici* Professors contend that the doctrine adopted by the Second Circuit in *Rogers* provides an additional ground to preclude the Sponsoring Organizations' Lanham Act claims. This argument fails for both procedural and substantive reasons.

As an initial matter, the adoption and application of *Rogers* is being raised for the very first time in this litigation by *Amici* Professors; neither party to the litigation argued about the import of that decision in the district court, the district court made no ruling on the matter, and PR does not discuss it in its appeal brief. Because *Rogers* is not part of the record, it would be improper for this Court to take up the question on appeal. *See Potter v. District of Columbia*, 558 F.3d 542, 547 (D.C. Cir. 2009) ("[W]hile review of the grant of summary judgment is *de novo*, this court reviews only those arguments that were made in the district court, absent exceptional circumstances."); *United States v. Stover*, 329 F.3d 859, 872 (D.C. Cir. 2003) (explaining that arguments not presented to the district court "cannot be considered for the first time on appeal"). Moreover, the fact that *Rogers* has been raised solely in an *amicus* submission renders consideration by this Court "particularly inappropriate because a court should avoid, not seek out, a constitutional issue the resolution of which is not essential to the disposition of the case before it." *Eldred v. Reno*, 239 F.3d 372, 378 (D.C. Cir. 2001) (refusing to

21

consider issue first raised in *amicus* brief); *see also Metlife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 666 n.4 (D.C. Cir. 2017) ("Nor may amici expand an appeal's scope to sweep in issues that a party has waived.").

Even if this Court addressed the application of *Rogers*—and for the first time adopted *Rogers* as the law of this Circuit—*Amici* Professors' contention that *Rogers* bars the Sponsoring Organizations' Lanham Act claims is inconsistent with the language and rationale of that case, and would reflect a bold expansion of its holding.

In *Rogers*, the Second Circuit's concern that "overextension of Lanham Act restrictions . . . might intrude on First Amendment values" was necessarily rooted in the context that the Lanham Act violation at issue—the use of the movie title "Ginger and Fred" to call to mind Ginger Rogers—constituted or contained "artistic expression." 875 F.2d at 998-99; *see id.* at 996 ("This appeal presents a conflict between Rogers' right to protect her celebrated name and the right of others to express themselves freely in their own artistic work."). The careful balance that the court struck between First Amendment concerns and Lanham Act rights was intended to "accommodate[] consumer and artistic interests." *Id.* at 1000. Therefore, the Second Circuit expressly built the concept of "artistic relevance" into its test, explaining that the "explicitly misleads" standard for

proving Lanham Act violations is not considered unless the violations arise in

"artistic works" in the first place:

> We believe that in general the Act should be construed to apply *to artistic works* only where the public interest in avoiding consumer confusion outweighs the public interest in free expression. In the context of allegedly misleading titles using a celebrity's name, that balance will normally not support application of the Act unless the title *has no artistic relevance to the underlying work whatsoever*, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work.

*Id.* at 999 (emphasis added). [9]  In short, that the use of the mark has intended

artistic relevance is a necessary element of the *Rogers* analysis; to remove that

element would create an entirely new standard not contemplated by the Second

Circuit or adopted by any other court.

Yet that is precisely what *Amici* Professors ask this Court to do.  *Amici*

Professors make no attempt to show (nor could they plausibly contend) that the use

of Sponsoring Organization trademarks by PR is for an artistic purpose, but

-----

[9]  Courts applying *Rogers* (including decisions to which *Amici* Professors cite) have required that defendants' use of the mark be artistically relevant.  *See, e.g., Univ. of Ala. Bd. of Trustees*, 683 F.3d 1266, 1278 (11th Cir. 2012) (explaining that *Rogers* applies to "construe the Lanham Act narrowly when deciding whether an artistically expressive work infringes a trademark"); *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 927 (6th Cir. 2003) (finding Rogers applied to "Lanham Act claims against works of artistic expression"); *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 902 (9th Cir. 2002) (applying the Rogers test to a song title, and noting that the Rogers test concerns "artistic works").

nevertheless they posit that *Rogers* should apply to any and all content as long as it is "non-advertising expression." (*Amici* Prof. Br. at 12 & 13 n.6.) By removing the requirement of "artistic relevance," however, this novel proposed expansion of *Rogers* would limit trademark owners' rights even in contexts where core First Amendment concerns are *not* implicated—*i.e.,* where trademark protection does not unduly "obstruct the conveyance of ideas, criticism, comparison, and social commentary." *Radiance Found., Inc.*, 786 F.3d 316, 322 (4th Cir. 2015). Here, the use of the Sponsoring Organization trademarks is solely for the purpose of being source identifiers, not as expressive or artistic content. Protecting the Sponsoring Organizations' trademarks under these circumstances would therefore not risk creating "a chilling effect for producers of expressive works." (*Amici* Prof. Br. at 13.)

At all events, even if *Rogers* applied, that would not serve as an absolute bar to the Lanham Act claims in the present case. *Amici* Professors assert that use of a trademark in an artistic work cannot be "explicitly misleading" unless an express misstatement of sponsorship, endorsement, or origin is made. (*Amici* Prof. Br. at 14.) But the Second Circuit itself has recognized (and the Fifth Circuit has agreed) that the "explicitly mislead[ing]" prong of *Rogers* may be satisfied if the likelihood of confusion is "particularly compelling," whether an affirmative misstatement of endorsement is made or not. *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996

24

F.2d 1366, 1379 (2d Cir. 1993); *accord Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 664-65 (5th Cir. 2000).  This more flexible approach recognizes that likelihood of confusion is necessarily a fact-dependent analysis, and is preferable to the blunt rule proposed by *Amici* Professors, which would both ignore the importance of context in Lanham Act cases and provide would-be infringers a virtual "blank check" to misappropriate trademarks by strongly implying an endorsement or affiliation with the trademark owner.

## III.    CONCLUSION

For the foregoing reasons, the interpretation of *Dastar* and *Rogers* propounded by PR and *Amici* Professors should be rejected.

Respectfully submitted,
 /s/ Anthony J. Dreyer
Anthony J. Dreyer
Jordan A. Feirman
Hannah M. Marek
SKADDEN ARPS SLATE
   MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036
(212) 735-3000
anthony.dreyer@skadden.com

David A. Donahue
FROSS ZELNICK LEHRMAN &
   ZISSU, P.C.
Four Times Square, 17th Floor
New York, New York 10036
ddonahue@frosszelnick.com

*Counsel for Amicus Curiae*

Dated:  December 6, 2017

25

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because the brief contains 6,178 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).  This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6), respectively, because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.


 /s/ Anthony J. Dreyer

Anthony J. Dreyer

## ADDENDUM OF STATUTES AND REGULATIONS

Except for the following, all applicable statutes on which INTA relies are contained in the Addenda to Appellant's Opening Brief and Appellees' Initial Brief.

## ADDENDUM TABLE OF CONTENTS

Page

15 U.S.C. § 1117(b), (c) ........................................................................... A-2

15 U.S.C. § 1127 ...................................................................................... A-3

17 U.S.C. § 301(d) ................................................................................... A-7

A-1

## 15 U.S.C. § 1117

### § 1117. Recovery for violation of rights

**(b) Treble damages for use of counterfeit mark**

In assessing damages under subsection (a) for any violation of section 1114(1)(a) of this title or section 220506 of title 36, in a case involving use of a counterfeit mark or designation (as defined in section 1116(d) of this title), the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever amount is greater, together with a reasonable attorney's fee, if the violation consists of—

**(1)** intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark (as defined in section 1116(d) of this title), in connection with the sale, offering for sale, or distribution of goods or services; or

**(2)** providing goods or services necessary to the commission of a violation specified in paragraph (1), with the intent that the recipient of the goods or services would put the goods or services to use in committing the violation.

In such a case, the court may award prejudgment interest on such amount at an annual interest rate established under section 6621(a)(2) of title 26, beginning on the date of the service of the claimant's pleadings setting forth the claim for such entry of judgment and ending on the date such entry is made, or for such shorter time as the court considers appropriate.

**(c) Statutory damages for use of counterfeit marks**

In a case involving the use of a counterfeit mark (as defined in section 1116(d) of this title) in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits under subsection (a), an award of statutory damages for any such use in connection with the sale, offering for sale, or distribution of goods or services in the amount of—

**(1)** not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just; or

(**2**) if the court finds that the use of the counterfeit mark was willful, not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.


## 15 U.S.C. § 1127

### § 1127. Construction and definitions; intent of chapter

In the construction of this chapter, unless the contrary is plainly apparent from the context--

The United States includes and embraces all territory which is under its jurisdiction and control.

The word "commerce" means all commerce which may lawfully be regulated by Congress.

The term "principal register" refers to the register provided for by sections 1051 to 1072 of this title, and the term "supplemental register" refers to the register provided for by sections 1091 to 1096 of this title.

The term "person" and any other word or term used to designate the applicant or other entitled to a benefit or privilege or rendered liable under the provisions of this chapter includes a juristic person as well as a natural person. The term "juristic person" includes a firm, corporation, union, association, or other organization capable of suing and being sued in a court of law.

The term "person" also includes the United States, any agency or instrumentality thereof, or any individual, firm, or corporation acting for the United States and with the authorization and consent of the United States. The United States, any agency or instrumentality thereof, and any individual, firm, or corporation acting for the United States and with the authorization and consent of the United States, shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity.

The term "person" also includes any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity.

A-3

The terms "applicant" and "registrant" embrace the legal representatives, predecessors, successors and assigns of such applicant or registrant.

The term "Director" means the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.

The term "related company" means any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used.

The terms "trade name" and "commercial name" mean any name used by a person to identify his or her business or vocation.

The term "trademark" includes any word, name, symbol, or device, or any combination thereof--

> **(1)** used by a person, or

> **(2)** which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter,

to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.

The term "service mark" means any word, name, symbol, or device, or any combination thereof--

> **(1)** used by a person, or

> **(2)** which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter,

to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown. Titles, character names, and other distinctive features of radio or television programs may be registered as service marks notwithstanding that they, or the programs, may advertise the goods of the sponsor.

The term "certification mark" means any word, name, symbol, or device, or any combination thereof--

> **(1)** used by a person other than its owner, or

A-4

(**2**) which its owner has a bona fide intention to permit a person other than the owner to use in commerce and files an application to register on the principal register established by this chapter,

to certify regional or other origin, material, mode of manufacture, quality, accuracy, or other characteristics of such person's goods or services or that the work or labor on the goods or services was performed by members of a union or other organization.

The term "collective mark" means a trademark or service mark--

(**1**) used by the members of a cooperative, an association, or other collective group or organization, or

(**2**) which such cooperative, association, or other collective group or organization has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter,

and includes marks indicating membership in a union, an association, or other organization.

The term "mark" includes any trademark, service mark, collective mark, or certification mark.

The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce--

(**1**) on goods when--

(**A**) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and

(**B**) the goods are sold or transported in commerce, and

(**2**) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

A-5

A mark shall be deemed to be "abandoned" if either of the following occurs:

> **(1)** When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

> **(2)** When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark. Purchaser motivation shall not be a test for determining abandonment under this paragraph.

The term "colorable imitation" includes any mark which so resembles a registered mark as to be likely to cause confusion or mistake or to deceive.

The term "registered mark" means a mark registered in the United States Patent and Trademark Office under this chapter or under the Act of March 3, 1881, or the Act of February 20, 1905, or the Act of March 19, 1920. The phrase "marks registered in the Patent and Trademark Office" means registered marks.

The term "Act of March 3, 1881", "Act of February 20, 1905", or "Act of March 19, 1920", means the respective Act as amended.

A "counterfeit" is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark.

The term "domain name" means any alphanumeric designation which is registered with or assigned by any domain name registrar, domain name registry, or other domain name registration authority as part of an electronic address on the Internet.

The term "Internet" has the meaning given that term in section 230(f)(1) of Title 47.

Words used in the singular include the plural and vice versa.

The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by

the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations.

**17 U.S.C. § 301(d)**

**§ 301. Preemption with respect to other laws**

**(d)** Nothing in this title annuls or limits any rights or remedies under any other Federal statute.

## CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2017, I electronically filed the foregoing Brief of the International Trademark Association as *Amicus Curiae* in Support of Appellees with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. All participants are registered CM/ECF users, and will be served by the appellate CM/ECF system. In addition, I certify that two (2) hard copies were served on counsel for all separately represented parties in the case.

 /s/ Anthony J. Dreyer

Anthony J. Dreyer