**NOT YET SCHEDULED FOR ORAL ARGUMENT**

**Appeal No. 17-7035**
**(consolidated with Appeal No. 17-7039)**

---

# United States Court of Appeals
### For The District of Columbia Circuit

---

American Society for Testing and Materials; National Fire Protection
Association, Inc.; and American Society of Heating, Refrigerating,
and Air Conditioning Engineers, Inc.,

*Appellees,*

v.

Public.Resource.Org, Inc.,

*Appellant.*

---

Appeal from the United States District Court for the District of Columbia
Hon. Tanya S. Chutkan
1:13-cv-1215-TSC
1:14-cv-0857-TSC

---

### APPELLANT PUBLIC.RESOURCE.ORG'S
### CONSOLIDATED REPLY BRIEF

---

Andrew P. Bridges
abridges@fenwick.com
Matthew B. Becker
mbecker@fenwick.com
Fenwick & West LLP
555 California Street
San Francisco, CA 94104
Phone: (415) 875-2300

Corynne McSherry
corynne@eff.org
Mitchell L. Stoltz
mitch@eff.org
Electronic Frontier Fndn.
815 Eddy Street
San Francisco, CA 94109
Phone: (415) 436-9333

David Halperin
davidhalperindc
 @gmail.com
1530 P Street NW
Washington, DC 20005
Phone: (202) 905-3434

Attorneys for Appellant Public.Resource.Org, Inc.
January 24, 2018

**TABLE OF CONTENTS**

**Page**

GLOSSARY OF ABBREVIATIONS ........................................................x

INTRODUCTION ........................................................................1

ARGUMENT ............................................................................5

I.     PLAINTIFFS DO NOT MEET THEIR BURDEN OF SHOWING
       THAT THE PUBLIC INTEREST FAVORS THE INJUNCTION. ...............5

       A.    Plaintiffs Have the Burden of Establishing That a Permanent
             Injunction Serves the Public Interest........................................5

       B.    The Public Interest in Speaking the Law Disfavors an
             Injunction...............................................................6

       C.    Due Process Considerations Under the Fifth and Fourteenth
             Amendments Also Disfavor an Injunction............................7

II.    PLAINTIFFS MAY NOT USE COPYRIGHT TO MONOPOLIZE
       THE RIGHT TO REPRODUCE, SPEAK, AND PROVIDE
       PUBLIC ACCESS TO LAWS. ......................................................11

       A.    All Standards and Codes That Public.Resource.Org Posted
             Are Laws. ...............................................................11

       B.    The Historic Exclusion of "Edicts of Government" From
             Copyright Applies to All Binding Regulations...................12

       C.    Section 102(b) of the Copyright Act and the Merger
             Doctrine Also Limit Enforcement of Copyright in Laws. .................15

             1.    Laws Fall Within the Section 102(b) Exception from
                   Copyright. ...................................................15

             2.    Because There Is No Way to State Laws Accurately
                   and Completely Without Speaking Them Literally,
                   Copyright Law Cannot Restrict Use of the Laws
                   Themselves..................................................16

**TABLE OF CONTENTS**
**(Continued)**

Page

D.    Reversing the Decision Below Would Avoid the
Constitutional Conflict the District Court Created. ............................18

III.    POSTING INCORPORATED STANDARDS TO ENABLE
PUBLIC ENGAGEMENT WITH LAWS IS A FAIR USE. ........................21

A.    Facilitating Access to Laws Is a Favored Purpose, and
Public.Resource.Org Provides Important New Modes of
Access..................................................................................................21

1.    Public.Resource.Org's Use of the Standards Fits
Comfortably Within Established Precedent.............................21

2.    Public.Resource.Org Has a Transformative Purpose to
Promote Access to Laws..........................................................22

3.    Providing Access to Print-Disabled Persons Is Also
Transformative. .......................................................................23

4.    Public.Resource.Org's Posting of the Standards as
Part of a Legal Research Archive with Commentary Is
Transformative. .......................................................................24

5.    Public.Resource.Org's Use Is Not Commercial. .....................25

B.    The Nature of the Works Is That They Are *Now Laws*. ....................25

C.    Posting Complete Laws Is Necessary to
Public.Resource.Org's Purpose...........................................................26

D.    Public.Resource.Org's Posting of the Standards Does Not
Harm Any Legitimate Market..............................................................26

IV.    PLAINTIFFS' FACTUAL CONTRADICTIONS REGARDING
OWNERSHIP OF COPYRIGHTS PRECLUDE SUMMARY
JUDGMENT ON THE COPYRIGHT CLAIMS. .........................................29

# TABLE OF CONTENTS
## (Continued)

Page

V.    THE ASTM PLAINTIFFS CANNOT USE TRADEMARK LAW
AS A SUBSTITUTE FOR COPYRIGHT LAW. ........................................31

A.    Under *Dastar,* Trademark Law Cannot Limit
Public.Resource.Org's Activities Here. ...............................32

B.    Public.Resource.Org Does Not Engage in Trademark Use of
the ASTM Plaintiffs' Marks.................................................34

C.    The Nominative Fair Use Doctrine Also Immunizes
Public.Resource.Org's Actions. ..........................................36

D.    *Rogers* Protects Public.Resource.Org's Activities Under the
First Amendment in Harmony with the Nominative Fair Use
Doctrine. ............................................................................37

CONCLUSION ...............................................................................40

CERTIFICATE OF COMPLIANCE.......................................................42

CERTIFICATE OF SERVICE ..............................................................43

TABLE OF CONTENTS TO ADDENDUM .......................................... A-i

ADDENDUM OF STATUTORY AND OTHER TEXTS.................................. A-1

# TABLE OF AUTHORITIES

**Page(s)**

CASES[1]

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
   486 U.S. 492 (1988)\*\*\*.................................................................10

*American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*,
   456 U.S. 556 (1982).............................................................9, 10

*Authors Guild v. Google, Inc.*,
   804 F.3d 202 (2d Cir. 2015) ...............................................26

*Banks & Bros. v. West Publ'g*,
   27 F.50 57 (C.C. Minn. 1886) .............................................12

*Bellwether Properties, LLC, v. Duke Energy Indiana, Inc.*,
   no. 53S04-1703-CT-121 (Ind. filed Dec. 20, 2017)\*\*\* ..............................3, 4, 7

*Bill Graham Archives v. Dorling Kindersley Ltd*,
   448 F.3d 605 (2d Cir. 2006) ....................................24, 25, 27

*Bldg. Officials & Code Adm. v. Code Tech., Inc.*,
   628 F.2d 730 (1st Cir. 1980)\*\*\*.......................................7, 13, 21

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569, 590 n.21 (1994)\*\*\*.........................................27

*CCC Information Services, Inc. v. Maclean Hunter Market Reports, Inc.*,
   44 F.3d 61 (2d Cir. 1994) .......................................16, 17

*Center for Creative Non-Violence v. Reid*,
   490 U.S. 730 (1989)...............................................................30

*Clark v. Martinez*,
   543 U.S. 371 (2005)...............................................................18

---

[1] Cases on which Appellant Public.Resource.Org chiefly relies have three asterisks appearing at the end of the citation.

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Grp., Inc.*,
   886 F.2d 490 (2d Cir. 1989) ..............................................................38

*Connally v. Gen Constr. Co.*,
   269 U.S. 385 (1926)..........................................................................12

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
   539 U.S. 23 (2003)\*\*\*.........................................................32, 33, 34, 37

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006)\*\*\*...............................................................5, 6, 8

*EMI Catalogue P'ship v. Hill, Holiday, Connors, Cosmopulos, Inc.*,
   228 F.3d 56 (2d Cir. 2000) ...............................................................33

*Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*,
   122 F.3d 1211 (9th Cir. 1997) ..........................................................30

*Fashion Originators Guild v. FTC*,
   312 U.S. 457 (1941)..........................................................................10

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
   499 U.S. 340 (1991)..........................................................................30

*Getty Petroleum Marketing, Inc., v. Capital Terminal Co.*,
   391 F.3d 312 (1st Cir. 2004) (*per curiam*)\*\*\* ....................................3

*Hassett v. Welch*,
   303 U.S. 303 (1938)..........................................................................11

*Hustler Magazine, Inc. v. Moral Majority, Inc.*,
   606 F. Supp. 1526 (C.D. Cal. 1985)\*\*\* ...........................................25

*International Code Council v. Nat'l Fire Prot'n Ass'n*,
   Case No. 02-cv-5610 (N.D. Ill. Feb. 28, 2005), Dkt. 75\*\*\* ..............18

*Kelo v. City of New London*,
   545 U.S. 469 (2005)..........................................................................19

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Kern River Gas v. Coastal Corp.*,
899 F.2d 1458 (5th Cir. 1990)\*\*\* ................................................... 17

*McCutcheon v. Fed. Election Comm'n*,
134 S. Ct. 1434 (2014) ..................................................................... 39

*Mid Am. Title Co. v. Kirk*,
59 F.3d 719 (7th Cir. 1995) ............................................................. 29

*Motion Picture Ass'n of America, Inc. v. F.C.C.*,
309 F.3d 796 (D.C. Cir. 2002) ........................................................ 14

*Mutual of Omaha Ins. Co. v. Novak*,
836 F.2d 397 (8th Cir. 1987) ........................................................... 39

*New Kids On The Block v. News America Pub., Inc.*,
745 F. Supp. 1540, 1544 (C.D. Cal 1990) ........................................ 39

*Online Policy Grp. v. Diebold, Inc.*,
337 F. Supp. 2d 1195 (N.D. Cal. 2004) ........................................... 21

*Phoenix Entm't Partners v. Rumsey*,
829 F.3d 817 (7th Cir. 2016)\*\*\* ................................................. 33, 37

*Practice Mgmt. Info. Corp. v. American Medical Ass'n*,
121 F.3d 516 (9th Cir. 1997) ........................................................... 16

*Radiance Foundation, Inc. v. N.A.A.C.P.*,
786 F.3d 316 (4th Cir. 2015) (applying *Rogers* test to political satire) ............ 39

*Richmond Newspapers, Inc. v. Virginia*,
448 U.S. 555 (1980) ....................................................................... 6, 7

*Rogers v. Grimaldi*,
875 F.2d 994 (2d Cir. 1989)\*\*\* ................................... 37, 38, 39, 40

*Schnapper v. Foley*,
667 F.2d 102 (D.C. Cir. 1981) ......................................................... 31

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Sega Enterprises Ltd. v. Accolade, Inc.*,
   977 F. 2d 1510 (9th Cir. 1992) ...........................................................9

*Slep-Tone Entm't Corp. v. Canton Phoenix Inc.*,
   690 Fed. Appx. 937 (9th Cir. 2017)*** .............................................33

*Slep-Tone Entm't Corp. v. Wired for Sound Karaoke and*
   *DJ Services, LLC*, 845 F.3d 1246 (9th Cir. 2017)*** .........................33

*So. Bldg. Code Cong. Int'l, Inc. v. Veeck*,
   No. 02-355 (U.S. May 2003) ..............................................................20

*Societe Comptoir de l'Industrie Cotonniere Etablissements Boussac v.*
   *Alexander's Dept. Stores, Inc.*, 299 F.2d 33 (2d Cir. 1962) ...............33

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984)...............................................................9, 19, 27

*Swatch Grp. Mgmt. Servs. v. Bloomberg LP*,
   756 F.3d 73 (2d Cir. 2014) .................................................................24

*United States v. Myers*,
   553 F.3d 328 (4th Cir. 2009)*** .........................................................11

*Veeck v. S. Bldg. Code Cong. Int'l, Inc.*,
   293 F.3d 791 (5th Cir. 2002)*** ........................................7, 16, 19, 20

**FEDERAL STATUTORY PROVISIONS**

5 U.S.C. 552(a) ....................................................................................26

5 U.S.C. § 552(a)(1)(c) .........................................................................12

"National Technology Transfer and Advancement Act"...................13, 14

17 U.S.C. § 102(b) ("Copyright Act").............................................1, 15, 16

17 U.S.C. § 105 ("Copyright Act").............................................1, 13, 16, 31

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

17 U.S.C. § 121 ("Chafee Amendment") ...............................................24

National Electrical Code ("NEC").......................................10, 27, 28, 35

National Electrical Safety Code 2002 ("NESC") ..............................3, 4, 5

**FEDERAL REGULATIONS**

34 C.F.R. § 462.13(f)(1) ...................................................................26

34 C.F.R. § 668.146(b)(6) ................................................................26

34 C.F.R. § 668.148(a)(1)(iv ............................................................26

34 C.F.R. § 668.148(a)(2)(i) .............................................................26

11 C. F.R part 51 ...........................................................................26

National Archives, *Code of Federal Regulations Incorporation by Reference*, https://www.archives.gov/federal-register/cfr-ibr-locations.html ..........................................................................12

OMB Circular A-119, 63 Fed. Reg. 8546, 8554 (Feb. 19, 1998 ............14

**STATE PROVISIONS**

*18-Month Code Adoption Cycle*, Cal. Bldg. Standards Comm'n ............12

Cal. Dep't of Gen. Servs., *2015 Triennial Code Adoption Cycle* (Dec. 2014) ...............................................................................12

California Building Standards Law .....................................................12

California Code of Regulations, Title 24...............................................12

N.Y. Comp. Codes, R. & Regs. tit. 11, § 216.7(c)(1)(i) (West 1999)....................17

**OTHER AUTHORITIES**

1 Paul Goldstein, Goldstein on Copyright § 2.5.2, at 2:51 ......................20

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

Institute of Electrical and Electronic Engineers ("IEEE") ...................................3, 4

L. Ray Patterson & Craig Joyce, *Monopolizing the Law: the Scope of Copyright Protection for Law Reports and Statutory Compilations*, 36 UCLA L. Rev. 719, 777 (1999) ...........................................................................15

"Law," Oxford English Dictionary, https://www.oxforddictionaries.com/us/definition/american_english/law ........15

Nina A. Mendelson, *Private Control Over Access to Public Law: The Perplexing Federal Regulatory Use of Private Standards*, 112 Mich. L. Rev. 737, 771 (2014) .....................................................................9

U.S. Copyright Office, Compendium of Copyright Office Practices § 313.6(c)(2) (3d ed. 2014) ("Copyright Office Compendium"). ...................13, 14

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| AERA | American Educational Research Association (Plaintiff) |
| ALEC | American Legislative Exchange Council |
| AMA | American Medical Association |
| APA | American Psychological Association (Plaintiff) |
| ASHRAE | American Society of Heating, Refrigeration, and Air Conditioning Engineers (Plaintiff) |
| ASTM | American Society of Testing and Materials (Plaintiff) |
| CFR | Code of Federal Regulations |
| CPT | Physician's Current Procedural Terminology |
| HCFA | Health Care Financing Administration |
| HCPCS | HCFA Common Procedure Coding System |
| HTML | Hypertext Markup Language |
| ICC | International Code Council |
| IEEE | Institute of Electrical and Electronic Engineers |
| INTA | International Trademark Association |
| MML | Mathematics Markup Language |
| NCME | National Council for Measurement in Education (Plaintiff) |
| NEC | National Electrical Code (of NFPA) |
| NESC | National Electrical Safety Code |
| NFPA | National Fire Protection Association (Plaintiff) |
| NTTAA | National Technology Transfer and Advancement Act of 1995 |
| SDO(s) | standards development organization(s) |

# INTRODUCTION

The district court made three fundamental errors. *First*, it misread copyright law, thereby putting the Copyright Act in tension with the First, Fifth, and Fourteenth Amendments. Private interests have long contributed to creation of the law, but courts have never held that private interests could monopolize citizens' ability to access and the law. Instead, laws incorporated by reference, like all other edicts of government, are outside the private statutory monopoly of copyright. A proper interpretation of the Section 102(b) of the Copyright Act, the merger doctrine, and the fair use doctrine also requires judgment for Public.Resource.Org.

This error is particularly egregious given the factual morass of Plaintiffs' copyright ownership claims. Contradicting their registrations and initial legal positions, they now claim to be joint authors with countless volunteers, including U.S. Government employees acting in the course of their official duties—a risky stance for Plaintiffs given that works by U.S. Government employees in their official capacity are excluded from copyright protection.

*Second*, the district court's cursory trademark analysis discounted the multiple trademark doctrines that protect Public.Resource.Org's posting of the law as adopted.

*Third,* the district court compounded its errors on the merits by permanently enjoining Public.Resource.Org, contrary to crucial public interests in speaking,

teaching, criticizing, and accessing the law. On appeal, Plaintiffs fail to carry *their burden* of justifying that injunction. In particular, they fail to demonstrate that the injunction against sharing the law serves the public interest. Instead, they rely upon a general public interest in copyright protection (collapsing analysis of the injunction into the underlying merits) and in the standards development system itself.

The ASTM Plaintiffs also argue that there is no public interest in the kind of broad availability of the law that Public.Resource.Org promotes because "PRO never identified a single individual unable to access the Works in question." ASTM Br. 47. But examples are readily at hand in a context this court knows well: the work of judges.

In a published First Circuit case, neither counsel nor the court of appeals itself could find and access the 1987 version of Plaintiff NPFA's standard NFPA 30, which Rhode Island law had incorporated by reference, and on which a

counterclaim depended. *See Getty Petroleum Marketing, Inc. v. Capital Terminal Co.*, 391 F.3d 312, 320-21, 330 (1st Cir. 2004) (per curiam).[2]

Moreover, *just last month*, the Indiana Supreme Court described its own obstacles in obtaining a standard that Indiana law incorporated by reference. *See Bellwether Properties, LLC, v. Duke Energy Indiana, Inc.,* no. 53S04-1703-CT-121 (Ind. filed Dec. 20, 2017).[3]  In that case, a statute-of-limitations question turned upon Indiana's adoption and incorporation by reference of the 2002 version of the National Electrical Safety Code (NESC), which the Institute of Electrical and Electronic Engineers (IEEE) had promulgated.

Neither of the parties had submitted the incorporated NESC for the record, and the Indiana Supreme Court wanted to know that the law said. So a court employee asked the relevant government agency to furnish a copy of NESC for the

---

[2] That dispute turned upon compliance with a Rhode Island law that incorporated the 1987 version of one of the standards at issue here: Plaintiff NFPA's Standard 30. Like every standard at issue here, that version of the document was obsolete as a standard but still current as law. The trial judge asked for a copy. Counsel could find the 2000 version but not the 1987 version. The court then looked for a copy but could not locate it. *Id. at* 320. The court ruled against the party that relied on the law because neither that party nor the court could find the document. *Id.* at 321. A concurring opinion specifically noted that the 1987 edition of NFPA 30 was "not so readily available" and that "it is neither reproduced in the Rhode Island statute books nor retrievable via commonly used legal research methods." *Id.* at 330 (Lipez, J., concurring).

[3] Available at https://scholar.google.com/scholar_case?case=9184779564574078018&hl=en&as_sdt=2006.

3

Supreme Court's study. The agency refused, saying the court employee could

make an appointment to inspect the NESC, but she could neither get a copy nor

check it out because of copyright restrictions.

How did the Indiana Supreme Court eventually find the 2002 version of

NESC, which was Indiana's relevant law?  By visiting the website of the Internet

Archive.[4]  *Id. at* *8. How did that document get on the Internet Archive?

*Public.Resource.Org. had placed it there*.[5]

The Indiana Supreme Court discussed at length the importance of

meaningful public access to laws and the practical problems of access to standards

incorporated by reference into laws. "If the rule of law means anything, it is that

persons have meaningful access to the laws they are obliged to follow, so they can

---

[4] The court, slip op. at *8, cited to
https://ia600704.us.archive.org/16/items/gov.law.ieee.c2.2002/ieee.c2.2002.pdf.

[5] This Court can take judicial notice that the 2002 edition of NESC that the Indiana
Supreme Court cited is a resource on the Internet Archive by examining the online
location cited; that the metadata page for this document indicates that it was
"Uploaded by Public.Resource.Org," see
https://archive.org/details/gov.law.ieee.c2.2002 and
https://ia600704.us.archive.org/16/items/gov.law.ieee.c2.2002/ieee.c2.2002.pdf_m
eta.txt; that Internet Archive hosts Public.Resource.Org's materials and that the
"cover sheet" of the document at the Archive is characteristic of other
Public.Resource.Org postings of incorporated laws. *See, e.g*., ASTM-Dkt-118-12.
Moreover, the Court can take judicial notice that IEEE describes the 2002 version
of NESC as "inactive–superseded," even though it is still Indiana law. *See*
http://ieeexplore.ieee.org/document/6516109/. These materials did not become
relevant to this appeal until after Public.Resource.Org's opening brief, because the
*Bellwether* decision occurred two months after the opening brief.

4

conform their conduct accordingly." *Id.* at *6. The court noted that, if *it* had difficulty accessing the NESC to learn Indiana law, perhaps the plaintiff had as well, which would bear on the limitations issue and application of the discovery rule to the issue. The court remanded the case for a determination of whether, and when, the substance of the Indiana law had become public domain. *Id.* at *9.

Citizens and other courts nationwide face similar barriers to accessing standards incorporated into law. Public.Resource.Org helps eliminate those barriers. Indeed, had the injunction here extended also to the 2002 version of the NESC (whose publisher, IEEE, supports Plaintiffs here as amicus), Indiana's highest court might never have found it. That would not have served the public interest, and neither does the injunction here.

The Court should reverse the injunction and summary judgment below and direct judgment for Public.Resource.Org.

## ARGUMENT

## I. PLAINTIFFS DO NOT MEET THEIR BURDEN OF SHOWING THAT THE PUBLIC INTEREST FAVORS THE INJUNCTION.

### A. Plaintiffs Have the Burden of Establishing That a Permanent Injunction Serves the Public Interest.

Public.Resource.Org explained how the permanent injunction impairs important First Amendment rights and injures the public's due-process rights in access to the law. Opening Br. 33-39. Under *eBay Inc. v. MercExchange, L.L.C.*,

5

547 U.S. 388, 391 (2006), Plaintiffs must satisfy all equitable requirements for an injunction, including the requirement that the injunction serve the public interest. Plaintiffs fail to address, much less meet, their burden.

**B.    The Public Interest in Speaking the Law Disfavors an Injunction.**

As Public.Resource.Org explained in its opening brief, these cases concern quintessentially *political* speech. No speech is more political than speaking the law itself and educating the public about it.

The ASTM Plaintiffs do not respond to that point. They argue instead that the standards-development system serves "economic and public interests," and that the public interest in accessing law does not "extinguish" copyright. ASTM Br. 10, 22, 47. This approach essentially collapses the merits and remedies analyses, precisely what *eBay* forbids.

The AERA Plaintiffs, for their part, quibble that only First Amendment "*interests and values*" are at issue, and that copyright's fair use doctrine accommodates First Amendment interests. AERA Br. 16-17 & n.5. Neither observation changes the public-interest analysis: under *eBay*, First Amendment "interests and values" properly inform appraisal of an injunction, and they do so independently of the merits of the copyright claims.

The AERA Plaintiffs (at 16 n.6) also look to *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575-77, 580 (1980), but nothing in *Richmond Newspapers*

6

addresses the property claims of private parties. But the case supports Public.Resource.Org: it established the right of press access to criminal trials, a right not explicit in the Constitution but resting on tradition, historical practices, and earlier decisions. *Id.* at 589-93. The Court highlighted the importance of public reporting on the work of the courts. *Id.* at 569-72, 592-93. There is a similar right of public access to, and a similar need for public reporting on, the body of the law itself.

Plaintiffs miss this latter point, wrongly assuming that *access* to the law is the only First Amendment concern here. Public.Resource.Org also has the right to *speak* and *teach* the law; to disseminate it for others' benefit; and to promote study, commentary, analysis, criticism, and further speech by others. A speaker's right to speak and teach is independent of a listener's right to hear. Thus, even if there were adequate access to the laws in question, Public.Resource.Org would still have a right to communicate those laws.

### C.    Due Process Considerations Under the Fifth and Fourteenth Amendments Also Disfavor an Injunction.

As the First Circuit observed, the public has an "essential due process right of free access to the law," *Bldg. Officials & Code Adm. v. Code Tech., Inc.*, 628 F.2d 730, 736 (1st Cir. 1980), a sentiment that the Fifth Circuit echoed later in *Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 293 F.3d 791, 801, (5th Cir. 2002), and which the Indiana Supreme Court reinforced last month in *Bellwether*.

The ASTM Plaintiffs deny Public.Resource.Org's standing to raise this issue. ASTM Br. 45-56. But a party has the right to argue the public interest for or against an injunction as one of the four considerations under *eBay*. Here, Public.Interest.Org properly argues for the public interest against an injunction limiting access to laws that began as private standards, which (as the Indiana Supreme Court noted) may languish in obscurity when they are merely incorporated by reference.

Plaintiffs offer no response to the bipartisan amicus brief submitted by Representatives Lofgren and Issa, which highlights significant problems with copyright-based restrictions on access to the law and stresses the burdens on the poor and disabled from the permanent injunction. Amici representing the print-disabled community; library associations and librarians; former senior government officials; legal educators; and non-profit consumer safety, nutrition, health, labor, and welfare organizations illustrate still more public-interest concerns that militate against an injunction.

As these amici demonstrate, the right of access to laws is important not just to those who must comply with, enforce, or interpret the laws. Everyone who enters a building whose construction and operation are dictated by standards incorporated into law, who uses a consumer product regulated by those laws, or

who wants to hold lawmakers (including private ones) or enforcers to account

deserves access to them.[6] As Professor Mendelson notes,

> regulatory beneficiaries of all sorts, as well as regulated entities, have
> a strong and direct interest in access to the content of regulatory
> standards…because it directly affects their interests and can
> potentially affect their conduct. Accordingly, if notice is to be
> effective, ready public access must be provided to anyone potentially
> affected by the law.

Nina A. Mendelson, *Private Control Over Access to Public Law: The Perplexing*

*Federal Regulatory Use of Private Standards*, 112 Mich. L. Rev. 737, 771 (2014).

Public access is especially important where laws may emerge from private

processes. In *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*,

456 U.S. 556, 559-62 (1982), the Supreme Court upheld a civil claim against

ASME, an amicus supporting Plaintiffs here, for abusing the standards process to

favor one member. The Court noted that "ASME can be said to be 'in reality an

extra-governmental agency, which prescribes rules for the regulation and restraint

---

[6] Plaintiffs also insist that Public.Resource.org lacks "standing" to argue the
importance of due process and the interests of others to the substantive copyright
issues. Due-process considerations inform the edicts-of-government exclusion
from copyright, application of the merger doctrine, and fair use. Each of these
applies directly to Public.Resource.Org's right to speak the law. Enabling further
fair uses by others is itself a fair use. *See Sega Enterprises Ltd. v. Accolade, Inc.*,
977 F. 2d 1510, 1523-24 (9th Cir. 1992) ("facilitating the entry of a new
competitor" is fair use). And in *Sony,* (a case involving claims of contributory
copyright infringement, like one of Plaintiffs' claims here) the Supreme Court
addressed, and agreed with, Sony's arguments regarding fair uses by its customers.
464 U.S. at 443-56. Public.Resource.Org has every right to argue the rights and
interests of those who may obtain laws from it.

of interstate commerce.'" *Id.* at 570 (quoting *Fashion Originators Guild v. FTC,* 312 U.S. 457, 465 (1941)).

Six years later, in *Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 500 (1988), the Court observed that, while one may presume that a government acts in the public interest, one may also presume that a private party is acting primarily on its own behalf. Addressing the National Electrical Code (NEC), which is at issue in this case, the Court observed that "the dividing line between restraints resulting from government action and those resulting from private action may not always be obvious." *Allied Tube,* 486 U.S. at 501-02. It described the restraint of trade that the NEC embodied as "imposed by persons unaccountable to the public and without official authority, many of whom have financial interests in restraining competition…." *Id.* To guard against such abuses, citizens must readily be able to access, analyze, and criticize the laws that emerge from these private processes.

Finally, Plaintiffs' argument that public access to the incorporated standards is presently adequate to ensure due process cannot be squared with their claim that they have the absolute right to choose where and how to distribute standards or to withdraw them from circulation entirely. Indeed, Plaintiffs claim the right to not make the standards available at all. ASTM Br. 44; AERA-Dkt-60-1 at 18 (AERA asserting it took the 1999 Standards off sale "to encourage sales of the newly-

10

revised edition—the 2014 Standards."); AERA-Dkt-68-7 (222:02-223:05); AERA-Dkt-68-7 (55:09-56:10); AERA-Dkt-14 ¶ 14, 19.

The Court should reverse the district court's injunction because the Plaintiffs failed to carry their burden on the public interest. And because the sole remedy Plaintiffs sought was an injunction, the Court may direct that the cases be dismissed on that basis alone.

## II.   PLAINTIFFS MAY NOT USE COPYRIGHT TO MONOPOLIZE THE RIGHT TO REPRODUCE, SPEAK, AND PROVIDE PUBLIC ACCESS TO LAWS.

Like the district court, Plaintiffs have tried to cast this dispute as an ordinary copyright case. It is not. It is not about creative expression, or art, or software. It is not even about the overwhelming majority of the Plaintiffs' standards and codes. It is only about documents that have become *laws*, and that fact changes the analysis.

### A.   All Standards and Codes That Public.Resource.Org Posted Are Laws.

As the Indiana case shows, standards incorporated by reference are the law, binding on all. "The general rule is that when one statute adopts a provision of another statute by specific reference, it is as if the adopting statute had itself spelled out the terms of the adopted provision." *United States v. Myers*, 553 F.3d 328, 331 (4th Cir. 2009) (citing *Hassett v. Welch*, 303 U.S. 303, 314 (1938)). Indeed, that is the goal of the incorporation process. "[I]ncorporation by reference is used primarily to make privately developed technical standards Federally

11

enforceable." National Archives, *Code of Federal Regulations Incorporation by Reference*, https://www.archives.gov/federal-register/cfr/ibr-locations.html.

Befitting the creation of enforceable rules, the incorporation process is formal and rigorous. At the federal level, government technical experts assess a standard, the Federal Register publishes a notice proposing incorporation, and there is an opportunity to submit comments. After a lengthy process, an agency will determine whether incorporation by reference is appropriate. The Director of the Federal Register must approve the incorporation. 5 U.S.C. § 552(a)(1)(c).

State adoptions are equally rigorous. For example, the State of California incorporates model codes into Title 24 of the California Code of Regulations on a triennial cycle, with a 45-day public-comment period, a six-month publication requirement, and a three-month delay to allow local governments to implement them. The California Building Standards Law precisely defines this process.[7]

### B.    The Historic Exclusion of "Edicts of Government" From Copyright Applies to All Binding Regulations.

For nearly two centuries it has been a fundamental principle of American law that the texts that make up the law are in the public domain. Opening Br. 29-32; *see generally Connally v. Gen Constr. Co.*, 269 U.S. 385, 391 (1926); *Banks*

---

[7] *See* Cal. Dep't of Gen. Servs., *2015 Triennial Code Adoption Cycle* (Dec. 2014), https://www.documents.dgs.ca.gov/bsc/2015TriCycle/2015TricycleTimeline.pdf; *18-Month Code Adoption Cycle*, Cal. Bldg. Standards Comm'n, http://www.bsc.ca.gov/Rulemaking/adoptcycle.aspx (last visited Jan. 24, 2018).

*& Bros. v. West Publ'g*, 27 F.50 57 (C.C. Minn. 1886). The First Circuit applied this principle to building codes, noting that basic precepts like constructive notice depend on the idea that the law is "generally available for the public to examine." *Building Officials & Code Administrators v. Code Technology, Inc.*, 628 F.2d 730, 734 (1st Cir. 1980). If private parties can control access to or public reporting of the laws, persons "may be deprived of the notice to which due process entitles them." *Id*.

Section 105 of the Copyright Act is not, as Plaintiffs suggest, coextensive with the traditional copyright exclusion of government edicts. Section 105 is both broader and narrower than the edicts-of-government doctrine. It precludes copyright in U.S. Government works generally, such as NASA photographs. It does not address state, local, and foreign laws, all of which are uncopyrightable as edicts of government. *See* U.S. Copyright Office, Compendium of Copyright Office Practices § 313.6(c)(2) (3d ed. 2014) ("Copyright Office Compendium"). The edicts-of-government exclusion stands on its own.

Nor does the National Technology Transfer and Advancement Act (NTTAA)*,* or the collection of nonstatutory authorities Plaintiffs cite establish private rights in edicts of government. First, like Section 105, they concern only the federal government, not the many states and municipalities that also

13

incorporate codes by reference. Second, neither the text nor the legislative history of the NTTAA addresses copyright in standards *after they have become law.*

Likewise, OMB Circular A-119, 63 Fed. Reg. 8546, 8554 (Feb. 19, 1998), does not govern the copyright status of standards incorporated by reference. And while the Office of the Federal Register did not require all federal agencies to make materials incorporated by reference available for free, it did not bar non-government entities like Public.Resource.Org from doing so as a public service.

Moreover, neither the Office of Management and Budget nor the Office of the Federal Register has jurisdiction to determine what is copyrightable. *See Motion Picture Ass'n of America*, *Inc. v. F.C.C.,* 309 F.3d 796, 801 (D.C. Cir. 2002) (no deference to agency statutory interpretation without authority from Congress to regulate the subject matter). The Copyright Office administers U.S. copyright law and has stated explicitly that edicts of government cannot be registered as copyrighted works. Copyright Office Compendium § 313.6(c)(2). That *standards* may be registered when they have *not been incorporated into law* is immaterial.

14

C.  **Section 102(b) of the Copyright Act and the Merger Doctrine Also Limit Enforcement of Copyright in Laws.**

1.  **Laws Fall Within the Section 102(b) Exception from Copyright.**

In addition to the free-standing tradition that precludes a copyright statutory monopoly over edicts of government, Congress has codified other principles that preclude copyright in the law.

In particular, Section 102(b) of the Copyright Act, 17 U.S.C. § 102(b), precludes copyright for "any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." Law is a "system of rules that a particular country or community recognizes as regulating the actions of its members and may enforce by the imposition of penalties."[8] Section 102(b) thus places law outside the scope of copyright. *See also* L. Ray Patterson & Craig Joyce, *Monopolizing the Law: the Scope of Copyright Protection for Law Reports and Statutory Compilations*, 36 UCLA L. Rev. 719, 777 (1999) ("[C]opyright protection is driven by a fundamental policy of ensuring maximum access to the law…[T]he need of the public, the bench and the bar for maximum access to the law requires that the courts weigh that

---

[8] *See* "Law," Oxford English Dictionary, https://www.oxforddictionaries.com/us/definition/american_english/law.

consideration carefully in construing provisions of the [Copyright] Act, such as sections 102 and 103….”).

### 2. Because There Is No Way to State Laws Accurately and Completely Without Speaking Them Literally, Copyright Law Cannot Restrict Use of the Laws Themselves.

The merger doctrine buttresses the Section 102(b) exclusion: when ideas and expression “merge” in a work, that work is not copyrightable. Otherwise copyright would improperly restrict the use of ideas. As the *Veeck* court recognized, the merger doctrine counsels against copyright in incorporated codes: once incorporated, standards become “the unique, unalterable expression of the ‘idea’ that constitutes local law.” *See Veeck*, 293 F.3d at 801. *Veeck* is directly on point and applies here.

The standards incorporated by reference at issue in this case are different from the “extrinsic standards” at issue in *Practice Mgmt. Info. Corp. v. American Medical Ass’n*, 121 F.3d 516 (9th Cir. 1997), and *CCC Information Services, Inc. v. Maclean Hunter Market Reports, Inc.,* 44 F.3d 61 (2d Cir. 1994). The documents here, like the codes in *Veeck*, *have become enforceable law*. In contrast, *Practice Management* involved regulations requiring Medicare and Medicaid claimants to use a medical coding system, which is analogous to a regulation mandating the submission of telephone numbers with claims. It did not incorporate the medical coding system into law—it merely *referred* to it.

16

Likewise, the relevant document in *CCC* was one of several automobile valuation references that regulations approved for use in insurance adjusting. The regulation at issue merely stated "[m]anuals approved for use are…The Redbook….," without any mention of incorporating those manuals into enforceable laws. *See* N.Y. Comp. Codes, R. & Regs. tit. 11, § 216.7(c)(1)(i) (West 1999), *cited in CCC*, 44 F.3d at 73 n.29.

Plaintiffs also misrepresent *Kern River Gas v. Coastal Corp.,* 899 F.2d 1458 (5th Cir. 1990), which held that merger precluded copyright in map markings of a pipeline route that a regulatory commission had approved and that therefore became the unique expression of an idea. Plaintiffs wrongly suggest that government action had nothing to do with the merger analysis. As *Kern River* stated, "[government s]taff approval was significant because any proposed pipeline constructed within the mile-wide corridor would require no further environmental study, whereas any route falling outside the corridor would be subject to further inquiry…. To extend copyright protection to the quad maps would grant Kern River a monopoly over the only approved pipeline route." *Id.* at 1460, 1464-65. Thus, *Kern River* contradicts Plaintiffs' argument that the merger doctrine cannot apply where, as here, government action has transformed the meaning of a work.

Notably, when the shoe was on the other foot, one of the plaintiffs here, took a very different position. Defending against copyright claims by its competitor,

International Code Council (ICC) (also an amicus of Plaintiffs), NFPA argued that the portions of ICC's codes it had copied were not copyrightable. NFPA asserted that (a) the portions of codes at issue were merely facts and ideas that were not copyrightable; and (b) the merger doctrine precluded copyright enforcement of those portions of ICC's codes because, given the constraints that applied to the safety codes, the range of expression was limited and therefore the ideas and the expression merged into an unprotectable whole. *See* Motion for Summary Judgment at 23-25, *International Code Council v. Nat'l Fire Prot'n Ass'n*, Case No. 02-cv-5610 (N.D. Ill. Feb. 28, 2005), Dkt. 75. NFPA was right then.

### D.     Reversing the Decision Below Would Avoid the Constitutional Conflict the District Court Created.

Plaintiffs suggest, in a footnote, that reversing the district court will create a "constitutional problem." ASTM Br. 45 n.13. But it is the district court's ruling that creates a constitutional problem, first by ignoring the constitutional policies that infuse copyright doctrines and then by elevating private copyright interests above the public's constitutional rights. Constitutional avoidance favors an interpretation that best reconciles the statute with the Constitution. *See Clark v. Martinez*, 543 U.S. 371, 380-81 (2005). Excluding these laws from copyright, like other edicts of government, accomplishes that goal.

Indeed, allowing a copyright monopoly over laws would run contrary to the purpose of copyright. "The monopoly privileges that Congress may authorize

are neither unlimited nor primarily designed to provide a special private benefit. Rather, the limited grant is a means by which an important public purpose may be achieved." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984). Recognizing the special role of laws, the fact that they are systems, and the fact that they merge ideas with precise expression respects both the Copyright Act and the Constitution.

Plaintiffs threaten that reversal here would cause them to bring claims for compensation under the Takings Clause. ASTM Br. 45 n.13. Even so, the doctrine of constitutional avoidance would not apply because the Constitution does not forbid taking for a public purpose. *Kelo v. City of New London*, 545 U.S. 469 (2005). In any event, any such dispute would be between the SDOs and the governments that incorporate their codes; it does not affect whether a third party like Public.Resource.Org can facilitate public access to, and speech about, the law.

Moreover, SDOs have long known that their copyright claims in incorporated standards would not withstand judicial scrutiny. In *Veeck*, two of the ASTM Plaintiffs (ASHRAE and NFPA) and four of their current amici filed briefs as amici supporting the appellant. In that case, the Fifth Circuit held there was no copyright in the building code at issue, establishing a national precedent that has not thwarted standards development. (The Supreme Court denied review in *Veeck*,

19

after the U.S. Justice Department told the court that the Fifth Circuit had "correctly decided" the case. *See* Brief for the United States as Amicus Curiae, *So. Bldg. Code Cong. Int'l, Inc. v. Veeck*, No. 02-355 (U.S. May 2003)).[9] The Fifth Circuit also observed:

> [I]t is difficult to imagine an area of creative endeavor in which the copyright incentive is needed less. Trade organizations have powerful reasons stemming from industry standardization, quality control, and self-regulation to produce these model codes; it is unlikely that, without copyright, they will cease producing them.

*Veeck*, 293 F.3d at 806 (quoting 1 Paul Goldstein, Goldstein on Copyright § 2.5.2, at 2:51). That prediction was accurate. Even since then, Plaintiffs still lobby for the incorporation of their standards into state and federal law,[10] despite knowing that it could result in loss of copyright monopoly. Two decades earlier, in *Building Officials*, the First Circuit vacated an injunction to enforce copyright in a

---

[9] *Available at* https://www.copyright.gov/rulings-filings/briefs/southern-building-code-congress-international-inc-v-veck-539-u.s.-969-2003.pdf.

[10] ASTM Plaintiffs do not dispute that they lobby for incorporation of their standards. AERA Plaintiffs try to distinguish themselves from the ASTM Plaintiffs by weakly protesting that "[t]he record reveals no efforts to persuade any government entity [to make the 1999 Standards law]" (AERA Br. 9-10), but in fact AERA produced evidence of lobbying, including a memorandum from 15 years ago commenting on a successful year of lobbying activity, particularly stating that Plaintiff APA's Public Policy Office wrote letters to members of Congress encouraging them to make the 1999 Standards law (and including a full copy of the text of those letters). AERA-Dkt-68-31; *see also* AERA-Dkt-68-7 (189:19-190:11).

model code because the plaintiff had not sufficiently shown that copyrights in its materials that had become law were enforceable. 628 F.2d at 736.

## III. POSTING INCORPORATED STANDARDS TO ENABLE PUBLIC ENGAGEMENT WITH LAWS IS A FAIR USE.

Fair-use analysis requires attention to the unique factual context here: the legally binding nature of the standards, their obsolescence as industry standards, Public.Resource.Org's use of the standards at issue *as laws*, and the absence of any valid or traditional market for the right to access and share any law. Plaintiffs' failure to grapple with that context dooms their fair use analysis.

### A. Facilitating Access to Laws Is a Favored Purpose, and Public.Resource.Org Provides Important New Modes of Access.

#### 1. Public.Resource.Org's Use of the Standards Fits Comfortably Within Established Precedent.

The authorities in Public.Resource.Org's opening brief all point to fair use. Br. 42. Contrary to Plaintiffs' assertion, no case has held that "enabl[ing] members of the public to obtain copies" (ASTM Br. 40) of a work cannot be transformative. Courts have found that providing complete copies of a work to the public can be a fair use where, as here, it serves the public interest. Like the documents on voting security at issue in *Online Policy Grp. v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1203 (N.D. Cal. 2004), "[i]t is hard to imagine a subject the discussion of which could be more in the public interest."

21

### 2.     Public.Resource.Org Has a Transformative Purpose to Promote Access to Laws.

Transformativeness turns on a difference in purpose from that of the original creators. Public.Resource.Org's purpose is to facilitate access to the law. Plaintiffs do not share that goal.

Consider just federally incorporated standards. Library availability of these standards is poor, and often nonexistent, particularly because very specific and outdated versions of standards are incorporated into law.[11] Citizens can read them in a Washington, D.C. reading room, after a written request. Otherwise, they must buy them at Plaintiffs' price. The average price for one incorporated pipeline-safety standard is $150, while a complete set of IBR standards implementing the Pipeline and Hazardous Materials Safety Act costs nearly $10,000. Moreover, Plaintiffs concede that some standards are not in print; they expressly assert their right to keep them out of print. ASTM Br. 44.

Plaintiffs make some (though not all) of the standards at issue available via online "reading rooms," but these do not fill the gap. The standards are hard to locate and not consistently available on Plaintiffs' sites. These read-only sites display portions in small panes that are difficult to read and navigate, and they

---

[11] Plaintiffs do not contest Public.Resource.Org's observation in its opening brief that, for example, the incorporated edition of ASTM D396 did not appear to be available at any library. Opening Br. 8.

disable the ability of users to excerpt or annotate text for future reference or other private use. Readers must identify themselves, waive rights through adhesion contracts—including the right to select and copy the provisions of law for future use—and agree to distant legal venues and to indemnification of Plaintiffs. Plaintiffs reserve the right to revoke access and shut reading rooms. And print-disabled citizens who rely on screen-reading software cannot use the reading rooms at all. ASTM-Dkt-122-6 at 139-151; ASTM-Dkt-122-8 at 162-169 and 172-173; ASTM-Dkt-122-9 at 3-5; ASTM-Dkt-120-30; ASTM-Dkt-120-31; ASTM-Dkt-120-32.

The AERA Plaintiffs stopped selling the 1999 Standards, arguing they would be harmful to the public, even though they remain legally binding. AERA-Dkt-89 at 54; AERA-Dkt-68-11 at 7-8. They restored sales of that document only after Public.Resource.Org repeatedly raised the issue at deposition. That Plaintiffs' withdrew from sale obsolete but legally binding standards belies their claim that they seek "to enable the public to obtain copies," ASTM Br. 34.

### 3. Providing Access to Print-Disabled Persons Is Also Transformative.

The record shows that Plaintiffs have little interest in enabling meaningful access to the law for people with print disabilities, a key part of Public.Resource.Org's overall purpose. Well-formatted websites like Public.Resource.Org allow for universal access through many different kinds of

software and devices. Plaintiffs' suggestion that accessibility for print-disabled

persons depends solely on the Chafee Amendment, 17 U.S.C. § 121, is incorrect.

Educational institutions have always relied in part on fair use to serve the needs of

people with disabilities. AERA-Dkt-99-13 at 22. Moreover, universal access to

regulations on safety, and on fairness of educational and vocational testing furthers

federal policy. *Id.*; *see Swatch Grp. Mgmt. Servs. v. Bloomberg LP*, 756 F.3d 73,

83 (2d Cir. 2014) (use that advances a federal policy favors fair use).

### 4.   Public.Resource.Org's Posting of the Standards as Part of a Legal Research Archive with Commentary Is Transformative.

Plaintiffs cannot support their assertion that their purpose is identical to

Public.Resource.Org's. ASTM Br. 34-35. Plaintiffs' stated purpose is to improve

safety and standardize industry practices, not to inform citizens about the law.

ASTM Br. 4; AERA Br. 2-3. Public.Resource.Org aims to create a public

collection of important *government edicts* with accompanying essays. ASTM-Dkt-

121-5 at 1-11; *see generally* http://www.public.resource.org/. Lesser

transformations have been fair uses. *See, e.g.*, *Bill Graham Archives v. Dorling

Kindersley Ltd*, 448 F.3d 605, 608-10 (2d Cir. 2006) (reproducing posters in a

book "along a timeline," often without commentary, was fair because of a different

purpose). A shift in purpose, whether from "artistic expression" to "biographical"

expression, as in *Bill Graham*, or from an industry-consensus standard to part of a legal archive, as here, is the essence of transformative use.

### 5.    Public.Resource.Org's Use Is Not Commercial.

Finally, Plaintiffs' assertion that Public.Resource.Org's use is commercial is absurd. Public.Resource.Org's posting of laws, which here are obsolete as standards, does not compete with the Plaintiffs. Fundraising by a frugal nonprofit does not render its activities commercial. Even distributing copies of works with an appeal for donations—which Public.Resource.Org did not do—would not defeat fair use. *See Hustler Magazine, Inc. v. Moral Majority, Inc.*, 606 F. Supp. 1526, 1530 (C.D. Cal. 1985).

### B.    The Nature of the Works Is That They Are *Now Laws*.

The second fair-use factor concerns the nature of the original work. As standards, Plaintiffs' documents were already near the factual end of the spectrum from "factual" to "creative." As *laws*, however, the documents have become *authoritatively factual* regarding the substance of the law. The choice of each word in each document has become a relevant legal fact to citizens, groups, and agencies (including courts) researching the law, complying with it, enforcing it, and interpreting it.

25

## C.     Posting Complete Laws Is Necessary to Public.Resource.Org's Purpose.

The third factor favors fair use where the defendant's use is "reasonable in relation to the purpose of the copying." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 221 (2d Cir. 2015). Plaintiffs incorrectly suggest that *Authors Guild* counsels against fair use here. While the overall reasoning in that case is persuasive, the use challenged there was qualitatively different. Google's database could serve as an effective research tool by presenting only short snippets of book text to the user. Public.Resource.Org's purpose requires making complete documents available.[12]

## D.     Public.Resource.Org's Posting of the Standards Does Not Harm Any Legitimate Market.

Plaintiffs wrongly portray Public.Resource.Org's public posting of the standards as the sole determinative fact under the fourth factor. "[The fourth] factor, no less than the other three, may be addressed only through a 'sensitive

---

[12] It is immaterial that "the DOE regulatory requirements that refer to the Standards designate only a few portions of them." ASTM Br. 41, fn. 10; AERA Br. 7, 11. The *entirety* of the 1999 Standards for Educational and Psychological Testing was incorporated by reference into law. 34 C.F.R. § 668.146(b)(6) ("Incorporation by reference of this document has been approved by the Director of the Office of the Federal Register pursuant to the Director's authority under 5 U.S.C. 552(a) and 11 CFR part 51."). Other regulations may refer to other portions, *e.g.,* 34 C.F.R. § 668.148(a)(1)(iv), (a)(2)(i); 34 C.F.R. § 462.13(f)(1), but Plaintiffs may not dictate which portions of the incorporated law are necessary for the public to read in order to be informed of their rights and obligations. That is why Public.Resource.Org posted precisely what had been incorporated into law, without making subjective determinations of relevance.

balancing of interests.'" *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 n.21 (1994) (quoting *Sony*, 464 U.S. at 455 n.40). It "requires a balancing of 'the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied.'" *Bill Graham Archives*, 448 F.3d at 613 (citation omitted).

The balance in this case tilts in favor of the public benefit. The record, including Plaintiffs' sales figures, shows not a single instance of lost sales attributable to Public.Resource.Org. ASTM-Dkt-120-33; ASTM-Dkt-122-1 at 207, 214, 249, 253-256, 266, 269, 271-279, 282-283, 286-289; AERA-Dkt-68-34; AERA-Dkt-70-38; AERA-Dkt-70-39; AERA-Dkt-68-35; AERA-Dkt-68-9 at 14-15, 17-20; AERA-Dkt-68-11 at 4-5.[13] And the AERA Plaintiffs' claims that sales of their 2014 Standards could be harmed is both incorrect and irrelevant. That document was never posted by Public.Resource.Org nor incorporated into law.

---

[13] The SDOs' claim that sales of the 2012 National Electrical Code declined after Public.Resource.Org posted the "full version" is incorrect. Public.Resource.Org posted the California Electrical Code, which contains the complete and clearly indicated text of the NEC, in 2008. ASTM-Dkt-164-8 at 2; ASTM-Dkt-121-5 at 5. NFPA claims that its sales declined in 2012, when a new version of the NEC was imminent and sales of the older version fell off. ASTM-Dkt-117, Rubel Decl. Ex. 1 (Jarosz Report) ¶ 133; ASTM-Dkt-124-3 (Jarosz Dep. 164:13–167:13). AERA's testing standards exhibited a similar sales pattern, responding not to Public.Resource.Org's activities but to the advent of a new edition. AERA-Dkt-68-34; AERA-Dkt-70-38; AERA-Dkt-70-39; AERA-Dkt-68-35; AERA-Dkt-68-9 at 14-15, 17-20; AERA-Dkt-68-11 at 4-5.

27

Plaintiffs' self-serving insistence that harm has occurred, without credible evidence, does not show that it has occurred or will occur.

In fact, the record shows an *absence* of harm to any legitimate market. All of the standards at issue have been superseded as technical documents by later versions, even though they remain laws. AERA Br. 5; ASTM-Dkt-122-6 at 193-228; https://catalog.nfpa.org/NFPA-70-National-Electrical-Code-NEC-Softbound-2017-Edition-P16529.aspx (2014 National Electrical Code was superseded by the 2017 edition). Their obsolescence *as standards* explains why commercial demand has fallen off and why Plaintiffs have stopped selling many of them. Set against the public's right to access and share the law, the "creative and economic choice," ASTM Br. 44, to restrict access to the standards at issue is not a traditional or reasonable market interest under the fourth factor.

Of course, Plaintiffs are free to continue selling copies of their legally binding standards alongside their many other standards, annotations, and training materials. After all, many works in the public domain and freely available on the Internet, such as legal texts, Shakespeare's works, and the Bible, still sell well as commercial publications.

28

## IV.  PLAINTIFFS' FACTUAL CONTRADICTIONS REGARDING OWNERSHIP OF COPYRIGHTS PRECLUDE SUMMARY JUDGMENT ON THE COPYRIGHT CLAIMS.

As an initial matter, Public.Resource.Org's choice to focus, on appeal, on the role of government officials in drafting the works at issue does not mean that Public.Resource.Org has "[a]bandon[ed]" its other copyright ownership challenges. ASTM Br. at 16. Those concerns remain; Plaintiffs radically changed their justifications of ownership from "work made for hire" treatment (in their registrations), to assignments, and now to joint authorship. And they have offered no explanation for the factual inconsistencies that Public.Resource.Org's opening brief described (at 11-12).

Instead, Plaintiffs insist that their "employees' contributions to the Works" suffice to establish their standing to claim infringement and that the Court should ignore the complications Plaintiffs themselves have introduced because Public.Resource.Org did not raise the issue below. ASTM Br. at 16. Neither assertion is true.

*First*, copyright registration creates only a rebuttable presumption of validity. *See, e.g.*, *Mid Am. Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995). The effect of this presumption is limited, as the Copyright Office does not investigate the truth of statements made in registration applications. To shift the burden of proof back on Plaintiffs, Public.Resource.Org need merely show some evidence

29

rebutting ownership. *See, e.g.*, *Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1217-18 (9th Cir. 1997).

There is ample evidence to rebut that presumption here. Plaintiffs effectively admitted that their copyright registrations incorrectly claimed the standards were "works made for hire" and that Plaintiffs authored the "entire text" by acknowledging that the standards were actually joint works written by thousands of volunteers. Opening Br. 11-12. The AERA Plaintiffs attempted to revise mistakes in their registration 14 years after publication, and to claim ownership through assignment, even though they had not obtained a single copyright assignment agreement when the "corrected" registration was filed just before suit. AERA-Dkt-68-28; 68-7 (122:23-126:20).

Plaintiffs in both cases refer to themselves consistently as the "Sponsoring Organizations" and stress the investment they made in convening volunteers and publishing the standards. But neither sponsorship nor investing resources in a work confer a copyright interest in that work. *See Center for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989); *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991). To the extent that the standards contained any copyrightable expression, the actual authors of that expression were the thousands of volunteers from governments, industry, academia, and the public who actually drafted it (or, in the case of persons acting within their employment, their employers).

*Second*, Public.Resource.Org did raise the question of joint U.S. Government authorship below (contrary to ASTM Br. at 17). After Plaintiffs switched theories late in the briefing stage, Public.Resource.Org presented the issue at length in the summary judgment hearing. ASTM-Dkt-173 (100:14-24). And *Schnapper v. Foley* does not resolve that issue: that case addresses a situation where the U.S. government *commissioned* a work. 667 F.2d 102, 106 (D.C. Cir. 1981). Here, there is ample evidence that federal employees *authored* the works in their official capacity. *See, e.g.*, ASTM-Dkt-122-3 at 12 (ASTM Washington office presentation stating "U.S. Government is both an equal partner and key stakeholder; 1000 units of U.S. Government participation in ASTM; Active in 93% of ASTM's [standard-drafting] committees"); ASTM-Dkt-120-9; ASTM-Dkt-120-11 to 14, and 16 (examples of contributions from federal employees). If the standards at issue are in fact joint works, with the federal government as joint author, the documents may be joint *U.S. Government* works, which Section 105 excludes from copyright.

## V.     THE ASTM PLAINTIFFS CANNOT USE TRADEMARK LAW AS A SUBSTITUTE FOR COPYRIGHT LAW.

Just as this is not a typical copyright case, it is not a typical trademark case. Public.Resource.Org does not compete with the ASTM Plaintiffs. It does not sell standards, whether they have become law or not, or otherwise use them

31

commercially. It posts only documents that have the force of law. And it has no interest in creating confusion about the sources of those documents.

Several distinct trademark doctrines converge to compel judgment for Public.Resource.Org. The Supreme Court's decision in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), established a broad principle against using trademark law to protect copyright interests. The trademark "use in commerce" requirement also prevents liability for mere expressions that do not signify a claim of ownership or commercial affiliation. And both the nominative fair use doctrine and the First Amendment balancing test protect truthful and fair speech even when it explicitly invokes another's brand. All four of these doctrines protect Public.Resource.Org's activities; any one of them suffices to require judgment for Public.Resource.Org.

### A.    Under *Dastar*, Trademark Law Cannot Limit Public.Resource.Org's Activities Here.

*Dastar* and its progeny have made clear that trademark law cannot serve the ASTM Plaintiffs' goal: to regulate conduct that the Copyright Act authorizes.

ASTM Plaintiffs focus on the factual minutiae in *Dastar*, but they cannot skirt its fundamental principle: there is a boundary between copyright and trademark law.

Contrary to ASTM Plaintiffs' suggestion, that principle applies beyond unregistered marks and reverse passing-off. Numerous Circuits have recognized

32

that the *Dastar* principle extends to claims of infringement of registered marks. In

*Phoenix Entm't Partners v. Rumsey*, the Seventh Circuit held that a karaoke music

publisher could not assert traditional infringement claims against a venue that

reproduced karaoke tracks and played them publicly, displaying the plaintiff's logo

and trade dress, because "[t]he Supreme Court's decision in *Dastar*…makes clear

that the law of trademark cannot be invoked to assert what in fact is really a claim

of copyright infringement."  829 F.3d 817, 826 (7th Cir. 2016). The Ninth Circuit

followed suit in a nearly identical case. *Slep-Tone Entm't Corp. v. Wired for Sound*

*Karaoke and DJ Services, LLC*, 845 F.3d 1246, 1250 (9th Cir. 2017); *see also*

*Slep-Tone Entm't Corp. v. Canton Phoenix Inc.*, 690 Fed. Appx. 937, 938 (9th Cir.

2017)(mem.). Those rulings were clear and broad. There is no reason to confine

them to their specific facts.

Moreover, the Second Circuit twice invoked an analogous principle long

before *Dastar*. "The Lanham Act does not prohibit a commercial rival's truthfully

denominating his goods a copy of a design in the public domain, though he uses

the name of the designer to do so." *Societe Comptoir de l'Industrie Cotonniere*

*Etablissements Boussac v. Alexander's Dept. Stores, Inc.*, 299 F.2d 33, 36 (2d Cir.

1962). "[C]ases involving trademark infringement should be those alleging the

appropriation of symbols or devices that identify the composition or its source, not

the appropriation or copying or imitation of the composition itself." *EMI*

33

*Catalogue P'ship v. Hill, Holiday, Connors, Cosmopulos, Inc.*, 228 F.3d 56, 64 (2d Cir. 2000).

The ASTM Plaintiffs cannot distort the Lanham Act to accomplish what the Copyright Act does not permit.[14]

### B.     Public.Resource.Org Does Not Engage in Trademark Use of the ASTM Plaintiffs' Marks.

Marks and logos appear in Public.Resource.Org's postings only because Public.Resource.Org has sought to replicate as exactly as possible the standards as they were incorporated into law. This is no more a trademark use than if a website allowed a person to view a film in the public domain that happened to include opening and closing credits featuring the trademarked name and logo of the production studio.

Reproducing the incorporated standards faithfully meant that even errors in those originals were in Public.Resource.Org's reproductions. While the ASTM Plaintiffs criticize Public.Resource.Org (at 3, 11, 14, 49, and 52-54) for introducing errors, many of the errors were present *in the standards enacted into law*. For example, Plaintiff NFPA alleged below that Public.Resource.Org omitted the

---

[14] Arguing that the copyright and trademark claims in this case are not coextensive, Plaintiffs' amicus INTA falsely accuses Public.Resource.Org of "lifting and using" Plaintiffs' marks and logos in ways that it did not and of falsely attributing its versions of the standards to Plaintiffs. INTA Br. 9-11. INTA also dwells on the minutiae but not the teaching of *Dastar*.

requirement that "Cables rated above 2000 volts shall be shielded" in Article

310.10(F) of the 2011 NEC. ASTM-Dkt-118-8 ¶ 54(a). But that requirement was

added in a later correction to the standard, which correction was not incorporated

into law. *See* ASTM-Dkt-122-8 at 76. Similarly, NFPA attributed to

Public.Resource.Org several cross-referencing errors that were in NFPA's own

publication of the 2011 NEC. *Compare* ASTM-Dkt-118-8 ¶ 54(f) *with* ASTM-Dkt-

122-8 at 75-79. Other supposed errors by Public.Resource.Org are minor solecisms

that, in context, are obvious. *See* Opening Br. 54, n.12. Moreover,

Public.Resource.Org's mission to be faithful to the original documents means that

it immediately corrects any error in presenting the documents that comes to its

attention; the postings can be changed. In this case, Plaintiffs several times alluded

to errors that they did not call to Public.Resource.Org's attention, perhaps because

the errors were more useful for litigation purposes than harmful to the public.

Contrary to ASTM Plaintiffs' assertions, there is no evidence that

Public.Resource.Org ever suggested that they endorsed Public.Resource.Org's

posting or versions of the standards. The portion of the Malamud deposition that

the ASTM Plaintiffs cite does not show it. ASTM Br. 57, citing Dkt-118-12, Ex. 3

(46:14-47:9). Public.Resource.Org made clear, with cover sheets and disclaimers,

exactly what it was doing in scanning and reformatting the standards. *See, e.g.*,

ASTM-Dkt-1-7 (original cover sheet); ASTM-Dkt-118-7 at 249; ASTM-Dkt-121-1 at 60-62 (updated disclaimer); *see also* ASTM-Dkt-121-5 ¶¶ 16, 20-22.

Nor has Public.Resource.Org ever "advertised" the versions on its website using Plaintiffs' trademarks. *Cf.* ASTM Br. 49. Public.Resource.Org has gone to great lengths through the cover sheets and disclaimers, other content on its website such as essays and videos, and public-facing interviews and editorials, to make very clear that Plaintiffs do not endorse Public.Resource.Org postings and in fact oppose the postings.

Public.Resource.Org has no interest in Plaintiffs' trademarks as *trademarks*. Again, the only reason the trademarks appear on the Public.Resource.Org website is because some use of the marks in the context of the standards is unavoidable in order to identify the standards and display them accurately.

### C. The Nominative Fair Use Doctrine Also Immunizes Public.Resource.Org's Actions.

The ASTM Plaintiffs do not deny that the district court conflated and misapplied various circuits' nominative-fair-use tests. Instead, Plaintiffs argue that "it was not necessary for PRO to refer to Plaintiffs or their trademarks to describe Plaintiffs' Works." ASTM Br. 56. But it is hard to see how anyone could refer to standards named "ASTM A285-78," "ASHRAE 90.1-2010," or "NFPA 25-2002" without stating Plaintiffs' acronyms. That is exactly how the Code of Federal Regulations referenced the standards.

36

Public.Resource.Org's statement to the district court that the trademark dispute was unnecessary and it could keep or remove the Plaintiffs' logos as the court directed was not a concession that its use of the Plaintiffs' logos was inappropriate. It reflected Public.Resource.Org's lack of particular interest in Plaintiffs' logos as such. Public.Resource.Org cares only that the public have access to the exact documents that have become laws; as a practical matter Public.Resource.Org assumed that Plaintiffs would sue to bar that access to those documents under a trademark theory whether the documents included or omitted the logos. Indeed, if Public.Resource.Org had presented the incorporated standards *without* Plaintiffs' logos, they would likely have sued on a reverse passing off theory instead. The courts in *Dastar* and in *Phoenix* both recognized the same dilemma. *Dastar,* 539 U.S. at 36; *Phoenix,* 829 F.3d at 830 n.6. Public.Resource.Org raised this concern at summary judgment and on appeal (Br. 54, n.13), and Plaintiffs have never disputed it. That Plaintiffs oppose *either* inclusion *or* omission of their logos from the documents shows that their real concern is the reproductions, and that trademark claims are pretextual.

### D.    *Rogers* Protects Public.Resource.Org's Activities Under the First Amendment in Harmony with the Nominative Fair Use Doctrine.

Amici intellectual property law professors showed how *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), supports Public.Resource.Org's First Amendment arguments and is consistent with *Dastar,* the lack of "trademark use," and the

nominative-fair-use doctrine. All of these points converge to the same effect.
*Rogers* established that, when a defendant uses another's trademark as part of an
expressive work, trademark claims for an implied endorsement fail (1) as long as
the use has at least "minimal…relevance to the work," and (2) unless the use
explicitly misrepresents the work's sponsorship, endorsement, content, or origin.
*Rogers*, 875 F.2d at 1000. This rule balances the "dual interest[s]" of consumers of
expressive works: "an interest in not being misled and…[also] an interest in
enjoying the results of the author's freedom of expression." *Id.* at 998.

      Plaintiffs' amicus International Trademark Association (INTA) argues that
*Rogers* applies only to artistic works where the use has artistic relevance. INTA Br.
22-23. INTA's interpretation severs the holding of *Rogers* from its rationale.
Reading *Rogers* to apply only to artistic works is like reading *Rogers* to apply only
to titles. *Cf. Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Grp., Inc.*, 886 F.2d
490, 494-95 (2d Cir. 1989) (rejecting such a cramped reading and extending
*Rogers* from titles to the body of a work).

      The *Rogers* court used "artistic relevance" as the measure of First
Amendment protection because the work and the speech at issue were artistic.
875 F.2d at 999. But the *Rogers* test is not so narrow. The key question was
whether the work was *expressive* and therefore implicated the First Amendment.
Given that political speech is at the heart of First Amendment protection, *see*

*McCutcheon v. Fed. Election Comm'n*, 134 S. Ct. 1434, 1446 (2014), *Rogers* applies with at least equal force where the expressive elements are political. *See Radiance Foundation, Inc. v. N.A.A.C.P.*, 786 F.3d 316 (4th Cir. 2015) (applying *Rogers* test to political satire); *New Kids On The Block v. News America Pub., Inc.*, 745 F. Supp. 1540, 1544 (C.D. Cal 1990) (applying *Rogers* test to newsgathering: "Although *Rogers* concerned First Amendment values in the context of artistic expression, the First Amendment plays the same central role regarding news gathering and dissemination.").

Here, Public.Resource.Org's posting of the laws is core political speech. Readers and listeners have an interest in accessing and understanding the law *in the form that it was enacted*, which in the case of standards documents includes the name of the standard, the organization that sponsored it, errors in the original, and so on. Moreover, they have an interest in knowing that what they are reading *is* the law in the form that it was enacted, not some digest or restatement. That cannot happen without nominative use of Plaintiffs' marks in the identical manner, placement, and frequency as in the incorporated-by-reference standard.[15]

---

[15] Thus Public.Resource.Org's use satisfies even the "no alternative avenues" test that *Rogers* deemed too stringent in this context. *See Rogers*, 875 F.2d at 998-99; *cf. Mutual of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 402 (8th Cir. 1987); *see also* IP Scholars Br. 13 n.6.

Nothing in Public.Resource.Org's use misrepresents the work's sponsorship, endorsement, content, or origin. *Cf. Rogers,* 875 F.3d at 1000. Thus Public.Resource.Org's use of Plaintiffs' marks satisfies the *Rogers* test, and the Lanham Act should not be "overexten[ded]" to "intrude on" Public.Resource.Org's speaking of the law. *See id.* at 998.

## CONCLUSION

As of 2015, the Code of Federal Regulations alone contained 9,500 incorporations by reference. State and municipal codes contain thousands more. Public.Resource.Org seeks to share those laws, precisely and completely, so that citizens, government agencies, and courts can find, learn, teach, analyze, criticize, and interpret them. The injunction below forbids that important effort. Under the standards of permanent injunctions, of copyright law, and of trademark law, the injunction and judgment below cannot stand. The Court should reverse the judgment of the district court with instructions to dismiss the actions.

Dated:  January 24, 2018                    Respectfully submitted,

FENWICK & WEST LLP

40

By:  */s/ Andrew P. Bridges*
    Andrew P. Bridges (admitted)
    abridges@fenwick.com
    Matthew B. Becker (admitted)
    mbecker@fenwick.com
    FENWICK & WEST LLP
    555 California Street, 12th Floor
    San Francisco, CA  94104
    Telephone:    (415) 875-2300
    Facsimile:     (415) 281-1350

    Corynne McSherry (admitted)
    corynne@eff.org
    Mitchell L. Stoltz (admitted)
    mitch@eff.org
    ELECTRONIC FRONTIER
    FOUNDATION
    815 Eddy Street
    San Francisco, CA 94109
    Telephone: (415) 436-9333
    Facsimile:  (415) 436-9993

    David Halperin (D.C. Bar No. 426078)
    davidhalperindc@gmail.com
    1530 P Street NW
    Washington, DC 20005
    Telephone: (202) 905-3434

    *Attorneys for Appellant*
    *Public.Resource.Org, Inc.*

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the word limit of Fed. R. App. P.

32(a)(7) because, excluding the parts of the document exempted by Fed. R. App. P.

32(f), this document contains 8,990 words, according to the word-processing

program used to prepare it.

2.     This document complies with the typeface requirements of Fed. R.

App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6)

because it uses proportionally spaced 14-point Times New Roman typeface.

Dated:  January 24, 2018               Respectfully submitted,

                                       FENWICK & WEST LLP


                                       By:  */s/ Andrew P. Bridges*
                                             Andrew P. Bridges (admitted)
                                             abridges@fenwick.com
                                             FENWICK & WEST LLP
                                             555 California Street, 12th Floor
                                             San Francisco, CA  94104
                                             Telephone:    (415) 875-2300
                                             Facsimile:    (415) 281-1350

                                       *Attorneys for Appellant*
                                       *Public.Resource.Org, Inc.*

## CERTIFICATE OF SERVICE

I, Andrew P. Bridges, hereby certify that on January 24, 2018, I

electronically filed the foregoing **Appellant Public.Resource.Org's Consolidated**

**Reply Brief** with the United States Court of Appeals for the District of Columbia

Circuit through the Court's CM/ECF system, which will serve all counsel who are

registered CM/ECF users, as follows:

| | |
|---|---|
| American Society for Testing and Materials<br>Plaintiff - Appellee | J. Kevin Fee<br>Jordana Rubel<br>Email: kevin.fee@morganlewis.com<br>Email: jrubel@morganlewis.com<br>Morgan, Lewis & Bockius LLP<br>1111 Pennsylvania Avenue, NW<br>Washington, DC 20004 |
| | Allyson Newton Ho, Attorney<br>Email: allyson.ho@morganlewis.com<br>Morgan, Lewis & Bockius LLP<br>1717 Main Street, Suite 3200<br>Dallas, TX 75201-7347 |
| National Fire Protection Association, Inc.<br>Plaintiff - Appellee | Kelly M. Klaus<br>Rose Leda Ehler<br>Email: Kelly.Klaus@mto.com<br>Email: Rose.Ehler@mto.com<br>Munger, Tolles & Olson LLP<br>560 Mission Street, 27th Floor<br>San Francisco, CA 94105 |
| | Donald B. Verrilli, Jr., Attorney<br>Email: donald.verrilli@mto.com<br>Munger, Tolles & Olson LLP<br>1155 F Street, NW<br>Washington, DC 20004 |

American Society of Heating,
Refrigerating, and Air-Conditioning
Engineers, Inc.

                              Plaintiff - Appellee

Anne Voigts
Joseph Richard Wetzel
Email: avoigts@kslaw.com
Email: jwetzel@kslaw.com
King & Spalding
101 Second Street, Suite 2300
San Francisco, CA 94105

Jason Blake Cunningham
Email: bcunningham@kslaw.com
King & Spalding LLP
401 Congress Avenue, Suite 3200
Austin, TX 78701

**ADDENDUM OF STATUTORY
AND OTHER TEXTS**

## TABLE OF CONTENTS TO ADDENDUM

**Statute or Other Text**                                                **Page(s)**

17 U.S.C. § 121 ................................................................................. A-1, 2

34 C.F.R. § 462.13 ................................................................................. A-2

34 C.F.R. § 668.148 ........................................................................ A-2, 3, 4

11 NYCRR 216.7 ................................................................................. A-4

U.S. Copyright Office, Compendium of Copyright Office Practices
    § 313.6(c)(2) (3d ed. 2014) .......................................................... A-5

OMB Circular A-119, 63 Fed. Reg. 8546 (Feb. 19, 1998)………………….A-5, 6

17 U.S.C. § 121

## § 121. Limitations on exclusive rights: Reproduction for blind or other people with disabilities

(a) Notwithstanding the provisions of section 106, it is not an infringement of copyright for an authorized entity to reproduce or to distribute copies or phonorecords of a previously published, nondramatic literary work if such copies or phonorecords are reproduced or distributed in specialized formats exclusively for use by blind or other persons with disabilities.

(b)(1) Copies or phonorecords to which this section applies shall--

(A) not be reproduced or distributed in a format other than a specialized format exclusively for use by blind or other persons with disabilities;

(B) bear a notice that any further reproduction or distribution in a format other than a specialized format is an infringement; and

(C) include a copyright notice identifying the copyright owner and the date of the original publication.

(2) The provisions of this subsection shall not apply to standardized, secure, or norm-referenced tests and related testing material, or to computer programs, except the portions thereof that are in conventional human language (including descriptions of pictorial works) and displayed to users in the ordinary course of using the computer programs.

(c) Notwithstanding the provisions of section 106, it is not an infringement of copyright for a publisher of print instructional materials for use in elementary or secondary schools to create and distribute to the National Instructional Materials Access Center copies of the electronic files described in sections 612(a)(23)(C), 613(a)(6), and section 674(e) of the Individuals with Disabilities Education Act that contain the contents of print instructional materials using the National Instructional Material Accessibility Standard (as defined in section 674(e)(3) of that Act), if--

(1) the inclusion of the contents of such print instructional materials is required by any State educational agency or local educational agency;

(2) the publisher had the right to publish such print instructional materials in print formats; and

(3) such copies are used solely for reproduction or distribution of the contents of such print instructional materials in specialized formats.

(d) For purposes of this section, the term--

(1) "authorized entity" means a nonprofit organization or a governmental agency that has a primary mission to provide specialized services relating to training, education, or adaptive reading or information access needs of blind or other persons with disabilities;

(2) "blind or other persons with disabilities" means individuals who are eligible or who may qualify in accordance with the Act entitled "An Act to provide books for the adult

A-1

blind", approved March 3, 1931 (2 U.S.C. 135a; 46 Stat. 1487) to receive books and other publications produced in specialized formats;

(3) "print instructional materials" has the meaning given under section 674(e)(3)(C) of the Individuals with Disabilities Education Act; and

(4) "specialized formats" means--

(A) braille, audio, or digital text which is exclusively for use by blind or other persons with disabilities; and

(B) with respect to print instructional materials, includes large print formats when such materials are distributed exclusively for use by blind or other persons with disabilities.

## 34 C.F.R. § 462.13

In order for the Secretary to consider a test suitable for use in the NRS, the test or the test publisher, if applicable, must meet the following criteria and requirements:

 (f) For a test that has been modified for individuals with disabilities, the test publisher must—

(1) Provide documentation that it followed the guidelines provided in the Testing Individuals With Disabilities section of the 1999 edition of the Standards for Educational and Psychological Testing;

(2) Provide documentation of the appropriateness and feasibility of the modifications relevant to test performance; and

(3)(i) Recommend educational functioning levels based on the information obtained from adult education students who
participated in the pilot or field test and who have the disability for which the test has been modified; and

(ii) Provide documentation of the adequacy of the procedures used to translate the performance of adult education students with the disability for whom the test has been modified to an estimate of the examinees' standing with respect to the NRS educational functioning levels.

## 34 C.F.R. § 668.148

(a) In addition to satisfying the criteria in § 668.146, to be approved by the Secretary, a test must meet the following criteria, if applicable:

(1) In the case of a test developed for a non-native speaker of English who is enrolled in a program that is taught in his or her native language, the test must be—

(i) Linguistically accurate and culturally sensitive to the population for which the test is designed, regardless of the language in which the test is written;

(ii) Supported by documentation detailing the development of normative data;

(iii) If translated from an English version, supported by documentation of procedures to determine its reliability and validity with reference to the population for which the translated test was designed;

(iv) Developed in accordance with guidelines provided in the 1999 edition of the "Testing Individuals of Diverse Linguistic Backgrounds" section of the Standards for Educational and Psychological Testing prepared by a joint committee of the American Educational Research Association, the American Psychological Association, and the National Council on Measurement in Education incorporated by reference in this section. Incorporation by reference of this document has been approved by the Director of the Office of the Federal Register pursuant to the Director's authority under 5 U.S.C. 552(a) and 1 CFR part 51. The incorporated document is on file at the Department of Education, Federal Student Aid, room 113E2, 830 First Street, NE., Washington, DC 20002, phone (202) 377–4026, and at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 1–866–272–6272, or go to: http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html. The document also may be obtained from the American Educational Research Association at:

(v)(A) If the test is in Spanish, accompanied by a distribution of test scores that clearly indicates the mean score and standard deviation for Spanish-speaking students with high school diplomas who have taken the test within five years before the date on which the test is submitted to the Secretary for approval.

(B) If the test is in a language other than Spanish, accompanied by a recommendation for a provisional passing score based upon performance of a sample of test takers representative of non–English speaking individuals who speak a language other than Spanish and who have a high school diploma. The sample upon which the recommended provisional passing score is based must be large enough to produce stable norms.

(2) In the case of a test that is modified for use for individuals with disabilities, the test publisher or State must—

(i) Follow guidelines provided in the "Testing Individuals with Disabilities" section of the Standards for Educational and Psychological Testing; and

(ii) Provide documentation of the appropriateness and feasibility of the modifications relevant to test performance.

(3) In the case of a computer-based test, the test publisher or State, as applicable, must—

A-3

(i) Provide documentation to the Secretary that the test complies with the basic principles of test construction and standards of reliability and validity as promulgated in the Standards for Educational and Psychological Testing;

(ii) Provide test administrators with instructions for familiarizing test takers with computer hardware prior to test-taking; and

(iii) Provide two or more parallel, equated forms of the test, or, if parallel forms are generated from an item pool, provide documentation of the methods of item selection for alternate forms.

(b) If a test is designed solely to measure the English language competence of non-native speakers of English—

(1) The test must meet the criteria set forth in § 668.146(b)(6), (c)(1), (c)(2), and (c)(4); and

(2) The test publisher must recommend a passing score based on the mean score of test takers beyond the age of compulsory school attendance who completed U.S. high school equivalency programs, formal training programs, or bilingual vocational programs.


**11 NYCRR 216.7**

**Section 216.7. Standards for prompt, fair and equitable settlement of motor vehicle physical damage claims**

(c) Adjustment of total losses.

(1) If the insurer elects to make a cash settlement, its minimum offer, subject to applicable deductions, must be one of the following:

(i) The average of the retail values for a substantially similar vehicle as listed in two valuation manuals current at the date of loss and approved by this department. Manuals approved for use are—The Redbook, published by National Market Reports Inc., and The N.A.D.A. Official Used Car Guide, published by the National Automobile Dealers Used Car Guide Company. The use of other manuals may be approved by this department upon demonstration of need and suitability. If it is evident that an option has not been considered in either or both of the above valuation manuals, the insurer shall consider the value, if any, of such option in arriving at the vehicle's value and shall utilize the best available method to value such option. The insurer may deduct documented, reasonable dealer preparation charges, up to $100, from the average of the retail values. The insurer shall provide to the insured, no later than the date of payment of the claim, a detailed copy of its calculation of the insured vehicle's total loss value, including the valuation of options which are not considered in the base price of the vehicle.

A-4

**U.S. Copyright Office, Compendium of Copyright Office Practices**

**§ 313.6(c)(2) (3d ed. 2014)**
   **313.6(C)(2) Government Edicts**
       As a matter of longstanding public policy, the U.S. Copyright Office will not register a government edict that has been issued by any state, local, or territorial government, including legislative enactments, judicial decisions, administrative rulings, public ordinances, or similar types of official legal materials. Likewise, the Office will not register a government edict issued by any foreign government or any translation prepared by a government employee acting within the course of his or her official duties. See Banks v. Manchester, 128 U.S. 244, 253 (1888) ("there has always been a judicial consensus, from the time of the decision in the case of Wheaton v. Peters, 8 Pet. 591, that no copyright could under the statutes passed by Congress, be secured in the products of the labor done by judicial officers in the discharge of their judicial duties"); Howell v. Miller, 91 F. 129, 137 (6th Cir. 1898) (Harlan, J.) ("no one can obtain the exclusive right to publish the laws of a state in a book prepared by him").
       There is a limited exception to this rule. Section 104(b)(5) of the Act states that works first published by the United Nations or any of its specialized agencies, or first published by the Organization of American States are eligible for copyright protection in the United States. See 17 U.S.C. § 104(b)(5).
       A work that does not constitute a government edict may be registered, even if it was prepared by an officer or employee of a state, local, territorial, or foreign government while acting within the course of his or her official duties. For example, the Office may register a tourist magazine written and published by Arizona's department of tourism or a map created and published by the public transit authority for the city of Detroit. Likewise, the Office may register annotations that summarize or comment upon legal materials issued by a federal, state, local, or foreign government unless the annotations themselves have the force of law. See Chapter 700, Section 717.1.

**OMB Circular A-119, 63 Fed. Reg. 8546 (Feb. 19, 1998)**

**Office of Management and Budget**
**OMB Circular A-119; Federal Participation in the Development and Use of Voluntary Consensus Standards and in Conformity Assessment Activities**
* * *

2. What Are The Goals Of The Government In Using Voluntary Consensus Standards?

Many voluntary consensus standards are appropriate or adaptable for the Government's purposes. The use of such standards, whenever practicable and appropriate, is intended to achieve the following goals:

a. Eliminate the cost to the Government of developing its own standards and decrease the cost of goods procured and the burden of complying with agency regulation.

b. Provide incentives and opportunities to establish standards that serve national needs.

c. Encourage long-term growth for U.S. enterprises and promote efficiency and economic competition through harmonization of standards.

d. Further the policy of reliance upon the private sector to supply Government needs for goods and services.