NOT YET SCHEDULED FOR ORAL ARGUMENT
**Appeal No 17-7035**
**(consolidated with No. 17-7039)**

_____

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

American Society for Testing and Materials; National Fire Protection
Association, Inc.; and American Society of Heating, Refrigerating,
and Air Conditioning Engineers, Inc.
*Plaintiffs-Appellees,*

v.

Public.Resource.Org, Inc.,
*Defendant-Appellant.*

_____

Appeal from the United States District Court for the District of Columbia
Hon. Tanya S. Chutkan
1:13-cv-1215-TSC
1:14-cv-0857-TSC

_____

**FINAL BRIEF OF PLAINTIFFS-APPELLEES**
**AMERICAN EDUCATIONAL RESEARCH ASSOCIATION, INC.;**
**AMERICAN PSYCHOLOGICAL ASSOCIATION, INC.; AND**
**NATIONAL COUNCIL ON MEASUREMENT IN EDUCATION, INC.**

_____

Michael J. Songer
John I. Stewart Jr.
Clifton S. Elgarten
Mark Thomson
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2505
Phone: (202) 624-2500
celgarten@crowell.com

*Attorneys for Plaintiffs-Appellees American*
*Educational Research Association, Inc.;*
*American Psychological Association, Inc.;*
*and National Council On Measurement In*
*Education, Inc.*

## CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), appellees certify as follows:

**(A) Parties and Amici.** The appellant in Case Nos. 17-7035 and 17-7039 is Public.Resource.Org, Inc. ("PRO"), which was the defendant/counter-plaintiff in the district court proceedings.

The appellees in Case No. 17-7035 are the American Society for Testing and Materials, National Fire Protection Association, Inc., and American Society of Heating, Refrigerating, and Air Conditioning Engineers, Inc., which were plaintiffs/counter-defendants in the district court.

The appellees in Case No. 17-7039 are the American Educational Research Association, Inc., American Psychological Association, Inc., and National Council on Measurement in Education, Inc., which were plaintiffs/counter-defendants in the district court.

The following individuals/entities submitted amicus briefs to the district court: Public Knowledge; Reporters Committee for Freedom of the Press; Sina Bahram; Stacey Dogan; Pamela Samuelson; Jessica Silbey; Rebecca Tushnet; Jennifer Urban; and Jonathan Zittrain.

The following additional individuals/entities submitted amicus briefs on behalf of appellants in this Court: American Association of Law Libraries; Association of College and Research Libraries; Association of Research Libraries;

i

Jonathan Askin; Lila Bailey; Annemarie Bridy; Carol M. Browner; Brandon Butler; Michael A. Carrier; Michael W. Carroll; Center for Science in the Public Interest; Consumers Union; Margaret Claybrook Chon; Joan Courtney; Kyle K. Cross; Will DelRosso; Jim Dygert; Amy Vanderlyke; Fastcase, Inc.; Edward Felten; Free Law Project; Shubha Ghosh; James Gibson; David Hansen; Darrell Issa; Bruce R. James; Judicata, Inc.; Justia Inc.; Ariel Katz; Benjamin J. Keele; Seamus Lee Kraft; Sarah Hooke; Kendra K. Levine; Yvette Joy Liebesma; Jessica Litman; Zoe Lofgren; Mark P. McKenna; Lincoln Network; Brian Love; Alexander Macgillivray; Stephen McLaughlin; Andrew McJohn; David Michaels; Raymond Mosley; National Employment Law Project; Tyler T. Ochoa; David Olson; OpenGov Foundation; DJ Patil; Aaron Perzanowski; John D. Podesta; David G. Post; Public Citizen, Inc.; Re:Create Coalition; Blake E. Reid; Betsy Rosenblatt; R Street Institute; Judith C. Russell; Roger V. Skalbeck; Megan J. Smith; David E. Sorkin; Sunlight Foundation; U.S. Public Interest Research Group, Inc.; Steven Van Roekel; Robert Walker; Ronald E. Wheeler; Beth Williams; Elizabeth I. Winston; Nicole Wong; Michelle M. Wu.

The following entities submitted amicus briefs on behalf of appellees in this Court: American Insurance Association; American Medical Association; American Dental Association; American Hospital Association; American National Standards Institute, Incorporated; American Society of Civil Engineers; American

ii

Society of Safety Engineers; Institute of Electrical and Electronics Engineers, Incorporated; International Association of Pluming & Mechanical Officials; International Electrotechnical Commission; International Organization for Standardization; International Code Council, Inc.; National Manufacturers Association; North American Energy Standards Board; Underwriters Laboratories Inc.; International Trademark Association.

**(B) Rulings Under Review.** Appellants seek review of the District Court's Memorandum Opinion and Order Granting Plaintiff's Motion for Summary Judgment and Denying Defendant's Cross-Motion for Summary Judgment ("Order"), both dated February 2, 2017 (JA3401 and JA3456). In addition, Appellant has indicated that it may seek review of the District Court's Order Denying Defendant-Appellant's Motion to Strike the Expert Report of Dr. Kurt Geisinger (JA3256) dated September 21, 2016.

**(C) Related Cases.** This case has not previously been before this Court. This Court has consolidated *American Society for Testing and Materials et al. v. Public.Resource.Org, Inc.*, Case No. 17-7035, with *American Educational Research Association, Inc. et al. v. Public.Resource.Org, Inc.,* Case No. 17-7039.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Circuit Rule 26.1, Plaintiffs-Appellees American Educational Research Association, Inc., American Psychological Association, Inc., and National Council on Measurement in Education, Inc., submit this Corporate Disclosure Statement as nongovernmental corporate parties to this proceeding.

Plaintiff-Appellee American Educational Research Association, Inc. states that it has no parent corporation, and there is no publicly held corporation that owns 10% or more of the American Educational Research Association, Inc. The American Educational Research Association, Inc. is a not-for-profit corporation.

Plaintiff-Appellee American Psychological Association, Inc. states that it has no parent corporation, and there is no publicly held corporation that owns 10% or more of the American Psychological Association, Inc. The American Psychological Association, Inc. is a not-for-profit corporation.

Plaintiff-Appellee National Council on Measurement in Education, Inc. states that it has no parent corporation, and there is no publicly held corporation that owns 10% or more of the National Council on Measurement in Education, Inc. The National Council on Measurement in Education, Inc. is a not-for-profit corporation.

## TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND
     RELATED CASES..................................................................... i

CORPORATE DISCLOSURE STATEMENT ...................................... iv

GLOSSARY OF ABBREVIATIONS ................................................. 1

STATEMENT OF ISSUES ............................................................. 2

STATEMENT OF THE CASE........................................................... 2

    A.    The Sponsoring Organizations and the Standards ............................. 2

    B.    Federal Government Use and Incorporation of the Standards............ 6

    C.    Public Resource's Misappropriation .................................... 8

    D.    Appellants' Factual Assertions........................................... 9

    E.    District Court Decision.................................................... 11

SUMMARY OF ARGUMENT ........................................................ 12

ARGUMENT ............................................................................ 14

I.    COPYRIGHT PROTECTION IS NOT LOST WHEN A
    FEDERAL AGENCY INCORPORATES A COPYRIGHTED
    WORK BY REFERENCE INTO AGENCY REGULATIONS. ............... 14

    A.    Neither the First Amendment Nor the Due Process Clause
        Supports the Result Public.Resource.Org Seeks Here...................... 14

    B.    Copyright Protection Cannot Be Lost by the Decision of a
        Government Body to Reference Privately-Authored
        Standards in Statute or Regulation. .................................... 18

        1.    Public.Resource.Org's Theory Is Untenable as a
            Practical Matter and as a Matter of Basic Copyright
            Principles................................................................ 18

2.    The Copyright Act, and Congress's Related Actions, Leave No Doubt That Matter Incorporated by Reference Does Not Lose Copyright Protection. ................... 20

3.    This Court Should Decline to Adopt Veeck,'s Improper Expansion of Wheaton and Banks, Let Alone Any Expansion of Veeck, to Reach These Cases. .................................................................... 24

II.    PUBLIC.RESOURCE.ORG DID NOT ENGAGE IN FAIR USE............. 29

III.    PUBLIC.RESOURCE.ORG HAS SHOWN NO IMPEDIMENT TO THE SPONSORING ORGANIZATIONS' RIGHT TO ENFORCE THE COPYRIGHT. ................................................. 29

CONCLUSION ........................................................................ 30

CERTIFICATE OF COMPLIANCE ........................................ 31

ADDENDUM OF STATUES AND REGULATIONS ......................................... 1a

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Electric Power Co. v. Connecticut,*
 564 U.S. 410 (2011) ........................................................ 25

*Banks v. Manchester,*
 128 U.S. 244 (1888) ................................ 20, 21, 24, 25

*CCC Information Services, Inc. v. Maclean Hunter Mkt. Reports, Inc.,*
 44 F.3d 61 (2d Cir. 1994) ............................................ 21

*Drauglis v. Kappa Map Group, LLC,*
 128 F. Supp. 3d 46 (D.D.C. 2015) ............................ 19

*Eldred v. Ashcroft,*
 537 U.S. 186 (2003) ............................................... 15, 17

*Golan v. Holder,*
 565 U.S. 302 (2011) ............................................... 17, 19

*Goldstein v. California,*
 412 U.S. 546 (1973) ...................................................... 15

*Lloyd Corp. v. Tanner,*
 407 U.S. 551 (1972) ...................................................... 16

*Oracle America, Inc. v. Google, Inc.,*
 750 F.3d 1339 (Fed. Cir. 2014) .................................. 20

*Practice Management Information Corp. v. American Medical Association,*
 121 F.3d 516 (9th Cir. 1997) ...................................... 21

*Richmond Newspapers, Inc. v. Virginia,*
 448 U.S. 555 (1980) ...................................................... 16

*United States v. Ron Pair Enterprises, Inc.*,
    489 U.S. 235 (1989) ............................................................... 25

*United Video, Inc. v. Federal Communications Commission*,
    890 F.2d 1173 (D.C. Cir. 1989) ........................................... 16

*Veeck v. Southern Building Code Congress International, Inc.*,
    293 F.3d 791 (5th Cir. 2002) ................................... 13, 24, 25, 26, 28

*Wheaton v. Peters*,
    33 U.S. (8 Pet.) 591 (1834) ........................................... 20, 21, 24, 25

**Statutes**

5 U.S.C. § 552(a)(1) ........................................................ 6, 22

15 U.S.C. § 272(b)(3) ...................................................... 6, 23

17 U.S.C. § 102 ............................................................. 26, 27

17 U.S.C. § 102(a) .............................................................. 19

17 U.S.C. § 102(e) .............................................................. 25

17 U.S.C. § 105 ............................................................. 21, 24

17 U.S.C. § 107 .................................................................. 16

17 U.S.C. § 121 .................................................................. 10

17 U.S.C. § 302(a) .............................................................. 19

17 U.S.C. § 410(c) .............................................................. 29

28 U.S.C. § 1498(b) ............................................................ 19

**Regulations**

1 C.F.R. § 51.7(a)(2) ........................................................ 7, 22

34 C.F.R. § 101 .................................................................. 21

34 C.F.R. § 462.10 ............................................................... 8

34 C.F.R. § 462.13 .............................................................. 11

34 C.F.R. § 462.13(c)(1) ............................................................ 7, 11

34 C.F.R. § 462.13(c)(2) ................................................................. 8

34 C.F.R. § 462.13(f)(1) ................................................................. 7

34 C.F.R. § 668.146 ..................................................................... 11

34 C.F.R. § 668.146(b)(6) .............................................................. 7

34 C.F.R. § 668.148(a)(1)(iv) ......................................................... 7

34 C.F.R. § 668.148(a)(2)(i) ........................................................... 7

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 8 ........................................................ 15

**Other Authorities**

63 Fed. Reg. 8546 (rev'd Feb. 19, 1998) ................................... 6, 23

H.R. Rep. No. 94-1476 (1976) ..................................................... 22

4 Nimmer on Copyright § 13.03 (2017) ...................................... 27

# GLOSSARY OF ABBREVIATIONS

The following abbreviated terms are used in this brief:

APA      American Psychological Association

DOE      Department of Education

NARA    National Archives and Records Administration

NTTAA   National Technology Transfer and Advancement Act of 1995

OMB     Office of Management and Budget

## STATEMENT OF ISSUES

(1)     Does a privately-created set of standards, made for sale to and use by private parties, lose copyright protection if a federal agency incorporates some of the standards by reference in a regulation establishing eligibility for a federal program?

(2)     Is it "fair use" to eliminate the market for a privately-created set of standards by copying the standards in their entirety onto a website to allow them to be accessed and further copied, rendering them freely available and copyable?

(3)     Did the district court err in concluding, based on uncontroverted evidence, that the Sponsoring Organizations own the copyright in the 1999 Standards and may sue to enforce it?

## STATEMENT OF THE CASE

### A.     The Sponsoring Organizations and the Standards

Plaintiffs-Appellees (Sponsoring Organizations) are not-for-profit corporations. JA3403. American Educational Research Association, Inc. is a national scientific society whose mission is "to advance knowledge and education, to encourage scholarly inquiry related to education, and to promote the use of research to improve education." JA3403. American Psychological Association, Inc. (APA) is the largest association of psychologists in the United States. Its mission is "to advance the creation, communication, and application of psychological knowledge." JA3403. Its members include researchers, educators,

2

clinicians, consultants and students.[1] National Council on Measurement in Education, Inc. is a professional organization "for individuals involved in assessment, testing, and other aspects of educational measurement." JA3403.

Since at least 1966, the Sponsoring Organizations have collaborated, through joint committees of unpaid volunteers appointed by the organizations, to develop and update what are known as the Standards for Educational and Psychological Testing. JA3403; JA3405.

The Standards apply in a broad range of test and evaluation settings. They set forth best practices to promote sound and ethical use of tests, and provide a basis for developing and evaluating test quality. JA2245. The Standards — the 1999 version of which Defendant-Appellant posted verbatim online — contain the individual standards themselves, of which there were 272 in the 1999 volume. *See* JA2233-435. They also contain a great deal of additional material, including a preface, introduction, a background section for groupings of standards, and commentary for each standard. JA2233-435.

The Standards provide guidance to the Sponsoring Organizations' members that need to understand proper test design and applications for their work. JA2702-03. But the Standards also reach a wider audience, across a range of

---

[1] *See* APA, *About APA*, www.apa.org/about.

disciplines, occupations, and contexts. JA2548. They are used by clinical psychologists, researchers, counselors, licensing boards, school psychologists, employment supervisors, and administrators in charge of selecting and interpreting tests and assessments for their organizations, both in the public and private sectors. JA2703-04; JA2581. The Standards enjoy wide respect and acceptance as a statement of best practices. JA2702-03.

The 1999 Standards began as draft revisions to the 1985 Standards, and took more than five years to complete. JA2546-47. The Sponsoring Organizations first selected a joint committee of experts in various areas of testing and assessment. JA2546-47. That committee met regularly and circulated drafts for public comment. JA2547. It received comments and proposed revisions, including from: members of the Sponsoring Organizations; scientific, professional, trade, and advocacy groups; credentialing boards; government agencies; test publishers and developers; and academic institutions. JA2547. The committee took those comments into account in subsequent drafts, circulated for further comment and further refinement, ultimately producing the 1999 Standards, totaling almost 200 pages. JA2547; JA2233-435.

Plaintiffs registered the copyright in 1999. JA2591; *see also* JA2594. Fifteen of sixteen committee members (or their heirs) later signed work-made-for-

hire letters confirming that the Sponsoring Organizations owned the copyright.[2] JA2475; *see also* JA2477-517.

It costs money to prepare and publish the Standards. Joint committee members volunteer their time, but are compensated for travel and lodging expenses. JA2546. Support staff is paid. JA2546. Advertising and promoting the Standards in journals and meetings costs money, as does printing and shipping. JA2546.

The Sponsoring Organizations charge a modest price per copy to cover costs. JA3407. From 1999 until today, the price has ranged from $25.95 to $49.95. *Id.* Between 2000 and 2012, annual sales proceeds averaged more than $127,000 — all dedicated to covering the costs of developing, updating, and publishing the Standards. JA2583. Even now, with the 1999 Standards superseded by the 2014 Standards, demand continues for the 1999 version. JA2583-84. Except for a two-year period immediately after introduction of the 2014 Standards, the Sponsoring Organizations continued to sell the 1999 Standards, and do so to this day. JA2583; JA2589. The 1999 Standards are available at libraries across the country. *See* AERA-DKT-089-5-57. The Sponsoring Organizations have never authorized

---

[2] One former member could not be located. JA2475.

posting the Standards for free dissemination on any public website. JA2582-83; JA2474; JA2524.

Without money from sales, the Standards would likely not exist. JA2474; JA2704-05; JA2584. The Sponsoring Organizations could continue to publish only by increasing member dues or obtaining grants — neither of which is a realistic option. *See* JA2584-85. As a practical matter, therefore, eliminating sales revenue eliminates further revisions to the Standards. JA2584-85.

### B.    Federal Government Use and Incorporation of the Standards

The National Technology Transfer and Advancement Act of 1995 (NTTAA) encourages federal agencies, "where possible," to use "standards developed by private, consensus organizations." 15 U.S.C. § 272(b)(3). That directive is implemented through Office of Management and Budget (OMB) Circular A-119, requiring use of "voluntary consensus standards in lieu of government-unique standards … except where inconsistent with law or otherwise impractical." 63 Fed. Reg. 8546 (rev'd Feb. 19, 1998). Voluntary standards are generally incorporated by reference, with sources of availability identified. *Id.* at 8555. The Freedom of Information Act provides that "matter reasonably available to the class of persons affected thereby is deemed published in the Federal Register when incorporated by reference …." 5 U.S.C. § 552(a)(1). Implementing regulations provide that matters "eligible for incorporation by reference" include

"criteria, standards, … or similar material." 1 C.F.R. § 51.7(a)(2). The referenced material is to be available at the Federal Register office or the incorporating agency. *Id.* § 51.3(b)(4).

Consistent with those provisions, the Department of Education (DOE) cited the 1999 Standards in certain regulations. DOE requires that tests affecting eligibility for certain Higher Education Act funds "[m]eet all the standards for test construction provided in the 1999 edition of the *Standards for Educational and Psychological Testing*, prepared by a joint committee of the [the Sponsoring Organizations] incorporated by reference in this section." 34 C.F.R. § 668.146(b)(6). DOE explained that those Standards were "on file at the Department of Education … and at the National Archives and Records Administration (NARA) [or could] be obtained from the American Education Research Association." *Id.*[3]

Separately, DOE set forth criteria for tests to be deemed suitable for use in the National Reporting System for Adult Education, including that they meet "applicable and feasible standards for test construction and validity provided in the 1999 edition of the *Standards* … incorporated by reference in this section," *id.*

---

[3] DOE rules also require that certain tests "follow" guidelines in the Standards relating to testing "Individuals of Diverse Linguistic Backgrounds" or "Individuals with Disabilities." 34 C.F.R. § 668.148(a)(1)(iv), (a)(2)(i); 34 C.F.R. § 462.13(f)(1).

7

§ 462.13(c)(1), or explain why compliance was not feasible, *id.* § 462.13(c)(2). DOE stated that the public could "inspect a copy" at DOE offices or NARA, or "obtain a copy from the American Psychological Association, Inc., 750 First Street, NE., Washington, DC 20002." *Id.* If a test publisher wishes to have its test considered under this rule, it must submit an application, *id.* § 462.10, and may explain why it considers the standards not applicable or feasible. *Id.*

### C.     Public Resource's Misappropriation

On May 17, 2012, Defendant-Appellee Public.Resource.Org, Inc. bought a used, paper copy of the 1999 Standards. It disassembled the copy, attached a cover, scanned the reassembled document, and created a PDF file. JA3408. It then posted the copy on Public.Resource.Org's publicly available website and another publicly-available website, the Internet Archive. JA3408-09. Public.Resource.Org posted the entire volume, which includes not only the standards, but the preface, introduction, and commentary, adding a cover. JA3408.

The 1999 Standards remained on those websites from 2012 until 2014. JA2222. In late 2013, the Sponsoring Organizations learned that Public.Resource.Org was posting the 1999 Standards online. JA2577-78. Public.Resource.Org refused to remove the postings. JA2461-64. That led to this lawsuit. *See* JA2158. In June 2014, after the Sponsoring Organizations threatened

8

to seek a preliminary injunction, Public.Resource.Org removed the Standards from the websites, pending resolution of this case. JA2466.

The Standards were accessed more than 5,000 times through Public.Resource.Org's postings. JA2226-27; JA2459. That figure does not account for hard and digital copies generated and disseminated by users downloading the Standards from the web. JA2438-57. There is no telling how many people who would have purchased the 1999 Standards did not do so because, thanks to Public.Resource.Org, the Standards were available on, and downloadable from, the websites. JA2585-86; JA2705.

### D.    Appellants' Factual Assertions

Public.Resource.Org's brief includes several ambiguous factual assertions that are incorrect as applied to the Sponsoring Organizations. The Sponsoring Organizations do not agree that these assertions are material, but some clarification is in order:

- Any implication that the Sponsoring Organizations lobby for the Standards to be incorporated into statutes or regulations is incorrect. The record reveals no efforts to persuade any government entity,

including DOE, to do so.[4] *See* JA2473-74; JA2582; JA2523. The Sponsoring Organizations do encourage professionals interested in testing, including public officials, to use the standards in their work, whether cited in regulations or not. JA2523; JA2473.

- Any implication that government employees authored the 1999 Standards is incorrect. While government employees likely commented on drafts, and their ideas may be reflected, the authors are private citizens participating as appointees of the Sponsoring Organizations. *See* JA2603.

- Any implication that Public.Resource.Org modified the format of the Standards to HTML to make them accessible to the handicapped is incorrect. Public.Resource.Org placed them online in PDF format. *See* JA3409. Public.Resource.Org did not comply with provisions of copyright law allowing copying to make works accessible to the handicapped. *See* 17 U.S.C. § 121.

- Any implication that DOE regulations use the 1999 Standards to impose "mandatory" rules of general applicability on some

---

[4] The record shows that in 2001, Plaintiff-Appellee APA commented favorably on proposed legislation referencing the Standards, which never became law. *See* JA2473.

population is incorrect. DOE's regulations address two programs: aid for students without high school diplomas or GED equivalents and national reporting of adult education program results. *See* 34 C.F.R. §§ 462.13, 668.146. The regulations reference the Standards among several conditions to qualify tests voluntarily submitted for approval in those programs. *See id.* There was no showing that any participating companies or institutions lacked access to the Standards. And finally, DOE regulations specify compliance only with certain subsets of standards (*e.g.*, construction and validity or language or disability), *see, e.g.*, *id.* § 462.13(c)(1), and not others (*e.g.*, employment and psychological testing). The regulations also do not expressly require compliance with introductory and background material and commentary that comprise the bulk of the Standards copied by Public.Resource.Org.

### E.    District Court Decision

The Sponsoring Organizations filed their complaint alleging infringement and contributory infringement, and sought a permanent injunction barring display of the 1999 Standards. JA2158. Other associations have also sued Public.Resource.Org for similar infringements. Their case is now No. 17-7035, consolidated with this one in this Court.

Following discovery, the district court heard argument on cross-motions for summary judgment in both cases. On February 2, 2016, it issued an opinion denying Public.Resource.Org's cross-motions, granting the Sponsoring Organizations' motion on their infringement claim, as well as the motion of the plaintiffs in No. 17-7035, issuing injunctions to each. *See* JA3401. The court denied summary judgment on the contributory infringement claim. JA3443.

## SUMMARY OF ARGUMENT

Public.Resource.Org and its *amici* assert that copyrighted materials lose copyright and enter the public domain if incorporated by reference in federal regulations. They support that assertion primarily with a policy-based rationale: that the public should have "unfettered" access to, and ability to copy, law, which, in their view, includes privately-created, copyrighted extrinsic standards merely incorporated by reference in federal regulations. That rationale might have force in a request to Congress, or a federal agency, for additional access. But, as the district court held, these arguments provide no defense to Public.Resource.Org's copyright infringement here.

The 1976 Copyright Act offers no statutory basis to *strip* a holder of copyright in a privately-created work because the work is cited in a federal regulation. Copyright protection is determined at the point of authorship and subsists until the term expires. A holder does not lose copyright through the

unilateral actions of a third party. Incorporation of extrinsic standards by reference, without copying or re-publishing, steers well clear of any infringement or interference with copyright.

To the contrary, the use of extrinsic standards by reference, subject to such access as Congress or agencies determine to be appropriate, is firmly established in statute and federal regulatory practice. It represents a purposeful effort by government to avail itself of the expertise underlying privately-created standards *without* infringing or impairing the copyright in those standards, and thus without dampening incentives to apply the creative efforts necessary to create such standards.

This case does not involve what would happen if a federal agency published a copyrighted work. Nor does it involve the issue in *Veeck*, the controversial case on which Public.Resource.Org relies. *Veeck* involved model codes, with no extrinsic function, which the copyright claimant created to be enacted into law and asked municipal governments to adopt and enforce as law. *Veeck* explicitly disclaimed any suggestion that extrinsic standards lose copyright protection if incorporated into regulations.

Moreover, the *Veeck* codes comprehensively regulated a broad area of primary conduct at the local level, backed by criminal sanctions, with effects on the daily activities of many citizens. This case, by contrast, involves Congress's

specific, statutorily-embodied intent for federal agency incorporation of privately-authored, extrinsic standards by reference. And the referenced standards (1) have use and value apart from enactment as law, (2) were not created to be law, (3) concern specialized fields, (4) are referenced in federal regulations only as one criterion for obtaining a government benefit, and (5) the copying in question goes far beyond the portion of the Standards incorporated by reference in federal regulations.

Because Congress endorsed incorporation by reference, and because a copyrighted work does not lose its protection through the actions of a third party, Public.Resource.Org's efforts to shoehorn its theory into the statutory definition of a non-copyrightable work cannot succeed. Neither does "fair use" offer Public.Resource.Org shelter for the verbatim, non-transformative reproduction of the Standards for the sole purpose of giving the public "unfettered" access, and unlimited ability to copy them. Permitting such an activity as fair use would eviscerate the very meaning of copyright.

## ARGUMENT

### I.     Copyright Protection Is Not Lost When a Federal Agency Incorporates a Copyrighted Work by Reference Into Agency Regulations.

#### A.     Neither the First Amendment Nor the Due Process Clause Supports the Result Public.Resource.Org Seeks Here.

Public.Resource.Org opens by invoking the Constitution, but its arguments confuse constitutional interests with constitutional rights.

14

Public.Resource.Org posits the importance of public discussion about law. It then asserts, *ipse dixit*, that the First Amendment creates a "right" of "unfettered" access to "law," which Public.Resource.Org defines, in turn, to include privately-authored, copyrighted standards referenced in government regulations.

Public.Resource.Org's suggestion of a First Amendment *right* of unfettered access and unlimited copying that overrides a copyright is readily rejected. The Constitution contemplates copyright protection, *see* U.S. CONST. art. I, § 8, cl. 8, even as it protects speech from government interference. *See Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003) ("in the Framers' view, copyright's limited monopolies are compatible with free speech principles"). The First Amendment does not *override* copyright because it does not override private property rights granted by statute or common law.

The First Amendment guards against government interference with speech. Copyright, on the other hand, grants an author certain rights, valid against private parties (and government itself, if the Act makes it so), in creative expression. *See Goldstein v. California*, 412 U.S. 546, 555 (1973). The First Amendment, of its own force, does not provide any right to invade private property, and therefore

cannot provide a right of access to, or a right to copy, a copyrighted work.[5] *See Lloyd Corp. v. Tanner*, 407 U.S. 551, 570 (1972) ("[T]he Fifth and Fourteenth Amendment rights of private property owners, as well as the First Amendment rights of all citizens, must be respected and protected. The Framers of the Constitution certainly did not think these fundamental rights of a free society are incompatible with each other."); *United Video, Inc. v. FCC*, 890 F.2d 1173, 1191 (D.C. Cir. 1989) ("[P]etitioners desire to make commercial use of the copyrighted works of others. There is no first amendment right to do so"). Although the First Amendment may support rights of access against the government, notably access to criminal trials, the right of access has not been held to override any property rights of private parties, let alone copyright.[6]

At bottom, Public.Resource.Org's constitutional argument mistakes First Amendment *interests* and *values* for First Amendment *rights*. There is a First Amendment *interest* in access to copyrighted materials that may inform public discussion, including materials incorporated in federal regulations. But that *interest* cannot be equated with an "unfettered" affirmative entitlement to access or copy protected works. To the contrary, there is an important First Amendment

---

[5] Congress largely accommodates First Amendment *interests* through the fair use doctrine. 17 U.S.C. § 107.

[6] *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575–77, 580 (1980).

*interest* in *protecting* copyright. The Framers saw copyright as an "engine of free expression: By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas." *Golan v. Holder*, 565 U.S. 302, 328 (2011) (citations and quotation marks omitted).

Congress thus balances between the interests best served by broad copyright protection and limits on that protection. *See Eldred*, 537 U.S. at 212–13 ("it is generally for Congress … to decide how best to pursue the Copyright Clause's objectives"). And here, the district court properly concluded that Congress has encouraged federal agencies to incorporate privately-created, copyrighted standards by reference, on the understanding that it would not impair copyright in those standards. *See* JA3419-24.

Public.Resource.Org does not assert that its own due process *rights* are at issue here. Someone adversely affected by lack of notice of legal standards to which he or she is subject might conceivably defend by asserting a denial of due process, arguing that the government should provide greater access, or be barred from enforcing the law that depends on those standards. But neither logic nor law supports the proposition that due process interests can be wielded as an independent sword to overcome a private party's copyright.

17

**B.    Copyright Protection Cannot Be Lost by the Decision of a Government Body to Reference Privately-Authored Standards in Statute or Regulation.**

Because nothing in the Constitution overrides the Sponsoring Organizations' copyright, the remaining issues are purely statutory, turning on congressional intent.

**1.    Public.Resource.Org's Theory Is Untenable as a Practical Matter and as a Matter of Basic Copyright Principles.**

The breadth of Public.Resource.Org's claims deserves highlighting from the outset. The 1999 Standards is a privately-authored creative work that assists members of the Sponsoring Organizations and other professionals in preparing and evaluating tests. Sales revenue supports the Standards' creation and improvement. Yet because DOE identified a portion of the Standards among criteria for judging tests' eligibility for inclusion in particular government programs, Public.Resource.Org here claims a right to copy and provide free on-line access to the entire document, including introductory and background material, and extensive commentary. Thus, a valuable, privately-authored work, serving private-sector purposes, would effectively *lose* all protection if the work were later (even in part, apparently) incorporated by reference in statute, regulation, or ordinance, by any of the innumerable government bodies — municipal, state, or federal — that might choose to do so. Moreover, the

government body would presumably become liable for either (a) a taking, or (b) infringement, *see, e.g.*, 28 U.S.C. § 1498(b).

The breadth of Public.Resource.Org's lost copyright theory is also clear from the way it would revise copyright law. The copyright would be lost to the holder, and the government entity held liable, even if the government entity purposely sought to *avoid* infringing, impairing or appropriating the copyright by merely referring to the work rather than copying it, even in part.

Public.Resource.Org's theory is also inconsistent with other foundational copyright principles. Copyrightability is determined as of the point of creation, when fixed in a tangible medium of expression. 17 U.S.C. § 102(a). "Rights typically vest at the outset of copyright protection, in an author or rightholder." *Golan*, 565 U.S. at 331. Short of a "taking," the Act provides no basis by which rights, vested on creation, are lost solely by virtue of third-party actions. Unlike trade secret or trademark, copyright is granted for a term of years, entering the public domain only upon expiration of the term, *see* 17 U.S.C. § 302(a), or through the holder's actions, as when the holder licenses the work for public use, *see, e.g.*, *Drauglis v. Kappa Map Grp., LLC*, 128 F. Supp. 3d 46, 52–53 (D.D.C. 2015).[7]

---

[7] Actions by the holder also may result in a loss of copyright enforcement rights in cases of copyright misuse or fraud on the Copyright Office.

This basic principle that copyright is determined at the point of authorship, and not lost as a result of later third-party actions, applies to all the various doctrines used to determine copyrightability, including "merger." See *Oracle Am., Inc. v. Google, Inc.*, 750 F.3d 1339, 1372 (Fed. Cir. 2014) (applying the merger doctrine as of creation, because it "is well-established that copyrightability and the scope of protectable activity are to be evaluated at the time of creation, not at the time of infringement"). These conflicts between Public.Resource.Org's theories and basic copyright law provide a sufficient basis for rejecting those theories here.

> **2.    The Copyright Act, and Congress's Related Actions, Leave No Doubt That Matter Incorporated by Reference Does Not Lose Copyright Protection.**

Public.Resource.Org invokes *Wheaton v. Peters*, 33 U.S. (8 Pet.) 591 (1834), and *Banks v. Manchester*, 128 U.S. 244 (1888). In those cases, the Supreme Court, construing the statute as it then existed, rejected the claim of reporters seeking to copyright decisions of their respective courts. As the district court properly held, however, *Wheaton* and *Banks* do not support Public.Resource.Org's theory here because the 1999 Standards, unlike the publications there, are not government works created as the law. *See* JA3420-21.

The issue here is different: whether copyrighted works, authored by private parties, *lose* protection, if later incorporated by reference in federal regulations. Public.Resource.Org's effort to extend *Wheaton* and *Banks* to privately-created

20

extrinsic standards incorporated by reference in laws or regulations has already been rejected by two courts of appeals. *See Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 518–20 (9th Cir. 1997) ("neither of [the grounds relied on in *Banks*] would justify invalidation of" a private organization's copyright in its own standards); *CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reports, Inc.*, 44 F.3d 61, 74 (2d Cir. 1994) ("We are not prepared to hold that a state's reference to a copyrighted work as a legal standard for valuation results in loss of the copyright.").

As the district court concluded, the 1976 Copyright Act, coupled with Congress's express encouragement of the federal agency practice of incorporating standards by reference, answers the copyrightability question here. In the 1976 Copyright Act, 17 U.S.C. § 105, Congress encapsulated the core of *Wheaton* and *Banks*, specifying that "Copyright protection under this title is not available for any work of the United States Government." A "work of the United States Government" is "a work prepared by an officer or employee of the United States Government as part of that person's official duties." *Id.* § 101. These "are the only government-related works that outright lack copyright under the law." JA3420.

The district court's reading of the Act as defining when federal government involvement precludes copyright is supported by the House Report for the Act, which explains that § 105 carries forward the principle "that publication or other

use by the Government of a private work would not affect its copyright protection in any way." H.R. Rep. No. 94-1476, at 60 (1976). Congress knew, of course, that works are sometimes prepared by private parties for the government, by request or by contract. Even then, the decision whether to withhold copyright is to be made by the political branches on a case-by-case basis, via contract, statute, or regulations, based on whether "the need to have a work freely available outweighs the need of the private author to secure a copyright." JA3420 (quoting H.R. Rep. No. 94-1476). The decision whether to eliminate copyright based on government involvement is thus left to Congress, via statute, or agencies by regulation or contract.

Congress was specifically aware of the practice of incorporating copyrighted materials by reference in federal regulations. Ten years earlier, Congress authorized such incorporation by reference, provided the referenced "matter" was "reasonably available" to persons affected. See 5 U.S.C. § 552(a)(1).[8] By regulation, publications "eligible for incorporation by reference" include "criteria, standards … or similar material." 1 C.F.R. § 51.7(a)(2).

---

[8] *Amici* argue that, in the "digital age," the requirement that referenced works be "reasonably available to … persons affected," 5 U.S.C. § 552(a)(1), should be interpreted to require availability to *everyone,* for free. *See* Br. of Amicus Curiae Sixty-Six Library Ass'ns *et al*. at 3, 9–10. *Amici* provide no clue how to reach that result from the actual statutory language, and, in any event, that argument is better pressed on the agencies involved.

Unsurprisingly, neither Congress nor the regulations suggest that such incorporation would itself affect private copyrights.

Moreover, with enactment of the NTTAA in 1996, Congress directed federal agencies "where possible," to use "standards developed by private, consensus organizations." 15 U.S.C. § 272(b)(3). OMB Circular A-119 (as revised in 1998), implementing the NTTAA, requires use of "voluntary consensus standards in lieu of government-unique standards …." 63 Fed. Reg. at 8554–55. When such standards are used, they are generally incorporated by reference. If the agency is considering *reprinting* such standards, care must be taken to protect any copyright holder. *Id.* at 8555 ("If a voluntary standard is used *and published* in an agency document, your agency must observe and protect the rights of the copyright holder.") (emphasis added). There is no similar caution for incorporation by reference. That practice was never seen as raising copyright concerns. To the contrary, it provides a means by which government can avail itself of the benefits of privately-created professional standards in a way that does *not* infringe, or diminish the rights of the copyright holder or the value of the copyright.

This case does not present the novel hypotheticals posed by Public.Resource.Org., where some lobbyist claims to have authored language enacted into statute — and then asserts copyright infringement. *See*

23

Public.Resource.Org Br. 30–31. This case does not even present the situation where the government publishes a preexisting work in its regulations, thereby infringing by its own actions. Those law school questions, like the specter of secret law invoked by Public.Resource.Org and its *amici*, have not arisen in the real world. Indeed, while Public.Resource.Org and its *amici* rail against secret law, their claim here is not for access to secret standards, but rather to "unfettered" access to, and ability to copy, the Standards. The Standards were neither secret nor unavailable.

> ### 3. This Court Should Decline to Adopt *Veeck*,'s Improper Expansion of *Wheaton* and *Bank*s, Let Alone Any Expansion of *Veeck*, to Reach These Cases.

Public.Resource.Org does not dispute that Section 105 of the Copyright Act, 17 U.S.C. § 105, encapsulates the facts of *Wheaton* and *Banks*. It nonetheless suggests that those cases actually stand for a broader, judicially-created, stand-alone principle that "law" — which Public.Resource.Org argues would extend to privately-authored standards, incorporated by reference— cannot be copyrighted. As support for all this, it rests on *Veeck v. Southern Building Code Congress International, Inc.*, 293 F.3d 791 (5th Cir. 2002) (en banc).

Public.Resource.Org's argument relies primarily on the notion of a freestanding, judicially-created exception to copyright for "law." *Veeck* itself cited the 1976 Copyright Act, but almost as an afterthought. *See id.* at 800–03

(purporting to apply the Act, but mentioning its provisions just a few times). That approach is misguided. Copyright is a statutory matter, and the statute — which now embodies matters such as the fair use doctrine, formerly judicial creations — should displace judicial authority to create new exceptions to copyright. *See generally Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 423–24 (2011). Thus, analysis should begin with the 1976 Act and reflect the intent of Congress. *See United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989). Even if *Wheaton* and *Banks* supported an independent, judicially-created, "law is not copyrightable" rule that survives the 1976 Act, that Act at least precludes any judicial expansion of that rule in the manner engaged in by *Veeck*, or even further, as Public.Resource.Org urges in an effort to expand *Veeck* to reach this case.

In any event — and without conceding that *Veeck* is correct even on its facts — *Veeck* offers no support for Public.Resource.Org's position. *Veeck* addressed whether model building codes created for the sole purpose of asking government entities to adopt and enforce them as law could be copyrighted when they were, as intended, adopted as law. 293 F.3d at 794. Because *Veeck* focused on local municipalities, it paid scant attention to 17 U.S.C. § 102(e), addressing federal government works, or to the longstanding *federal* practice of incorporating privately-created, copyrighted standards in federal regulations.

Even more to the point, the Fifth Circuit expressly distinguished model codes, created solely to be enacted as law, from the "extrinsic standards" at issue here. *Veeck*, 293 F.3d at 803–04. Extrinsic standards are, by definition, created and employed for purposes other than "law." For that reason, the Fifth Circuit readily dismissed the concern of "national standards-writing organizations … that their copyrights may be vitiated simply by the common practice of governmental entities' incorporating their standards in laws and regulations." *Id.*

> This case does not involve references to extrinsic standards. Instead, it concerns the wholesale adoption of a model code promoted by its author … precisely for use as legislation. Case law that derives from official incorporation of extrinsic standards is distinguishable in reasoning and result.

*Id.* at 804. Although the author in *Veeck* had not formally licensed its work to the public, it created the work to be law and urged municipalities to enact it. *See id.* at 803 ("The issue in the case is … the legal consequences flowing from the permission that [the author] gave"); *id.* at 805 (distinguishing cases where "standards … were created by private groups for reasons other than incorporation into law" and none of the authors "solicited incorporation of their standards by legislators or regulators").

Ignoring *Veeck*'s stated limitation on its reach, Public.Resource.Org would extend *Veeck*'s idea of "law" to encompass extrinsic standards incorporated by reference, arguing that the "law is not copyrightable" rule is "reinforced" by 17

26

U.S.C. § 102's definition of copyrightable subject matter. But all of Public.Resource.Org's efforts to shoehorn its arguments into § 102 rest on sheer *ipse dixit*. Indeed, Public.Resource.Org's lead *amicus* candidly concedes that while it might be possible to declare that such a rule resides in § 102, it does not do so "literally." *See* Br. of Amicus Curiae Sixty-Six Library Ass'ns *et al*. at 26.

Extrinsic standards are copyrightable at their creation; they embody creativity and have utility and significance. Those qualities provide the basis for copyright, and remain whether or not later incorporated by reference in a regulation. Copyright protection, once granted, subsists. Thus, it does not advance Public.Resource.Org's argument to declare law to be an uncopyrightable fact or idea because that does not describe the Standards themselves. Similarly, even if one were to accept Public.Resource.Org's implausible assertion that *law* is an uncopyrightable "system," not even Public.Resource.Org now contends that *the Standards'* creative description and organization of principles was an uncopyrightable system. Incorporation by reference does not turn it into one.

Similarly, the merger doctrine — that expression merges with the idea when there are few ways to express the idea, *see* 4 NIMMER ON COPYRIGHT § 13.03 (2017) — does not help Public.Resource.Org. There are "myriad ways to write and organize the text of the standards." *See* JA3430. The copyrightable character

of the Standards does not change when incorporated by reference by some other author or the government.

Neither does it help to argue that the Standards are uncopyrighted because law is in the public domain. Such an assertion is circular. Any work that is not copyrightable is in the public domain. The Standards are copyrighted and therefore not in the public domain.

In any event, Public.Resource.Org here did not merely copy incorporated, individual standards, but rather the 1999 Standards book in its entirety. That book included 279 standards, which extended beyond those identified in the regulations, and a preface, introduction, background sections, and extensive comments. All of this was original, copyright-protected expression.

Finally, even if one were to accept that some version of a freestanding, extra-statutory rule that "law cannot be copyrighted" exists and remains operative, and even if that rule reached the "law" in *Veeck*, this case involves a very different type of "law." *Veeck* involved model building codes, created for enactment into law. Those codes comprehensively and directly regulated a broad swath of primary conduct — construction of peoples' homes and businesses. They were backed by criminal sanctions. They had direct effects on many people.

Here, by contrast, the Standards were intended for use, and have value, apart from enactment as law. They are valued as professional standards because of

their merit, irrespective of whether they are the "law" of two DOE programs. And even as incorporated, they do not govern primary conduct, but merely eligibility for consideration under two programs that must be applied for. No criminal or civil sanction is imposed for failing to heed them. DOE's reference reflects an intention to import privately-sponsored professionalism into a governmental program, not to impose a rule on the population at large.

In sum, even if some version of "law may not be copyrighted" stands as an independent rule after the 1976 Act, that rule does not reach this case.

## II.    Public.Resource.Org Did Not Engage in Fair Use.

Because the circumstances concerning Public.Resource.Org's fair use defense are substantially the same in the two consolidated cases, the Sponsoring Organizations adopt Appellees' fair use arguments in No. 17-7035.

## III.    Public.Resource.Org Has Shown No Impediment to the Sponsoring Organizations' Right to Enforce the Copyright.

As the district court held, Public.Resource.Org's arguments about the Sponsoring Organizations' right to enforce the copyright are unavailing. Doc-JA3411-15. The registration certificate provides *prima facie* evidence of ownership. *See* JA2590-95; 17 U.S.C. § 410(c). Ownership is further demonstrated by work-made-for-hire confirmations from the committee members who authored the 1999 Standards. *See* JA2475; *see also* JA2477-517. Public.Resource.Org speculates that other persons contributed to the Standards, or

29

were perhaps authors. Public.Resource.Org Br. 49–50. But even if these speculations were supported in the record, the Sponsoring Organizations were nonetheless owners and had standing to assert their claim.

Public.Resource.Org's related suggestion about partial government authorship is even more speculative. Even if that possibility had legal significance (and had been raised below), the fact that government employees commented or contributed during the development process cannot be equated with government *authorship*.

## CONCLUSION

The judgment should be affirmed.

Respectfully submitted

*/s/  Clifton S. Elgarten*

Michael J. Songer
John I. Stewart Jr.
Clifton S. Elgarten
Mark Thomson
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2505
Phone: (202) 624-2500
celgarten@crowell.com

*Attorneys for Plaintiffs-Appellees American Educational Research Association, Inc.; American Psychological Association, Inc.; and National Council On Measurement In Education, Inc.*

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and the Court's October 27, 2017 order in this case because it contains 5,931 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

2.    This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point font.

DATED this 14th day of February, 2018.


*/s/  Clifton S. Elgarten*
Clifton S. Elgarten

# ADDENDUM OF

# STATUTES AND REGULATIONS

## TABLE OF CONTENTS TO
## ADDENDUM OF STATUES AND REGULATIONS

**Statute or Regulation**                                    **Page No.**

15 U.S.C. § 272(b) .................................................................1a

17 U.S.C. § 102 ......................................................................3a

17 U.S.C. § 302 ......................................................................4a

17 U.S.C. § 410 ......................................................................6a

28 U.S.C. § 1498 ....................................................................7a

34 C.F.R. § 462.10 ...............................................................10a

34 C.F.R. § 462.13 ...............................................................11a

34 C.F.R. § 668.146 .............................................................13a

34 C.F.R. § 668.148 .............................................................16a

## ADDENDUM OF STATUES AND REGULATIONS

## 15 U.S.C. § 272(b)

## Establishment, functions, and activities

**(b) Functions of Secretary and Institute** The Secretary of Commerce (hereafter in this chapter referred to as the "Secretary") acting through the Director of the Institute (hereafter in this chapter referred to as the "Director") is authorized to serve as the President's principal adviser on standards policy pertaining to the Nation's technological competitiveness and innovation ability and to take all actions necessary and appropriate to accomplish the purposes of this chapter, including the following functions of the Institute—

**(1)** to assist industry in the development of technology and procedures needed to improve quality, to modernize manufacturing processes, to ensure product reliability, manufacturability, functionality, and cost-effectiveness, and to facilitate the more rapid commercialization, especially by small- and medium-sized companies throughout the United States, of products based on new scientific discoveries in fields such as automation, electronics, advanced materials, biotechnology, and optical technologies;

**(2)** to develop, maintain, and retain custody of the national standards of measurement, and provide the means and methods for making measurements consistent with those standards;

**(3)** to facilitate standards-related information sharing and cooperation between Federal agencies and to coordinate the use by Federal agencies of private sector standards, emphasizing where possible the use of standards developed by private, consensus organizations;

**(4)** to enter into contracts, including cooperative research and development arrangements, and grants and cooperative agreements, in furtherance of the purposes of this chapter;

**(5)** to provide United States industry, Government, and educational institutions with a national clearinghouse of current information, techniques, and advice for the achievement of higher quality and productivity based on current domestic and international scientific and technical development;

**(6)** to assist industry in the development of measurements, measurement methods, and basic measurement technology;

**(7)** to determine, compile, evaluate, and disseminate physical constants and the properties and performance of conventional and advanced materials when they are important to science, engineering, manufacturing, education, commerce, and industry and are not available with sufficient accuracy elsewhere;

**(8)** to develop a fundamental basis and methods for testing materials, mechanisms, structures, equipment, and systems, including those used by the Federal Government;

**(9)** to assure the compatibility of United States national measurement standards with those of other nations;

**(10)** to cooperate with other departments and agencies of the Federal Government, with industry, with State and local governments, with the governments of other nations and international organizations, and with private organizations in establishing standard practices, codes, specifications, and voluntary consensus standards;

**(11)** to advise government and industry on scientific and technical problems;

**(12)** to invent, develop, and (when appropriate) promote transfer to the private sector of measurement devices to serve special national needs; and

**(13)** to coordinate technical standards activities and conformity assessment activities of Federal, State, and local governments with private sector technical standards activities and conformity assessment activities, with the goal of eliminating unnecessary duplication and complexity in the development and promulgation of conformity assessment requirements and measures.

2a

**17 U.S.C. § 102**

**Subject matter of copyright: In general**

**(a)** Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories:

   **(1)** literary works;

   **(2)** musical works, including any accompanying words;

   **(3)** dramatic works, including any accompanying music;

   **(4)** pantomimes and choreographic works;

   **(5)** pictorial, graphic, and sculptural works;

   **(6)** motion pictures and other audiovisual works;

   **(7)** sound recordings; and

   **(8)** architectural works.

**(b)** In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

**17 U.S.C. § 302**

**Duration of copyright: Works created on or after January 1, 1978**

**(a) In General.—**
Copyright in a work created on or after January 1, 1978, subsists from its creation and, except as provided by the following subsections, endures for a term consisting of the life of the author and 70 years after the author's death.

**(b) Joint Works.—**
In the case of a joint work prepared by two or more authors who did not work for hire, the copyright endures for a term consisting of the life of the last surviving author and 70 years after such last surviving author's death.

**(c) Anonymous Works, Pseudonymous Works, and Works Made for Hire.—**
In the case of an anonymous work, a pseudonymous work, or a work made for hire, the copyright endures for a term of 95 years from the year of its first publication, or a term of 120 years from the year of its creation, whichever expires first. If, before the end of such term, the identity of one or more of the authors of an anonymous or pseudonymous work is revealed in the records of a registration made for that work under subsections (a) or (d) of section 408, or in the records provided by this subsection, the copyright in the work endures for the term specified by subsection (a) or (b), based on the life of the author or authors whose identity has been revealed. Any person having an interest in the copyright in an anonymous or pseudonymous work may at any time record, in records to be maintained by the Copyright Office for that purpose, a statement identifying one or more authors of the work; the statement shall also identify the person filing it, the nature of that person's interest, the source of the information recorded, and the particular work affected, and shall comply in form and content with requirements that the Register of Copyrights shall prescribe by regulation.

**(d) Records Relating to Death of Authors.—**
Any person having an interest in a copyright may at any time record in the Copyright Office a statement of the date of death of the author of the copyrighted work, or a statement that the author is still living on a particular date. The statement shall identify the person filing it, the nature of that person's interest, and the source of the information recorded, and shall comply in form and content with requirements that the Register of Copyrights shall prescribe by regulation. The Register shall maintain current records of information relating to the death of authors of copyrighted works, based on such recorded statements and, to the

extent the Register considers practicable, on data contained in any of the records of the Copyright Office or in other reference sources.

**(e) Presumption as to Author's Death.—**
After a period of 95 years from the year of first publication of a work, or a period of 120 years from the year of its creation, whichever expires first, any person who obtains from the Copyright Office a certified report that the records provided by subsection (d) disclose nothing to indicate that the author of the work is living, or died less than 70 years before, is entitled to the benefits of a presumption that the author has been dead for at least 70 years. Reliance in good faith upon this presumption shall be a complete defense to any action for infringement under this title.

**17 U.S.C. § 410**

**Registration of claim and issuance of certificate**

**(a)** When, after examination, the Register of Copyrights determines that, in accordance with the provisions of this title, the material deposited constitutes copyrightable subject matter and that the other legal and formal requirements of this title have been met, the Register shall register the claim and issue to the applicant a certificate of registration under the seal of the Copyright Office. The certificate shall contain the information given in the application, together with the number and effective date of the registration.

**(b)** In any case in which the Register of Copyrights determines that, in accordance with the provisions of this title, the material deposited does not constitute copyrightable subject matter or that the claim is invalid for any other reason, the Register shall refuse registration and shall notify the applicant in writing of the reasons for such refusal.

**(c)** In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

**(d)** The effective date of a copyright registration is the day on which an application, deposit, and fee, which are later determined by the Register of Copyrights or by a court of competent jurisdiction to be acceptable for registration, have all been received in the Copyright Office.

## 28 U.S.C. § 1498

## Patent and copyright cases

**(a)** Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture. Reasonable and entire compensation shall include the owner's reasonable costs, including reasonable fees for expert witnesses and attorneys, in pursuing the action if the owner is an independent inventor, a nonprofit organization, or an entity that had no more than 500 employees at any time during the 5-year period preceding the use or manufacture of the patented invention by or for the United States. Nothwithstanding [1] the preceding sentences, unless the action has been pending for more than 10 years from the time of filing to the time that the owner applies for such costs and fees, reasonable and entire compensation shall not include such costs and fees if the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States.

The court shall not award compensation under this section if the claim is based on the use or manufacture by or for the United States of any article owned, leased, used by, or in the possession of the United States prior to July 1, 1918.

A Government employee shall have the right to bring suit against the Government under this section except where he was in a position to order, influence, or induce use of the invention by the Government. This section shall not confer a right of action on any patentee or any assignee of such patentee with respect to any invention discovered or invented by a person while in the employment or service of the United States, where the invention was related to the official functions of the employee, in cases in which such functions included research and development, or in the making of which Government time, materials or facilities were used.

**(b)** Hereafter, whenever the copyright in any work protected under the copyright laws of the United States shall be infringed by the United States, by a corporation owned or controlled by the United States, or by a contractor, subcontractor, or any person, firm, or corporation acting for the Government and with the authorization or consent of the Government, the exclusive action which may be brought for such infringement shall be an action by the copyright owner against the United States in the Court of Federal Claims for the recovery of his reasonable and entire compensation as damages for such infringement, including the minimum statutory damages as set forth in section 504(c) of title 17, United States Code: *Provided*, That a Government employee shall have a right of action against the Government under this subsection except where he was in a position to order, influence, or induce use of the copyrighted work by the Government: *Provided, however*, That this subsection shall not confer a right of action on any copyright owner or any assignee of such owner with respect to any copyrighted work prepared by a person while in the employment or service of the United States, where the copyrighted work was prepared as a part of the official functions of the employee, or in the preparation of which Government time, material, or facilities were used: *And provided further*, That before such action against the United States has been instituted the appropriate corporation owned or controlled by the United States or the head of the appropriate department or agency of the Government, as the case may be, is authorized to enter into an agreement with the copyright owner in full settlement and compromise for the damages accruing to him by reason of such infringement and to settle the claim administratively out of available appropriations.

Except as otherwise provided by law, no recovery shall be had for any infringement of a copyright covered by this subsection committed more than three years prior to the filing of the complaint or counterclaim for infringement in the action, except that the period between the date of receipt of a written claim for compensation by the Department or agency of the Government or corporation owned or controlled by the United States, as the case may be, having authority to settle such claim and the date of mailing by the Government of a notice to the claimant that his claim has been denied shall not be counted as a part of the three years, unless suit is brought before the last-mentioned date.

**(c)** The provisions of this section shall not apply to any claim arising in a foreign country.

**(d)** Hereafter, whenever a plant variety protected by a certificate of plant variety protection under the laws of the United States shall be infringed by the United States, by a corporation owned or controlled by the United States, or by a

contractor, subcontractor, or any person, firm, or corporation acting for the Government, and with the authorization and consent of the Government, the exclusive remedy of the owner of such certificate shall be by action against the United States in the Court of Federal Claims for the recovery of his reasonable and entire compensation as damages for such infringement: *Provided*, That a Government employee shall have a right of action against the Government under this subsection except where he was in a position to order, influence, or induce use of the protected plant variety by the Government: *Provided, however*, That this subsection shall not confer a right of action on any certificate owner or any assignee of such owner with respect to any protected plant variety made by a person while in the employment or service of the United States, where such variety was prepared as a part of the official functions of the employee, or in the preparation of which Government time, material, or facilities were used: *And provided further*, That before such action against the United States has been instituted, the appropriate corporation owned or controlled by the United States or the head of the appropriate agency of the Government, as the case may be, is authorized to enter into an agreement with the certificate owner in full settlement and compromise, for the damages accrued to him by reason of such infringement and to settle the claim administratively out of available appropriations.

**(e)** Subsections (b) and (c) of this section apply to exclusive rights in mask works under chapter 9 of title 17, and to exclusive rights in designs under chapter 13 of title 17, to the same extent as such subsections apply to copyrights.

9a

**34 C.F.R. § 462.10**

**How does the Secretary review tests?**

**(a)** The Secretary only reviews tests under this part that are submitted by a test publisher.

**(b)** A test publisher that wishes to have the suitability of its test determined by the Secretary under this part must submit an application to the Secretary, in the manner the Secretary may prescribe, by October 1, 2016, April 1, 2017, October 1, 2017, April 1, 2018, October 1, 2018, and by October 1 of each year thereafter.

**34 C.F.R. § 462.13**

**What criteria and requirements does the Secretary use for determining the suitability of tests?**

In order for the Secretary to consider a test suitable for use in the NRS, the test or the test publisher, if applicable, must meet the following criteria and requirements:

**(a)** The test must measure the NRS educational functioning levels of members of the adult education population.

**(b)** The test must sample one or more of the major content domains of the NRS educational functioning levels of ABE, ASE or ESL with sufficient numbers of questions to adequately represent the domain or domains.

**(c)**

    **(1)** The test must meet all applicable and feasible standards for test construction and validity provided in the 1999 edition of the *Standards for Educational and Psychological Testing,* prepared by the Joint Committee on Standards for Educational and Psychological Testing of the American Educational Research Association, the American Psychological Association, and the National Council on Measurement in Education incorporated by reference in this section. The Director of the Federal Register approves this incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 1 CFR part 51. You may obtain a copy from the American Psychological Association, Inc., 750 First Street, NE., Washington, DC 20002. You may inspect a copy at the Department of Education, room 11159, 550 12th Street, SW., Washington, DC 20202 or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call (202) 741-6030, or go to: *http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html*.

    **(2)** If requested by the Secretary, a test publisher must explain why it believes that certain standards in the 1999 edition of the *Standards for Educational and Psychological Testing* were not applicable or were not feasible to meet.

**(d)** The test must contain the publisher's guidelines for retesting, including time between test-taking, which are accompanied by appropriate justification.

**(e)** The test must -

**(1)** Have two or more secure, parallel, equated forms of the same test - either traditional paper and pencil or computer administered instruments - for which forms are constructed prior to administration to examinees; or

**(2)** Be an adaptive test that uses computerized algorithms for selecting and administering items in real time; however, for such an instrument, the size of the item pool and the method of item selection must ensure negligible overlap in items across pre- and post-testing. Scores associated with these alternate administrations must be equivalent in meaning.

**(f)** For a test that has been modified for individuals with disabilities, the test publisher must -

**(1)** Provide documentation that it followed the guidelines provided in the Testing Individuals With Disabilities section of the 1999 edition of the *Standards for Educational and Psychological Testing;*

**(2)** Provide documentation of the appropriateness and feasibility of the modifications relevant to test performance; and

**(3)**

**(i)** Recommend educational functioning levels based on the information obtained from adult education students who participated in the pilot or field test and who have the disability for which the test has been modified; and

**(ii)** Provide documentation of the adequacy of the procedures used to translate the performance of adult education students with the disability for whom the test has been modified to an estimate of the examinees' standing with respect to the NRS educational functioning levels.

**34 C.F.R. § 668.146**

**Criteria for approving tests.**

**(a)** Except as provided in § 668.148, the Secretary approves a test under this subpart if -

  **(1)** The test meets the criteria set forth in paragraph (b) of this section;

  **(2)** The test publisher or the State satisfies the requirements set forth in paragraph (c) of this section; and

  **(3)** The Secretary makes a determination that the information the test publisher or State submitted in accordance with § 668.144(c)(17) or (d)(8), as applicable, provides adequate assurance that the test publisher or State will conduct rigorous test anomaly analyses and take appropriate action if test administrators do not comply with testing procedures.

**(b)** To be approved under this subpart, a test must -

  **(1)** Assess secondary school level basic verbal and quantitative skills and general learned abilities;

  **(2)** Sample the major content domains of secondary school level verbal and quantitative skills with sufficient numbers of questions to -

    **(i)** Adequately represent each domain; and

    **(ii)** Permit meaningful analyses of item-level performance by students who are representative of the contemporary population beyond the age of compulsory school attendance and have earned a high school diploma;

  **(3)** Require appropriate test-taking time to permit adequate sampling of the major content domains described in paragraph (b)(2) of this section;

  **(4)** Have all forms (including short forms) comparable in reliability;

  **(5)** Have, in the case of a test that is revised, new scales, scale values, and scores that are demonstrably comparable to the old scales, scale values, and scores;

  **(6)** Meet all standards for test construction provided in the 1999 edition of the *Standards for Educational and Psychological Testing,* prepared by a joint committee of the American Educational Research Association, the American Psychological Association, and the National Council on Measurement in Education incorporated by reference in this section. Incorporation by reference of this document has been approved by the Director of the Office of the Federal

13a

Register pursuant to the Director's authority under 5 U.S.C. 552(a) and 1 1 CFR part 51. The incorporated document is on file at the Department of Education, Federal Student Aid, room 113E2, 830 First Street, NE., Washington, DC 20002, phone (202) 377-4026, and at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 1-866-272-6272, or go to: *http://www.archives.gov/ federal_register/code_of_federal_regulations/ibr_locations.html.* The document also may be obtained from the American Educational Research Association at: *http://www.aera.net;* and

**(7)** Have the test publisher's or the State's guidelines for retesting, including time between test-taking, be based on empirical analyses that are part of the studies of test reliability.

**(c)** In order for a test to be approved under this subpart, a test publisher or a State must -

**(1)** Include in the test booklet or package -

**(i)** Clear, specific, and complete instructions for test administration, including information for test takers on the purpose, timing, and scoring of the test; and

**(ii)** Sample questions representative of the content and average difficulty of the test;

**(2)** Have two or more secure, equated, alternate forms of the test;

**(3)** Except as provided in §§ 668.148 and 668.149, provide tables of distributions of test scores which clearly indicate the mean score and standard deviation for high school graduates who have taken the test within three years prior to the date that the test is submitted to the Secretary for approval under § 668.144;

**(4)** Norm the test with -

**(i)** Groups that are of sufficient size to produce defensible standard errors of the mean and are not disproportionately composed of any race or gender; and

**(ii)** A contemporary sample that is representative of the population of persons who have earned a high school diploma in the United States; and

14a

**(5)** If test batteries include sub-tests assessing different verbal and/or quantitative skills, a distribution of test scores as described in paragraph (c)(3) of this section that allows the Secretary to prescribe either -

  **(i)** A passing score for each sub-test; or

  **(ii)** One composite passing score for verbal skills and one composite passing score for quantitative skills.

**34 C.F.R. § 668.148**

**Criteria for approving tests.**
**Additional criteria for the approval of certain tests.**

**(a)** In addition to satisfying the criteria in § 668.146, to be approved by the Secretary, a test must meet the following criteria, if applicable:

**(1)** In the case of a test developed for a non-native speaker of English who is enrolled in a program that is taught in his or her native language, the test must be -

**(i)** Linguistically accurate and culturally sensitive to the population for which the test is designed, regardless of the language in which the test is written;

**(ii)** Supported by documentation detailing the development of normative data;

**(iii)** If translated from an English version, supported by documentation of procedures to determine its reliability and validity with reference to the population for which the translated test was designed;

**(iv)** Developed in accordance with guidelines provided in the 1999 edition of the "Testing Individuals of Diverse Linguistic Backgrounds" section of the *Standards for Educational and Psychological Testing* prepared by a joint committee of the American Educational Research Association, the American Psychological Association, and the National Council on Measurement in Education incorporated by reference in this section. Incorporation by reference of this document has been approved by the Director of the Office of the Federal Register pursuant to the Director's authority under 5 U.S.C. 552(a) and 1 1 CFR part 51. The incorporated document is on file at the Department of Education, Federal Student Aid, room 113E2, 830 First Street, NE., Washington, DC 20002, phone (202) 377-4026, and at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 1-866-272-6272, or go to: *http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_lo cations.html.* The document also may be obtained from the American Educational Research Association at: *http://www.aera.net;* and

**(v)**

**(A)** If the test is in Spanish, accompanied by a distribution of test scores that clearly indicates the mean score and standard deviation for Spanish-speaking students with high school diplomas who have taken the test within

16a

five years before the date on which the test is submitted to the Secretary for approval.

**(B)** If the test is in a language other than Spanish, accompanied by a recommendation for a provisional passing score based upon performance of a sample of test takers representative of non-English speaking individuals who speak a language other than Spanish and who have a high school diploma. The sample upon which the recommended provisional passing score is based must be large enough to produce stable norms.

**(2)** In the case of a test that is modified for use for individuals with disabilities, the test publisher or State must -

**(i)** Follow guidelines provided in the "Testing Individuals with Disabilities" section of the *Standards for Educational and Psychological Testing;* and

**(ii)** Provide documentation of the appropriateness and feasibility of the modifications relevant to test performance.

**(3)** In the case of a computer-based test, the test publisher or State, as applicable, must -

**(i)** Provide documentation to the Secretary that the test complies with the basic principles of test construction and standards of reliability and validity as promulgated in the *Standards for Educational and Psychological Testing;*

**(ii)** Provide test administrators with instructions for familiarizing test takers with computer hardware prior to test-taking; and

**(iii)** Provide two or more parallel, equated forms of the test, or, if parallel forms are generated from an item pool, provide documentation of the methods of item selection for alternate forms.

**(b)** If a test is designed solely to measure the English language competence of non-native speakers of English -

**(1)** The test must meet the criteria set forth in § 668.146(b)(6), (c)(1), (c)(2), and (c)(4); and

**(2)** The test publisher must recommend a passing score based on the mean score of test takers beyond the age of compulsory school attendance who completed U.S. high school equivalency programs, formal training programs, or bilingual vocational programs.

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2018, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/  Clifton S. Elgarten*
Clifton S. Elgarten