# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 14, 2018        Decided July 17, 2018

No. 17-7035

AMERICAN SOCIETY FOR TESTING AND MATERIALS, ET AL.,
APPELLEES

v.

PUBLIC.RESOURCE.ORG, INC.,
APPELLANT

———

Consolidated with 17-7039

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:13-cv-01215)
(No. 1:14-cv-00857)

———

*Corynne McSherry* argued the cause for appellant. With her on the briefs were *Andrew P. Bridges*, *Matthew B. Becker*, *Mitchell L. Stoltz*, and *David Halperin*.

*Adina H. Rosenbaum* and *Allison M. Zieve* were on the brief for *amici curiae* Public Citizen, Inc., et al. in support of appellant.

*Charles Duan* was on the brief for *amici curiae* Sixty-Six Library Associations, et al. in support of appellant.

2

*Catherine R. Gellis* was on the brief for *amici curiae* Members of Congress in support of appellant.

*Samuel R. Bagenstos* was on the brief for *amici curiae* Intellectual Property Professors in support of appellant.

*Phillip R. Malone* and *Jeffrey T. Pearlman* were on the brief for *amicus curiae* Sina Bahram in support of appellant.

*Donald B. Verrilli, Jr.*, argued the cause for appellees. With him on the brief for appellees American Society for Testing and Materials, et al. were *Allyson N. Ho*, *Anne Voigts*, *Joseph R. Wetzel*, *J. Blake Cunningham*, *Kelly M. Klaus*, *Rose L. Ehler*, and *J. Kevin Fee*.

*John I. Stewart Jr.* and *Clifton S. Elgarten* were on the brief for appellees American Educational Research Association, Inc., et al. *Jeffrey S. Bucholtz* and *Michael F. Clayton* entered appearances.

*V. Robert Denham*, *Jr.*, was on the brief for *amicus curiae* American Insurance Association in support of appellees.

*Bonnie Y. Hochman Rothell* was on the brief for *amici curiae* American National Standards Institute, Inc., and Ten Standards Organizations in support of appellees.

*Anthony J. Dreyer* was on the brief for *amicus curiae* International Trademark Association in support of appellees.

*Jack R. Bierig* was on the brief for *amici curiae* American Medical Association, et al. in support of appellees.

Before: TATEL, WILKINS, and KATSAS, *Circuit Judges*.

3

Opinion for the Court filed by *Circuit Judge* TATEL.

Concurring opinion filed by *Circuit Judge* KATSAS.

TATEL, *Circuit Judge*: Across a diverse array of commercial and industrial endeavors, from paving roads to building the Internet of Things, private organizations have developed written standards to resolve technical problems, ensure compatibility across products, and promote public safety. These technical works, which authoring organizations copyright upon publication, are typically distributed as voluntary guidelines for self-regulation. Federal, state, and local governments, however, have incorporated by reference thousands of these standards into law. The question in this case is whether private organizations whose standards have been incorporated by reference can invoke copyright and trademark law to prevent the unauthorized copying and distribution of their works. Answering yes, the district court granted partial summary judgment in favor of the private organizations that brought this suit and issued injunctions prohibiting all unauthorized reproduction of their works. In doing so, the court held that, notwithstanding serious constitutional concerns, copyright persists in incorporated standards and that the Copyright Act's "fair use" defense does not permit wholesale copying in such situations. The court also concluded that the use of the private organizations' trademarks ran afoul of the Lanham Act and did not satisfy the judicial "nominative fair use" exception. Because the district court erred in its application of both fair use doctrines, we reverse and remand, leaving for another day the far thornier question of whether standards retain their copyright after they are incorporated by reference into law.

4

## I.

Ever operated a tank barge and wondered what power source you would need for your cargo tank's liquid overfill protection system to comply with the law? Probably not. But if you did, you might consider thumbing through the Code of Federal Regulations, where you would discover that one option is to hook up to an off-barge facility, provided that your system has "a 120-volt, 20-ampere explosion-proof plug that meets . . . NFPA 70, Articles 406.9 and 501-145." 46 C.F.R. § 39.2009(a)(1)(iii)(B). Dig deeper and you would learn that NFPA 70 is not some obscure rule or regulation or agency guidance document but is instead another name for the "National Electrical Code," a multi-chapter technical standard prepared by the National Fire Protection Association (the eponymous "NFPA"), detailing best practices for "electrical installations." Complaint ¶ 66, *American Society for Testing & Materials v. Public.Resource.Org, Inc. (ASTM)*, No. 1:13-cv-01215 (D.D.C. Aug. 6, 2013) ("ASTM Compl."), Dkt. No. 1, Joint Appendix (J.A.) 86. Parts of NFPA 70 have been incorporated into the statutes or regulations of at least forty-seven states and, as we have just seen, the federal government. American Insurance Ass'n Amicus Br. 5.

NFPA 70 is one of thousands of standards developed by so-called Standards Developing Organizations (SDOs), six of whom are plaintiffs-appellees here. The typical SDO operates through volunteer committees that focus on narrow technical issues. Comprised of industry representatives, academics, technical experts, and government employees, these committees meet regularly to debate best practices in their areas of expertise and to issue new technical standards or update existing ones. Once a committee decides on a standard, the SDO publishes the standard and secures a copyright registration.

5

Technical standards are as diverse as they are many, addressing everything from product specifications and installation methods to testing protocols and safety guidelines. Take, for instance, the more than 12,000 standards developed by the American Society for Testing and Materials (ASTM), a plaintiff-appellee here. Its standards establish best practices and specifications in a wide variety of fields, including consumer products, textiles, medical services, electronics, construction, aviation, and petroleum products. ASTM Compl. ¶ 48, J.A. 81. Three other plaintiffs-appellees, the American Educational Research Association, Inc., the American Psychological Association, Inc., and the National Council on Measurement in Education, Inc. (collectively, "AERA"), have collaborated to jointly produce a single volume, "Standards for Educational and Psychological Testing," a collection of standards that aims "to promote the sound and ethical use of tests and to provide a basis for evaluating the quality of testing practices." AERA, *Standards for Educational and Psychological Testing* 1 (1999), J.A. 2245.

Industry compliance with technical standards developed by private organizations is entirely voluntary. In some cases, however, federal, state, or local governments have incorporated technical standards into law. In fact, federal law encourages precisely this practice. *See* National Technology Transfer and Advancement Act of 1995, Pub. L. No. 104-113, § 12, 110 Stat. 775, 782 (1996) (codified as amended at 15 U.S.C. § 272(b)(3)) (authorizing the National Institute of Standards and Technology "to coordinate the use by Federal agencies of private sector standards, emphasizing where possible the use of standards developed by private, consensus organizations"). As the Office of Management and Budget has explained, incorporating private standards "eliminate[s] the cost to the Federal government of developing its own standards" and "further[s] the reliance upon private sector expertise to supply

6

the Federal government with cost-efficient goods and services." Office of Mgmt. & Budget, Exec. Office of the President, *OMB Circular A-119: Federal Participation in the Development and Use of Voluntary Consensus Standards and in Conformity Assessment Activities* 14 (2016), 2016 WL 7664625.

When agencies or legislatures incorporate private standards into law, they often do so by reference—that is, instead of spelling out the requirements of a standard within legislative or regulatory text, they reference the standard being incorporated and direct interested parties to consult that standard in order to understand their obligations. The process for incorporation by reference varies widely by jurisdiction. For example, consider the process employed by the federal government. If an agency wishes to incorporate a standard into a final rule, it must submit a formal request to the Director of the Federal Register. 1 C.F.R. § 51.5(b). In that request, the agency must, among other things, "[d]iscuss . . . the ways that the [incorporated] materials . . . are reasonably available to interested parties and how interested parties can obtain the materials," *id.* § 51.5(b)(2), and "[e]nsure that a copy of the incorporated material is on file at the Office of the Federal Register," *id.* § 51.5(b)(5). Once the Director approves the incorporation, provided that the "matter [is] reasonably available to the class of persons affected," it "is deemed published in the Federal Register," 5 U.S.C. § 552(a)(1), and, "like any other properly issued rule, has the force and effect of law," Nat'l Archives & Records Admin., *Code of Federal Regulations Incorporation by Reference*, J.A. 1879. Other jurisdictions have established similar procedures but impose additional requirements. For instance, the District of Columbia limits incorporation by reference to circumstances where "[t]he publication of the document would be impractical due to its unusual lengthiness," D.C. Code § 2-552(c)(1), and requires

7

that "[a] copy of the document incorporated by reference [be] available to the public at every public library branch in the District of Columbia," *id.* § 2-552(c)(3).

Just as the incorporation process varies, so too—and this is central to the issues before us—do the legal consequences of any given incorporation. This is hardly surprising, given that federal, state, and local legislatures and agencies have incorporated by reference thousands of technical standards. Indeed, by ASTM's own count, the Code of Federal Regulations alone has incorporated by reference over 1,200 of its standards. ASTM Compl. ¶ 57, J.A. 83. This appeal, which concerns ten standards incorporated by reference into law, reflects just a sliver of that diversity.

One way in which the incorporated standards vary is how readily they resemble ordinary, binding law. At one end of this spectrum lie incorporated standards that define one's legal obligations just as much as, say, a local building code—except that the specific legal requirements are found outside the two covers of the codebook. The NFPA 70 tank-barge plug specification discussed above, which the relevant regulation mentions by name in making compliance mandatory, is one such example. *See* 46 C.F.R. § 39.2009(a)(1)(iii)(B) (providing that the plug must "meet[] . . . NFPA 70"). Another is the incorporation of ASTM D975-07, the "Standard Specification for Diesel Fuel Oils," into the U.S. Code. It provides that a retailer of certain biofuels need not affix any special labels to its fuel so long as the fuel "meet[s] ASTM D975 diesel specifications." 42 U.S.C. § 17021(b)(1). These laws impose legally binding requirements indistinguishable from, for example, a cigarette-labeling obligation, *see* 15 U.S.C. § 1333(a), except that the federal law imposing that obligation expressly specifies, without reference to an external standard, exactly what qualifies as a cigarette, *see id.* § 1332(1).

8

At the other end of the spectrum lie standards that serve as mere references but have no direct legal effect on any private party's conduct. One example is the incorporation of ASTM D86-07, the "Standard Test Method for Distillation of Petroleum Products and Liquid Fuels at Atmospheric Pressure," which a federal regulation describes as a "[r]eference procedure" used by the Environmental Protection Agency and regulated motor-vehicle manufacturers to determine whether the boiling point for certain gasoline used for "exhaust and evaporative emission testing" falls within a permissible range. 40 C.F.R. § 86.113-04(a)(1). The regulation creates only one relevant legal obligation: the regulated entity, in testing vehicular emissions, must use gasoline that meets specifications expressly laid out within the regulation itself. The incorporation of an external standard merely tells the regulated entity how it can ensure that the gasoline it uses in fact satisfies the codified requirements.

Of course, between those two poles are countless other varieties of incorporation. Some standards are incorporated for the purpose of triggering agency obligations, *see, e.g.*, 42 U.S.C. § 6833(b)(2)(A) (providing that "[w]henever . . . [the American Society of Heating, Refrigerating, and Air Conditioning Engineers, Inc., (ASHRAE)] Standard 90.1-1989," which provides energy-efficiency guidelines for commercial buildings, "[is] revised, the Secretary [of Energy] shall . . . determine whether such revision will improve energy efficiency in commercial buildings"), or establishing regulatory floors, *see, e.g.*, *id.* § 6833(b)(2)(B)(i) ("If the Secretary makes an affirmative determination," each state shall have two years to "certify that it has reviewed and updated the provisions of its commercial building code regarding energy efficiency" such that its code "meet[s] or exceed[s] [the] revised standard."). Still others, like the "Standards for Educational and Psychological Testing" mentioned above,

9

establish criteria that determine one's eligibility to apply for federal educational grants. *See* 34 C.F.R. §§ 668.141(a), 668.146(b)(6) (providing that a student may be eligible for Higher Education Act fund grants if he or she passes a test that, among other things, "[m]eet[s] all standards for test construction provided in the 1999 edition of the Standards for Educational and Psychological Testing").

Put simply, the incorporated standards at issue here vary considerably in form, substance, and effect. Indeed, even this limited effort to categorize them is surely underinclusive given the dearth of record evidence about all the places where even the ten standards identified in this appeal may have been incorporated by reference into law at the federal, state, and local levels. These ten standards, in turn, represent but a fraction of the heterogeneity of the hundreds of other incorporated standards not at issue in this appeal.

Defendant-Appellant Public.Resource.Org, Inc. (PRO), is a non-profit organization whose self-proclaimed mission is "to make the law and other government materials more widely available." Malamud Decl. ¶ 4, *ASTM*, No. 1:13-cv-01215 (D.D.C. Dec. 21, 2015), Dkt. No. 121-5, J.A. 1070. In furtherance of that goal, PRO distributed on the internet technical standards that had been incorporated by reference into law. To do this, PRO purchased copies of incorporated standards, which the SDOs make available for between $25 and $200 per standard, scanned them into digital files, appended cover sheets explaining PRO's mission and the source of the standards, and then posted the documents to a public website. In some cases, PRO would modify a file so that the text of the standard could more easily be enlarged, searched, and read with text-to-speech software.

10

Between 2012 and 2014, PRO uploaded hundreds of technical standards, which, collectively, were downloaded tens of thousands of times. In mid-2013, several SDOs, including ASTM, discovered that their standards were freely available on PRO's website. After PRO refused to take their standards off the internet, ASTM, along with NFPA and ASHRAE (collectively, "ASTM"), sued PRO, asserting claims of copyright and trademark infringement, contributory copyright infringement, unfair competition, and false designation of origin as to nearly 300 technical standards. Around the same time, AERA discovered that the 1999 edition of the Standards for Educational and Psychological Testing was also available on PRO's website, and so it too filed suit against PRO for copyright infringement and contributory copyright infringement. *See* Complaint ¶ 1, *American Educational Research Ass'n, Inc. v. Public.Resource.Org, Inc.*, No. 1:14-cv-00857 (D.D.C. May 23, 2014) ("AERA Compl."), Dkt. No. 1, J.A. 2158.

Both sets of plaintiffs moved for summary judgment in their respective cases: AERA on both its claims as to the 1999 educational standard and ASTM on all of its claims but contributory copyright infringement as to nine standards (ASTM D86-07, ASTM D975-07, ASTM D396-98, ASTM D1217-93(98), the 2011 and 2014 versions of NFPA's National Electrical Code, and the 2004, 2007, and 2010 versions of ASHRAE's Standard 90.1). Although there are no obvious connections among these standards—chosen from the hundreds of standards ASTM identified in its complaint—ASTM explained that it selected "this subset of particularly important standards . . . to streamline the issues." Pls.' Mem. of Law in Supp. of Mot. for Summ. J. 2, *ASTM*, No. 1:13-cv-01215 (D.D.C. Nov. 19, 2015), Dkt. No. 118-1. PRO responded with cross-motions for summary judgment, as well as motions to strike two expert reports submitted by the SDOs.

11

The district court, after denying the motions to strike, issued a joint opinion resolving both cases. Granting summary judgment to the SDOs on their claims of direct copyright infringement, the district court found that they held valid and enforceable copyrights in the incorporated standards that PRO had copied and distributed and that PRO had failed to create a triable issue of fact that its reproduction qualified as "fair use," 17 U.S.C. § 107, under the Copyright Act. *American Society for Testing & Materials v. Public.Resource.org, Inc.* (*ASTM*), No. 1:13-cv-01215 (TSC), 2017 WL 473822, at *18 (D.D.C. Feb. 2, 2017). The court also concluded that ASTM was entitled to summary judgment on its trademark infringement claims because PRO had used copies of ASTM's marks in commerce in a manner "likely to cause confusion," 15 U.S.C. § 1114(1), and because PRO's reproduction of the marks did not qualify as a nominative fair use. Based on these liability findings, the court issued permanent injunctions prohibiting PRO from all unauthorized use of the ten standards identified in the summary judgment motions and of ASTM's registered trademarks.

PRO appeals the district court's injunctions, and the underlying partial summary judgment orders. Although "[a]n order granting partial summary judgment is usually considered a nonappealable interlocutory order," because this "order granted an injunction," we may consider the entire appeal "pursuant to 28 U.S.C. § 1292(a)(1)." *Gomez v. Turner*, 672 F.2d 134, 138 n.5 (D.C. Cir. 1982). "We review the district court's grant of summary judgment *de novo*, applying the same standards as the district court and drawing all inferences from the evidence in favor of the non-movant." *Estate of Coll-Monge v. Inner Peace Movement*, 524 F.3d 1341, 1346 (D.C. Cir. 2008) (internal quotation marks omitted). We consider the copyright issues in Part II and the trademark issues in Part III.

12

**II.**

Article I, Section 8, Clause 8, of the Constitution empowers Congress "To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. The very first Congress took up that charge in the Copyright Act of 1790, which granted authors of certain works "the sole right and liberty of printing, reprinting, publishing and vending" those works "for the term of fourteen years." Act of May 31, 1790, § 1, 1 Stat. 124.

In the ensuing two centuries, although the precise contours of the Act have changed, Congress's purpose has remained constant:

> The enactment of copyright legislation by Congress under the terms of the Constitution is not based upon any natural right that the author has in his writings . . . but upon the ground that the welfare of the public will be served and progress of science and useful arts will be promoted by securing to authors for limited periods the exclusive rights to their writings.

H.R. Rep. No. 60-2222, at 7 (1909); *see also Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984) (This "limited grant" is "intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired."). The challenge with each iteration of the Act, both for its drafters and its interpreters, has been to strike the "difficult balance between the interests of authors and inventors in the control and exploitation of their writings and

13

discoveries on the one hand, and society's competing interest in the free flow of ideas, information, and commerce on the other hand." *Sony Corp.*, 464 U.S. at 429.

Under the current Act, "[c]opyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a). This copyright, which "vests initially in the author or authors of the work," *id.* § 201(a), and generally endures for at least "70 years after the author's death," *id.* § 302(a), endows authors with "exclusive rights" to use or authorize the use of their work in six statutorily specified ways, including "reproduc[ing] the copyrighted work" and "distribut[ing] copies . . . of the copyrighted work to the public," *id.* § 106. "Anyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright," *id.* § 501(a), and may be subject to a number of equitable and legal remedies, *id.* §§ 502-505. Reflecting copyright's balance between private ownership and public welfare, the Act has long recognized that certain "fair use[s]" of a copyrighted work do not constitute infringement. *Id.* § 107. Not all uses of a copyrighted work are "within the exclusive domain of the copyright owner," the Supreme Court has explained, "some are in the public domain." *Sony Corp.*, 464 U.S. at 433.

By its plain terms, the Copyright Act says nothing about what, if anything, happens when a copyrighted work is incorporated by reference into federal, state, or local statutes or regulations. The SDOs take this statutory silence, along with the fact that Congress enacted the current version of the Act just years after it authorized federal agencies to incorporate works by reference into federal regulations, *see* Act of June 5, 1967, Pub. L. No. 90-23, 81 Stat. 54, 54 (codified at 5 U.S.C. § 552(a)(1)) (providing that material "is deemed published in the Federal Register when incorporated by reference"), as

14

proof positive that Congress intended to establish a comprehensive copyright regime that contemplates no effect on copyright when works are incorporated by reference into law. Accordingly, the SDOs contend that they have a straightforward claim of copyright infringement: they registered copyrights to ten ordinary works—the standards at issue in this appeal—and PRO invaded their exclusive rights when it reproduced and distributed copies of the works on a public website. Case closed.

Unsurprisingly, PRO sees it differently. As an initial matter, PRO argues that there is a triable question as to whether the standards at issue here were ever validly copyrighted given the Act's prohibition on copyrighting "work[s] of the United States Government," 17 U.S.C. § 105, and the fact that government employees may have participated in drafting certain standards. PRO, however, failed to adequately present this claim to the district court and has thus forfeited it. *See Keepseagle v. Perdue*, 856 F.3d 1039, 1053 (D.C. Cir. 2017) (explaining that "legal theories not asserted" in the district court "ordinarily will not be heard on appeal" (quoting *District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1084 (D.C. Cir. 1984))). In any event, given PRO submitted no evidence that specific language in any of the works was "prepared by an officer or employee of the United States Government as part of that person's official duties," 17 U.S.C. § 101 (defining "work of the United States Government"), the argument is meritless.

Aside from the government-work issue, PRO advances two primary challenges to the SDOs' copyright claim. First, in contrast to the SDOs' view that standards remain copyrighted even after incorporation, PRO contends that incorporation by reference makes these works a part of the "law," and the law can never be copyrighted. Allowing private ownership of the law, PRO insists, is inconsistent with the First Amendment

15

principle that citizens should be able to freely discuss the law and a due process notion that citizens must have free access to the law. PRO also maintains that the Copyright Act itself, when viewed through the lens of these constitutional concerns, also supports extinguishing copyright. Second, PRO argues that, even assuming the incorporated standards remain copyrighted, PRO's copying qualifies as a fair use because it facilitates public discussion about the law—a use within the "public domain."

PRO and the SDOs each seek a bright-line rule either prohibiting (the SDOs) or permitting (PRO) *all* of PRO's uses of *every* standard incorporated by reference into law. The district court, accepting this undifferentiated view of the incorporated standards, concluded that incorporation by reference had no effect on the works' copyright and that none of PRO's copying qualified as fair use.

Were we to conclude, contrary to the district court, that the SDOs do not prevail as a matter of law on either their reading of the scope of copyright or the fair use question, we would have to reverse the grant of summary judgment. Although PRO raises a serious constitutional concern with permitting private ownership of standards essential to understanding legal obligations, we think it best at this juncture to address only the statutory fair use issue—which may provide a full defense to some, if not all, of the SDO's infringement claims in this case—and leave for another day the question of whether the Constitution permits copyright to persist in works incorporated by reference into law. This approach not only allows us to resolve the appeal within the confines of the Copyright Act but is also more faithful to our responsibility to avoid "pass[ing] on questions of constitutionality . . . unless such adjudication is unavoidable." *Spector Motor Service v. McLaughlin*, 323 U.S. 101, 105 (1944). Avoiding the constitutional question is all the

16

more pressing here given that the record reveals so little about the nature of any given incorporation or what a constitutional ruling would mean for any particular standard. After all, it is one thing to declare that "the law" cannot be copyrighted but wholly another to determine whether any one of these incorporated standards—from the legally binding prerequisite to a labeling requirement, *see* 42 U.S.C. § 17021(b)(1), to the purely discretionary reference procedure, *see* 40 C.F.R. § 86.113-04(a)(1)—actually constitutes "the law."

Our narrower approach, focusing on fair use, has two additional virtues. First, it limits the economic consequences that might result from the SDOs losing copyright—which they repeatedly emphasize would jeopardize the continued development of high-quality standards, *see* ASTM Br. 6–8, 22, AERA Br. 6, 13—by allowing copying only where it serves a public end rather than permitting competitors to merely sell duplicates at a lower cost. Second, it avoids creating a number of *sui generis* caveats to copyright law for incorporated standards. For instance, we need not determine what happens when a regulation or statute is revised to incorporate newer versions of a particular standard. Do the older, now unincorporated versions regain the copyright they might have lost with the initial incorporation? Likewise, we need not resolve what happens when only part of a standard is incorporated by reference into law. Although copyright law speaks of "works," *see* 17 U.S.C. § 102 ("Copyright protection subsists . . . in original *works* . . . ." (emphasis added)), does a partial incorporation cause the entire work to lose copyright or just the relevant portions?

To be sure, it may later turn out that PRO and others use incorporated standards in a manner not encompassed by the fair use doctrine, thereby again raising the question of whether the authors of such works can maintain their copyright at all. In our

17

view, however, we ought exhaust all remaining statutory options and only return to that question, if we must, on a fuller record. *See Communist Party of U.S. v. Subversive Activities Control Board*, 351 U.S. 115, 122–25 (1956) (remanding case raising constitutional challenges to a federal statute for failure to consider certain "new evidence" because the "non-constitutional issue must be met at the outset" and "the case must be decided on a non-constitutional issue, if the record calls for it, without reaching constitutional problems," *id.* at 122); *see also Communist Party of U.S. v. Subversive Activities Control Board*, 367 U.S. 1, 70–72 (1961) (returning, after remand, to only those constitutional issues "properly before" the Court, *id.* at 72).

We turn, then, to the fair use defense, which provides that "the fair use of a copyrighted work, including such use by reproduction in copies . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107. When considering whether a particular use is fair, courts must consider the following factors:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

> (2) the nature of the copyrighted work;

> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

> (4) the effect of the use upon the potential market for or value of the copyrighted work.

18

*Id.* "The factors enumerated in the section are not meant to be exclusive: '[S]ince the doctrine is an equitable rule of reason, no generally applicable definition is possible, and each case raising the question must be decided on its own facts.'" *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 560 (1985) (alteration in original) (quoting H.R. Rep. No. 94-1476, at 65 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 5659, 5678). The end of this quotation bears repeating: each case raising a fair use defense must be decided on its own facts.

In the district court, PRO argued that its distribution of the incorporated standards was in pursuit of the Act's enumerated fair use purposes—to facilitate criticism and comment—and explained why the statutory fair use factors supported the conclusion that its reproduction was fair use, especially because the reproduced works were incorporated by reference into the law. The district court rejected PRO's claimed purpose. Instead, it flatly concluded that PRO's "distribution of identical copies of copyrighted works [was] for the direct purpose of undermining [the SDOs'] ability to raise revenue" and that "*nothing* in the Copyright Act or court precedent" suggests that such use of copyrighted works "can *ever* be a fair use." *ASTM*, 2017 WL 473822, at *18 (emphasis added). Reviewing *de novo*, however, we see nothing in the record that supports the district court's blanket conclusion that PRO distributed copies of the incorporated standards solely to "undermin[e] [the SDOs'] ability to raise revenue." *Id.* Rather, by all accounts, PRO distributed these standards for the purpose of educating the public about the specifics of governing law. *See* PRO Br. 43 (explaining that "[t]here is no better way to teach the law to the public than to *provide the public with the law*"); ASTM Br. 34 ("PRO's purpose is to enable members of the public to obtain copies of [the standards]."). More fundamentally, the district court failed to account for the variation among the standards at issue and afford due consideration to the particular

19

legal status of each incorporated work. That is, it failed to consider each fair use claim "on its own facts." *Harper & Row*, 471 U.S. at 560 (internal quotations and citations omitted).

In this section, we review each of the fair use factors, and, as we shall explain, though there is reason to believe "as a matter of law" that PRO's reproduction of certain standards "qualif[ies] as a fair use of the copyrighted work," *id.* (internal quotations and citations omitted), we ultimately think the better course is to remand the case for the district court to further develop the factual record and weigh the factors as applied to PRO's use of each standard in the first instance. As we have emphasized, the standards here and the modes of their incorporation vary too widely to conclusively tell goose apart from gander, and the record is just too thin to tell what went into the sauce. On remand, the district court will need to develop a fuller record regarding the nature of each of the standards at issue, the way in which they are incorporated, and the manner and extent to which they were copied by PRO in order to resolve this "mixed question of law and fact." *Id.* This is not to say that the district court must analyze each standard individually. Instead, it might consider directing the parties, who poorly served the court by treating the standards interchangeably, to file briefs addressing whether the standards are susceptible to groupings that are relevant to the fair use analysis.

The first factor asks courts to consider "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). Mindful of the statute's stated goal to protect such "purposes such as criticism [and] comment," *id.* § 107, the Supreme Court has explained that the fact that an infringing "publication was commercial as opposed to nonprofit . . . tends to weigh against a finding of fair use,"

20

*Harper & Row*, 471 U.S. at 562. The district court found that even though PRO "did not earn revenue directly from the display of the standards, its activity still bears 'commercial' elements given that it actively engaged in distributing identical standards online in the same consumer market." *ASTM*, 2017 WL 473822, at *16. This, in our view, takes too broad a view of when a use is commercial rather than nonprofit. To be sure, one consideration of the fair use inquiry is whether the copy "may serve as a market substitute for the original," *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 587 (1994) (discussing the fourth fair use factor, *i.e.* market effect), but "[t]he crux of the profit/nonprofit distinction is . . . whether the user stands to profit from exploitation of the copyrighted material without paying the customary price," *Harper & Row*, 471 U.S. at 562. Although PRO's copies of the technical standards may, in some cases, serve as a substitute for the SDOs' versions, little, if anything, in the record indicates that PRO stands to profit from its reproduction. Moreover, the district court discounted PRO's claimed purpose, reflected in the organization's mission statement and summary-judgment submissions to the court, that it was distributing the standards to facilitate public debate. On appeal, the SDOs suggest in passing that distributing the standards is part of PRO's fundraising appeal, but that hardly rises to the level of making this a "commercial" use. Thus, at least as a general matter, PRO's attempt to freely distribute standards incorporated by reference into law qualified as a use that furthered the purposes of the fair use defense.

Of course, "the mere fact that a use is educational and not for profit does not insulate it from a finding of infringement, any more than the commercial character of a use bars a finding of fairness." *Campbell*, 510 U.S. at 584. Thus, another facet of the "purpose and character" factor that courts consider is whether the use "adds something new, with a further purpose," or, put differently, "whether and to what extent the new work

21

is 'transformative.'" *Id.* at 578–79 (quoting Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990)). Although "transformative use is not absolutely necessary for a finding of fair use, the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works." *Id.* at 579 (citations and footnotes omitted). On this point, the district court properly rejected some of PRO's arguments as to its transformative use—for instance, that PRO was converting the works into a format more accessible for the visually impaired or that it was producing a centralized database of all incorporated standards. *See ASTM*, 2017 WL 473822, at *16; *see also American Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 923–24 (2d Cir. 1994) (holding that photocopying articles "into a form more easily used in a laboratory" does not constitute transformative use but acknowledging "the benefit of a more usable format").

The district court, however, failed to adequately consider whether, in certain circumstances, distributing copies of the law for purposes of facilitating public access could constitute transformative use. Indeed, in various circumstances, courts have recognized that a secondary work "can be transformative in function or purpose without altering or actually adding to the original work." *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639 (4th Cir. 2009). For instance, "[i]n the context of news reporting and analogous activities . . . the need to convey information to the public accurately may in some instances make it desirable and consonant with copyright law for a defendant to faithfully reproduce an original work without alteration." *Swatch Group Management Services Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 84 (2d Cir. 2014); *see also, e.g.*, *iParadigms*, 562 F.3d at 639 (producing a digital copy of a student's thesis for the purpose of assessing plagiarism).

22

PRO makes precisely this argument: "[p]araphrases, summaries, and descriptions," it explains, "do not capture the precision that is necessary to understand the legal obligations that governments impose and enforce." PRO Br. 43. This may well be the case. Where an incorporated standard provides information essential to comprehending one's legal duties, for example, this factor would weigh heavily in favor of permitting a nonprofit seeking to inform the public about the law to reproduce in full the relevant portions of that particular standard. Of the incorporated standards at issue here, federal statute's incorporation of ASTM D975's diesel specifications to dictate whether a retailer needs to provide additional fuel labels, *see* 42 U.S.C. § 17021(b)(1), likely supports PRO's copying. By contrast, the incorporation of ASTM D86-07 as a reference procedure for determining whether gasoline without ethanol has an "[e]vaporated initial boiling point" of "75-95[°F]," *see* 40 C.F.R. § 86.113-04(a)(1), likely does not.

Homing in on this inquiry may also illuminate which particular version of a standard may fairly be reproduced. Recall that a qualifying power source for tank barges must meet "[National Electrical Code], Articles 406.9 and 501-145." 46 C.F.R. § 39.2009(a)(1)(iii)(B). This incorporation might justify reproducing that portion of the 2011 National Electrical Code, the one incorporated in the power source regulation, *see id.* § 39.1005(h)(1), but not the 2014 edition, also at issue in this appeal but not so incorporated.

By contrast, where knowing the content of an incorporated standard might help inform one's understanding of the law but is not essential to complying with any legal duty, the nature of PRO's use might be less transformative and its wholesale copying, in turn, less justified. For instance, ASHRAE Standard 90.1 provides important context for assessing provisions of state commercial building codes regarding

23

energy efficiency. *See* 42 U.S.C. § 6833(b). At the same time, unless a particular provision of Standard 90.1 has been incorporated into state building codes, PRO's claim that a paraphrase or summary would always be inadequate to serve its purposes seems less persuasive. Of course, PRO might argue that Standard 90.1 provides key information for debating the virtues of requiring states to meet the energy efficiency floor set by that standard but even that justification would apply only to a version of Standard 90.1 that actually sets such a floor, and it raises the question of whether PRO can fairly copy the 2004, 2007, and 2010 editions, all of which are at issue here.

Even our brief consideration of just a few of the standards at issue in this appeal reveals that it will not always be easy to test whether the purpose and character of each of PRO's uses weigh in favor of finding fair use but, as the Supreme Court has remarked, "[t]he task is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis." *Campbell*, 510 U.S. at 577. Faithfully reproducing the relevant text of a technical standard incorporated by reference for purposes of informing the public about the law obviously has great value, but whether PRO's specific use serves that value must be assessed standard by standard and use by use.

The second fair use factor, "the nature of the copyrighted work," 17 U.S.C. § 107(2), also demands an individual appraisal of each standard and its incorporation. "This factor," the Supreme Court has explained, "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586. Courts often reduce this inquiry to the question of whether the work is factual or fictional, as "[t]he law generally recognizes a greater need to disseminate factual

24

works than works of fiction or fantasy." *Harper & Row*, 471 U.S. at 563.

All of the works at issue here fall at the factual end of the fact-fiction spectrum, which counsels in favor of finding fair use. But, of course, the factual or fictional nature of a work is just one heuristic for assessing whether the work "falls within the core of . . . copyright's protective purposes." *Campbell*, 510 U.S. at 586. Focusing on that deeper question, the district court concluded that because technical standards "are vital to the advancement of scientific progress in the U.S.," they are "exactly the type of expressive work that warrants full protection under . . . the Copyright Act." *ASTM*, 2017 WL 473822, at \*17. Were these ordinary technical standards used for no public purpose, the district court might well be correct. But the standards at issue here have all, in some capacity, been incorporated by reference into law, and, as the cases PRO relies on for its constitutional argument make clear, the express text of the law falls plainly outside the realm of copyright protection. *See, e.g.*, *Banks v. Manchester*, 128 U.S. 244, 253 (1888) (holding that the state court judges may not copyright their judicial opinions because the "exposition and interpretation of the law, which, binding every citizen, is free for publication to all"); *Howell v. Miller*, 91 F. 129, 137 (6th Cir. 1898) (Harlan, J.) ("[A]ny person desiring to publish the statutes of a state may use any copy of such statutes to be found in any printed book, whether such book be the property of the state or the property of an individual."). Given this, we think that standards incorporated by reference into law are, at best, at the outer edge of "copyright's protective purposes." *Campbell*, 510 U.S. at 586. Of course, just how close to the edge will, again, vary standard by standard. Where the consequence of the incorporation by reference is virtually indistinguishable from a situation in which the standard had been expressly copied into law, this factor weighs heavily in favor of fair use. But where

25

the incorporation does not lend to such easy substitution, fair use is harder to justify.

The third fair use factor asks about "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). The Supreme Court has explained that "the extent of permissible copying varies with the purpose and character of the use" and characterized the relevant inquiry as whether "'the amount and substantiality of the portion used['] . . . are reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586–87 (quoting 17 U.S.C. § 107(3)). As this language makes clear, this inquiry is ill-suited to wholesale resolution. Rather, PRO's copying must be considered standard by standard in light of its purpose of informing the public about the specific incorporation at issue. If PRO limits its copying to only what is required to fairly describe the standard's legal import, this factor would weigh strongly in favor of finding fair use here, especially given that precision is ten-tenths of the law.

To see why this is so, consider once more the power source specification referred to in 46 C.F.R. § 39.2009(a). It requires compliance with "Article 406.9 and 501-145" of the 2011 National Electrical Code. *Id.* § 39.2009(a)(1)(iii)(B). This incorporation would likely justify posting the specific text of only *those* two provisions of *that* version of the National Electrical Code but not, as might have been the case here, multiple versions of the entire code. By contrast, the labeling requirement for biodiesel refers more generally to biodiesel "that meets ASTM D975 diesel specifications," *see* 42 U.S.C. § 17021(b)(1), suggesting, in that case, that a greater amount of the standard's text might be fairly reproduced. And where the incorporation merely makes reference to an external standard, but that standard does not govern any conduct, perhaps the copier's purpose could be achieved with only a

26

paraphrase or a summary. The district court engaged in no such analysis, and we lack a sufficient record to do so in the first instance.

The fourth fair use factor—"the effect of the use upon the potential market for or value of the copyrighted work," 17 U.S.C. § 107(4)—"requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original." *Campbell*, 510 U.S. at 590 (alteration in original) (quoting 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.05[A][4], at 13–102.61 (1993) (footnotes omitted)). In evaluating this factor, the court "must take account not only of harm to the original but also of harm to the market for derivative works." *Harper & Row*, 471 U.S. at 568.

Letting this factor carry the day, the district court inferred that "[w]hen [PRO] engages in 'mere duplication for commercial purposes,' as here, a harm to the potential market for the copyrighted works may be inferred," and concluded that PRO's commercial use precluded its fair use defense. *ASTM*, 2017 WL 473822, at *18 (quoting *Campbell*, 510 U.S. at 591). For the reasons stated above, however, PRO's use was not for "commercial purposes," and so the district court's inference cannot be sustained on the basis of undisputed evidence in the summary judgment record. That said, the SDOs are right to suggest that there may be some adverse impact on the market for the copyrighted works PRO reproduced on its website. But it remains unclear from this record just how serious that impact is.

27

In our view, when developing a fuller record on this issue on remand, the district court should consider at least three questions. First, the SDOs, by their own admission, make copies of their standards freely available online in controlled reading rooms. *See* ASTM Br. 9. Because the SDOs presumably do so without entirely cannibalizing sales of their standards, just how much additional harm does PRO's reproduction cause to the market for these standards? Second, it appears that PRO generally reproduces entire standards. As we have explained, such wholesale copying may be unjustified if a law incorporates by reference only a few select provisions of a much longer standard. In such circumstances, if PRO were to reproduce only the incorporated provisions, would there still be a vibrant market for the standards in their entirety? And third, it is entirely unclear what consequences PRO's reproduction has on the market for derivative works. It appears that the SDOs routinely update these standards and that, in many cases, the edition PRO posts to the internet—and, indeed, the one incorporated into the law—is long outdated. Is PRO's posting of outdated standards harming the market for updated, unincorporated editions of the standards? If, as the SDOs assert, the primary purpose in developing technical standards is "to have them used by private industry and other non-governmental users to address technical issues or problems," ASTM Br. 4, there is at least some reason to think that the market demand for the most up-to-date standards would be resilient. Along these lines, can the SDOs continue to make money on derivative goods such that they have an adequate incentive to continue producing these standards? As one amici notes, even after a sister circuit ruled that an organization that drafted a model building code adopted into law lost its copyright, *see Veeck v. Southern Building Code Congress International, Inc.*, 293 F.3d 791 (5th Cir. 2002), its successor organization remains profitable both through sales of codes and of "program services, including consulting, certification, and

28

training." 66 Libraries Amicus Br. 22 (citing Int'l Code Council, *Annual Report* 52 (2015)). In remanding these questions, we decline PRO's passing request to reverse the district court's admission of expert testimony on economic harm, as we see no abuse of discretion in the district court's careful consideration of the relevant factors. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (directing courts of appeals to apply an abuse-of-discretion standard when reviewing admission of expert testimony).

Considering the four fair use factors together, then, we find that the novel and complex issues raised by this case resolve in a manner entirely ordinary for our court: reviewing the record afresh, as our standard of review requires, we conclude—unlike the district court—that, as to the fair use defense, genuine issues of material fact preclude summary judgment for either party. To be sure, as we have explained, a proper accounting of the variation among these incorporated standards and of the fact that several are essential to understanding one's legal obligations suggests that, in many cases, it may be fair use for PRO to reproduce part or all of a technical standard in order to inform the public about the law. In the end, however, whether PRO's use as to each standard at issue in this appeal qualifies as a fair use remains for the district court to determine. *Rodriguez v. Penrod*, 857 F.3d 902, 906 (D.C. Cir. 2017) ("[F]ederal courts of appeals generally are courts of review, not first view.").

## III.

The Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, "provide[s] national protection for trademarks used in interstate and foreign commerce," *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 193 (1985). Under the Act, the seller or producer of a good has the exclusive right to "register" a trademark, 15 U.S.C. § 1052, and to prevent competitors from using the mark,

29

*see id.* § 1114. The basic premise of trademark law, the Supreme Court has explained, is that, "by preventing others from copying a source-identifying mark," a trademark "'reduce[s] the customer's costs of shopping and making purchasing decisions,' for it quickly and easily assures a potential customer that *this* item—the item with this mark—is made by the same producer as other similarly marked items that he or she liked (or disliked) in the past." *Qualitex Co. v. Jacobson Products Co*., 514 U.S. 159, 163–64 (1995) (alteration in original) (quoting 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 2.01[2] (3d ed. 1994) (McCarthy)). "At the same time, the law helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product." *Id.* at 164. Put simply, trademarks "'encourage[] the production of quality products,' and simultaneously discourage[] those who hope to sell inferior products by capitalizing on a consumer's inability quickly to evaluate the quality of an item offered for sale." *Id.* (quoting McCarthy § 2.01[2]).

The SDOs who brought the ASTM litigation have registered numerous trademarks, including the "ASTM word mark," "the ASTM INTERNATIONAL word mark," and two stylized ASTM logos, which they place on the cover pages of their technical standards. ASTM Compl. ¶ 61, J.A. 84–85. Take, for example, ASTM D86-07, referenced in 40 C.F.R § 80.47(h)(1). The first page of that standard, part of which we reproduce below, introduces the name of the work by depicting the "ASTM International" logo and placing it next to the text "Designation D 86-07." ASTM International, *Designation: D 86–07 Standard Test Method for Distillation of Petroleum Products at Atmospheric Pressure* 1 (2007), J.A. 278.



**Standard Test Method for**
**Distillation of Petroleum Products at Atmospheric Pressure¹**

Each subsequent page of the work includes a header that again displays the ASTM logo and places it next to the text "D86-07." *See id.* at 2–28, J.A. 279–305. This is typical of the technical standards at issue in this appeal.

ASTM plaintiffs contend that PRO infringed on their registered marks when it distributed its copies of the technical standards because it also reproduced the ASTM marks in connection with the distribution of those goods. ASTM Compl. ¶¶ 123–24, J.A. 102. ASTM objects to this use of its mark not simply because PRO copied the marks when it copied the works as a whole, but because PRO affixed the marks to versions of the standards that it had modified and, in the process, introduced errors into. *Id.* ¶ 130, J.A. 103. Acknowledging that PRO included disclaimers with its version of the standards, ASTM reiterates the district court's finding that they "'can hardly be called disclaimers at all,'" ASTM Br. 58 (quoting *ASTM*, 2017 WL 473822, at *23), because they "do not mention [PRO's] creation of the reproductions, [the SDOs'] lack of association or authorization, or that they are even reproductions or transcriptions," *ASTM*, 2017 WL 473822, at *23. Given this, ASTM contends, consumers are likely to confuse PRO's modified version for authentic copies of ASTM's works, even though PRO "did not undertake the same quality control procedures," ASTM Compl. ¶ 130, J.A. 103, which, in turn, will harm ASTM's brand identity and goodwill, *id.* ¶¶ 133–34, J.A. 104.

As a threshold matter, PRO contends that ASTM's trademark claims, which it calls an "attempt to use trademark law to circumvent the limitations of the Copyright Act," PRO

31

Br. 52, are precluded by the Supreme Court's decision in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003). In *Dastar*, the Supreme Court considered Twentieth Century Fox Film's claim that Dastar violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125 (prohibiting "false designation of origin"), when it copied large portions of a television series about General Eisenhower's campaign in Europe, which had fallen into the public domain, in Dastar's own television program about a similar subject. *See Dastar*, 539 U.S. at 31. Rejecting this claim, the Court declined to read the Lanham Act "as creating a cause of action for, in effect, plagiarism—the use of otherwise unprotected works and inventions without attribution." *Id.* at 36. To permit such claims, the Court warned, "would create a species of mutant copyright law that limits the public's federal right to copy and to use expired copyrights." *Id.* at 34 (internal quotations and citations omitted).

Were PRO accused of reproducing identical copies of ASTM's standards, and assuming that ASTM lacked an enforceable copyright to those standards, ASTM's trademark claim might well have been precluded under *Dastar*. Here, however, PRO is not accused of faithfully copying ASTM's work without attribution but instead of "creat[ing] reproductions through scanning and re-typing, with resultant errors and differences," *ASTM*, 2017 WL 473822, at *21, to which it affixes ASTM's marks. Consumers who download copies of the standards from PRO's website may not only be misled into thinking that ASTM produced the digital files but also may attribute any errors to ASTM. This risks precisely the sort of confusion as to "the producer of the tangible product sold in the marketplace" that the Supreme Court in *Dastar* deemed a cognizable injury under the Lanham Act. *Dastar*, 539 U.S. at 31. It is perhaps unsurprising, then, that the post-*Dastar* cases where courts have found trademark claims foreclosed

32

involved instances of virtually identical copies. *See, e.g.*, *Phoenix Entertainment Partners, LLC v. Rumsey*, 829 F.3d 817, 831 (7th Cir. 2016) (noting that the trademark owner's claim failed because, among other things, they "[did] not affirmatively allege that the defendants' copies are noticeably inferior to their patrons"); *see also Slep-Tone Entertainment Corp. v. Wired for Sound Karaoke & DJ Services, LLC*, 845 F.3d 1246, 1250 (9th Cir. 2017) (per curiam) (finding no "alleg[ation of] consumer confusion over the origin of a good properly cognizable in a claim of trademark infringement").

Given that ASTM alleges that PRO is distributing meaningfully inferior versions of the technical standards under ASTM's trademark and given trademark law's concern for "discourag[ing] those who hope to sell inferior products by capitalizing on a consumer's inability quickly to evaluate the quality of an item offered for sale," *Qualitex*, 514 U.S. at 164, *Dastar* does not bar ASTM's trademark claims.

This leaves, then, the merits of the trademark claim. To establish a trademark infringement claim under the Lanham Act, ASTM must show that PRO used in commerce, without ASTM's consent, a "reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion." 15 U.S.C. § 1114(1)(a). This inquiry boils down to two questions: (1) does ASTM own "a valid mark entitled to protection" and (2) is PRO's "use of it . . . likely to cause confusion." *Gruner + Jahr USA Publishing v. Meredith Corp*., 991 F.2d 1072, 1075 (2d Cir. 1993).

PRO never challenges the validity of ASTM's marks, so this case involves only the second question. Although our court has yet to opine on the precise factors courts should consider

33

when assessing likelihood of confusion, our sister circuits have adopted similar multi-factor tests, all of which "owe their origin to the 1938 Restatement of Torts." 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 24:30 (5th ed. 2018); *see id.* (noting that "[t]he [v]arious [c]ircuit [m]ulti-[f]actor [t]ests are [n]ot [f]undamentally [d]ifferent"). Factors considered include the strength of the mark, the similarity of the marks, the proximity of the goods, the similarity of the parties' marketing channels, evidence of actual confusion, the defendant's intent in adopting the mark, the quality of the defendant's product, and the sophistication of the buyers. *See id.* §§ 24:31–24:43 (cataloging the factors used by each circuit and citing, *inter alia*, *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979); *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir. 1961)).

Just as some uses of a copyrighted work do not violate the Copyright Act, certain uses of a trademark do not run afoul of the Lanham Act. One such use, known as the "nominative" fair use of a mark, occurs when "the defendant uses the plaintiff's trademark to identify the plaintiff's own goods and 'makes it clear to consumers that the plaintiff, not the defendant, is the source of the trademarked product or service.'" *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 154 (4th Cir. 2012) (internal citations omitted) (quoting *Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 220 (3d Cir. 2005)). A prototypical example of nominative fair use would be where "an automobile repair shop specializing in foreign vehicles runs an advertisement using the trademarked names of various makes and models to highlight the kind of cars it repairs." *Id.* (citing *New Kids on the Block v. News America Publishing, Inc.*, 971 F.2d 302, 306–07 (9th Cir. 1992)). Permitting such use accommodates situations where it would be "virtually impossible to refer to a particular product for purposes of

34

comparison, criticism, point of reference or any other such purpose without using the mark." *New Kids*, 971 F.3d at 306. In order for a use to qualify as nominative fair use, courts require that "[1] the product or service in question must be one not readily identifiable without use of the trademark; [2] only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and [3] the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder." *Id.* at 308 (footnote omitted).

PRO contests neither the enforceability of ASTM's trademarks nor the district court's analysis of the ordinary likelihood of confusion factors. Rather, it argues only that its use of ASTM's trademarks qualified as a nominative use that should be allowed under the Lanham Act. The district court rejected this claim, finding instead that because it had "already determined that consumer confusion as to the source of the trademarked standards is likely, the nominative fair use defense is inapplicable and the court need not assess each of the [] factors." *ASTM*, 2017 WL 473822, at *23. The district court's failure to consider the three nominative fair use factors, as we shall explain, was error.

Courts of appeals have disagreed about how exactly to evaluate nominative fair use claims. The Third Circuit, for instance, treats nominative fair use as an affirmative defense to infringement. *See* C*entury 21*, 425 F.3d at 222. The Second and Ninth Circuits, by contrast, treat nominative fair use as a means for evaluating, for purposes of determining trademark infringement, whether there is any likelihood of confusion at all. *See International Information Systems Security Certification Consortium, Inc. v. Security University, LLC*, 823 F.3d 153, 167 (2d Cir. 2016) (*IISSC*); *New Kids*, 971 F.2d at 308. And, even the courts of appeals that agree about when to

test nominative fair use disagree about how precisely to apply the factors. On the one hand, the Ninth Circuit has held that the three nominative fair use factors supplant the ordinary multi-factor likelihood of confusion test. *New Kids*, 971 F.3d at 308. On the other, the Second Circuit, although "recogniz[ing] that many of the [likelihood of confusion] factors are a bad fit" for nominative fair use cases, has held that the three factors should be considered in addition to the ordinary likelihood of confusion factors. *IISSC*, 823 F.3d at 168.

The parties have not briefed, and we need not resolve today, which approach our court should adopt. What we can say is that under no formulation can a court ignore the nominative fair use factors altogether. Where, as here, there is a claim of nominative fair use, the likelihood of confusion analysis remains incomplete without at least some discussion of these factors. Indeed, the particulars of this case show just how consideration of these factors can provide valuable insight both into whether trademark infringement has occurred and, if so, how broad a remedy is needed to address the injury.

Consider the first factor, whether the work is readily identifiable without use of the mark. Assuming that PRO may reproduce some of the technical standards under copyright's fair use doctrine for the purpose of informing the public about the law, it is hard to see how PRO could fulfill that goal without identifying the standard by its name—the very name also used in the incorporating law.

Likewise, as to the second factor—whether only so much of the mark is used as is reasonably necessary to identify the product—it may well be that PRO overstepped when it reproduced both ASTM's logo and its word marks but, as it told the district court, it is not wedded to using the logo. *See* Transcript of 9/12/16 Motions Hearing at 116, *ASTM*, No.

36

13-cv-1215 (TSC) (D.D.C. Oct. 13, 2016), Dkt. No. 173, J.A. 3374 ("Public.Resource would take direction from this Court. Logos: yes or no? [PRO] doesn't care."). Thus, accounting for this factor may suggest ways of crafting a narrower remedy that better balances the parties' competing interests here.

Finally, as to the third factor—whether the user has suggested sponsorship or endorsement by the trademark holder—the disclaimers PRO appends to many of its copies of the standards may well fail to adequately eliminate the possibility a consumer would assume sponsorship or endorsement by ASTM, but that hardly means that no disclaimer could cure that risk. Indeed, at oral argument, PRO suggested that it would be "more than happy to modify the disclaimers." Oral Arg. 24:06–19. And although the disclaimers initially used by PRO were quite barebones, the record contains examples of more fulsome disclaimers it later appended to at least some standards. *See, e.g.*, Declaration of Thomas O'Brien, Jr. and Exhibits ex. 18, *ASTM*, No. 13-cv-1215 (TSC) (D.D.C. Nov. 19, 2015), Dkt. No. 118-7, J.A. 345 (disclaiming, among other things, that PRO "has transformed this specification into [HTML]," that "[a]ny errors in the transformation of th[e] specification should be reported to [PRO]," and that PRO "is not affiliated in any way with any of the organizations named herein").

As with the copyright fair use issue, it remains for the district court to consider in the first instance whether PRO's use of ASTM's marks constitutes trademark infringement in light of the nominative fair use factors. And even if the district court ultimately concludes that the record supports an infringement finding, it should consider whether its previous grant of an injunction barring all unauthorized use is still warranted or whether it "may order defendants to modify their use of the mark so that all three factors are satisfied" and a

37

narrower remedy would suffice. *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1176 (9th Cir. 2010).

## IV.

For the foregoing reasons, we vacate the permanent injunctions, reverse the district court's partial grant of summary judgment against PRO, and remand for further proceedings consistent with this opinion.

*So ordered.*

KATSAS, *Circuit Judge*, concurring: The plaintiffs here claim a copyright over binding legal texts, which would enable them to prevent anyone from gaining access to that law or copying it for the public. *See* 17 U.S.C. § 106. Moreover, saying what that law is, without plaintiffs' permission, would expose an individual to injunctive relief, impoundment, damages, attorneys' fees, and potentially even criminal liability. *See id.* §§ 502–506. As a matter of common-sense, this cannot be right: access to the law cannot be conditioned on the consent of a private party, just as it cannot be conditioned on the ability to read fine print posted on high walls. *See* Suetonius, *Gaius Caligula* ¶ XLI, *in* The Lives of the Caesars (J.C. Rolfe trans., Macmillan Co. 1914) ("he … had the law posted up, but in a very narrow place and in excessively small letters, to prevent the making of a copy").

Not surprisingly, precedent confirms this instinct. In *Banks v. Manchester*, 128 U.S. 244 (1888), the Supreme Court held that judges cannot copyright their opinions, in part because their work "constitutes the authentic expression and interpretation of the law, which, binding every citizen, is free for publication to all." *Id.* at 253. Moreover, two courts of appeals have confirmed that *Banks* remains good law under the modern Copyright Act of 1976. In *Building Officials & Code Administrators v. Code Technology, Inc.*, 628 F.3d 730 (1st Cir. 1980), the First Circuit vacated a preliminary injunction that would have enforced the copyright of a model building code as enacted into Massachusetts law. While not definitively deciding the question, the court reasoned that enforcement of the copyright could not be "squared with the right of the public to know the law to which it is subject." *Id.* at 735. Similarly, in *Veeck v. Southern Building Code Congress International*, 293 F.3d 791 (5th Cir. 2002) (en banc), the Fifth Circuit held that "as *law*," model rules adopted by a legislative body "enter the public domain and are not subject to the copyright holder's exclusive prerogatives." *Id.* at 793.

2

Today, the *Banks* rule might rest on at least four possible grounds: the First Amendment; the Due Process Clause of the Fifth Amendment; Section 102(b) of the Copyright Act, which denies copyright protection to "any idea, procedure, process, system, method of operation, concept, principle, or discovery," 17 U.S.C. § 102(b); or Section 107 of the Act, which sets forth the fair-use doctrine, *id.* § 107.  The Court today reasonably avoids what it correctly regards as "a serious constitutional concern" under the First and Fifth Amendments.  *Ante*, at 15–16.  And it expressly reserves, in substance though not by name, the question whether Section 102(b) extends protection to private standards as enacted into law.  *Ante*, at 14–15.

The Court's fair-use analysis faithfully recites the governing four-factor balancing test, yet, in conducting the balancing, it puts a heavy thumb on the scale in favor of an unrestrained ability to say what the law is.  Thus, when an incorporated standard sets forth binding legal obligations, and when the defendant does no more and no less than disseminate an exact copy of it, three of the four relevant factors—purpose and character of the use, nature of the copyrighted work, and amount and substantiality of the copying—are said to weigh "heavily" or "strongly" in favor of fair use.  *Ante*, at 22, 25.  This analysis closely parallels *Banks*, which the Court explicitly invokes in its discussion of factor two.  *Ante*, at 24.  The Court acknowledges the thinness of the record in this case, and it appropriately flags potentially complicating questions about how particular standards may be incorporated into law, and whether such standards, as so incorporated, actually constitute "the law."  *Ante*, at 15–16.  But, where a particular standard *is* incorporated as a binding legal obligation, and where the defendant has done nothing more than disseminate it, the Court leaves little doubt that the dissemination amounts to fair use.

3

  With that understanding, and recognizing that the Section 102(b) and constitutional issues remain open in the unlikely event that disseminating "the law" might be held not to be fair use, I join the Court's opinion.